RONALD O. KAYE (No. 145051)
KAYE, McLANE & BEDNARSKI, LLP
234 E. Colorado Blvd. Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
rok@kmbllp.com

Attorneys for Defendant
CURTIS DAVID FAHLBERG

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CURTIS DAVID FAHLBERG,<br><br>Defendant. | ) | CASE NO. 09-00683-MMM<br><br>NOTICE OF MOTION; MOTION TO SUPPRESS EVIDENCE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS; EXHIBITS<br><br>Hearing Date: June 28, 2010<br>Hearing Time: 1:15 p.m.<br>Court: Hon. Margaret M. Morrow |

TO: UNITED STATES ATTORNEY ANDRE BIROTTE, AND ASSISTANT UNITED STATES ATTORNEY ROBERT DUGDALE:

PLEASE TAKE NOTICE that on June 28, 2010 at 1:15 a..m, before the Honorable United States District Margaret M. Morrow, defendant, Curtis David Fahlberg, by and through his attorney, Ronald O. Kaye, will make the following motion:

\\

\\

\\

**MOTION**

Defendant Curtis David Fahlberg, through his counsel of record, Ronald O. Kaye, hereby moves this Honorable Court for an order:

Suppressing the laptops and the cellular telephone seized at Los Angeles Airport on June 26, 2006, and all fruits therefrom, in violation of the Fourth Amendment of the United States Constitution.

This motion is made pursuant to the Fourth and Fifth Amendments to the United States Constitution, Rule 12(b)(3) of the Federal Rules of Criminal Procedure and is based on the attached Memorandum of Points and Authorities, Declarations, the attached Exhibits, all files and records in this case, and any evidence which may be presented at the hearing on this Motion.

Respectfully submitted,
KAYE, McLANE & BEDNARSKI, LLP

DATED: May 31, 2010

By________/S/____________________
RONALD O. KAYE
Attorneys for Curtis David Fahlberg

# TABLE OF CONTENTS

TABLE OF AUTHORITIES CITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . 1

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. THE SUSPICIONLESS BORDER SEARCH OF MR. FAHLBERG'S LAPTOPS INVADED HIS PRIVACY AND DIGNITY INTERESTS TO SUCH AN EXTENT THAT IT WAS UNREASONABLE UNDER THE FOURTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 5

1. The Fourth Amendment's Reasonableness Requirement Applies to Border Searches . . . . . . . . . . . . . . . . . . . . . . 5

2. This Court is Not Bound By *United States v. Arnold* as the Rationale of it's Three-judge Panel Has Been Subsequently Undercut by an *En Banc* Decision of the Ninth Circuit in *United States v. Comprehensive Drug Testing, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

B. THE MANNER IN WHICH THE SEARCH OF MR. FAHLBERG'S LAPTOPS WAS CONDUCTED IS DISTINGUISHABLE FROM THAT IN *ARNOLD*, AND WAS SO "PARTICULARLY OFFENSIVE" AS TO BE UNREASONABLE UNDER THE FOURTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1. The Duration of The Detention of Mr. Fahlberg's Laptops Was Particularly Offensive . . . . . . . . . . . . . . 15

**TABLE OF CONTENTS (CONT.)**

2. The Indefinite Retention and Derivative Use of the Information Taken from Mr. Fahlberg's Laptop without Probable Cause was "Particularly Offensive" . . . . . . . 18

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Blackford v. United States*, 247 F.2d 745 (9th Cir. 1957) ............................ 6

*County of Allegheny v. ACLU Greater Pittsburg Chapter*, 492 U.S. 573 (1989) .................................................................... 9, 10

*Henderson v. United States*, 390 F.2d 805 (1967) ...................................... 6

*Katz v. United States*, 389 U.S. 347 (1967) ............................................... 11

*Kyllo v. United States*, 533 U.S. 27 (2001) ................................................ 11

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) ........................................ 9

*Ohio v. Robinette*, 519 U.S. 33 (1996) ........................................................ 5

*Reno v. ACLU*, 521 U.S. 844 (1997) .......................................................... 13

*Segura v. United States*, 468 U.S. 796 (1984) .................................... 15, 16

*Terry v. Ohio*, 392 U.S. 1 (1968) ............................................................... 5

*United States v. $125,570 U.S. Currency*, 873 F.2d 1240 (9th Cir. 1989) . 23

*United States v. Adjani*, 452 F.3d 1140 (9th Cir. 2006) ............................ 13

*United States v. Alfonso*, 759 F.2d 728 (9th Cir. 1985) ............................... 6

*United States v. Arnold*, 454 F. Supp. 2d 999 (C.D. CA 2006) .................... 8

*United States v. Arnold*, 533 F.3d 1003 (9th Cir. 2008) ...................... *passim*

*United States v. Bulacan*, 156 F.3d 963 (9th Cir. 1998) ................ 23, 24, 25

*United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989 (9th Cir. 2009) ......................................................... *passim*

*United States v. Cunningham*, 1996 WL 665747 (E.D. La. 1996) ............... 7

*United States v. Flores-Montano*, 541 U.S. 149 (2004) ......................... 6, 14

*United States v. Gibberson*, 527 F.3d 882 (9th Cir. 2008) ......................... 10

*United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006) ............................ 12

*United States v. Guadalupe-Garza*, 421 F.2d 876 (9th Cir. 1970) ........... 5, 6

*United States v. Kim*, 677 F. Supp. 2d 930 (S.D. Tex 2009) ...................... 10

*United States v. Ramsey*, 431 U.S. 606 (1977) .................................... 21, 22

## TABLE OF AUTORITIES (CONT.)


*United States v. Romm*, 455 F.3d 990 (9th Cir. 2006) ................................ 13

*United States v. Sanders*, 663 F.2d 1 (2nd Cir. 1981) .................................. 7

*United States v. Seljan*, 547 F.3d 993 (9th Cir. 2008) ................................ 20

*United States v. Tank*, 200 F.3d 627 (9th Cir. 2000) ................................. 13

**STATE CASES**

*State v. Stone*, 149 P.3d 547 (Kan. App. 2007) ........................................... 7

**TREATISES, JOURNALS, LAW REVIEWS, ETC.**

Antonin Scalia, *Rule of Law as a Law of Rules,* 56 U. Chi. L. Rev. 1175, 1177 (1989) .................................................... 9

Computer Forensics, Search Strategies and the Particularity Requirement, 12 U. Pittsburgh J. Tech. L & Pol'y 2, 9 (2007) ................................. 13

Orin Kerr, *Searches and Seizures in a Digital World,* 119 Harv. L. Rev. 531, 569 (2005) ....................................................... 12

Raphael Winick, *Searches and Seizures of Computers and Computer Data*, 8 Harv. J.L. & Tech 75, 104 (1994)

Susan W. Brenner, *Law in an Era of Pervasive Technology* 15 Widener Law Journal 667, 732 (2006) ........................................... 12

Wayne Jekot, *Computer Forensics, Search Strategies, and the Particularity Requirement*, 12 U. Pittsburgh J. Tech. L. & Pol'y 2, 13 ..................... 7

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

This motion challenges the search, detention and retention of Mr. Fahlberg's laptop computers at the custom's inspection area at Bradley International Terminal in the Los Angeles International Airport on June 26, 2006.

Without reasonable suspicion, agents from the Immigration and Customs Enforcement Agency ("ICE") searched Mr. Fahlberg's laptops, found no evidence of contraband, and, without consent, detained the laptops without the necessary internal authorization for an unreasonable time period, in excess of the standard 30 day period set out by their own directives. Then, and what is particularly offensive, again without consent, without probable cause, and without discovering any contraband, ICE agents made a mirror image of Mr. Fahlberg's laptop, and used this mirror image to perform investigation not related to a customs purpose in Thailand and Cambodia, which led to the filing of the instant charges almost three years later.

Such cavalier manipulation of the border exception to the Fourth Amendment by law enforcement, not related to any objective customs related purpose, is contrary to law. Consequently, the evidence seized and all of its fruits, must be suppressed.

## II.

## STATEMENT OF FACTS

On June 26, 2006, Mr. Fahlberg returned from his home in Thailand to the United States to check on family property in Mississippi in the wake of hurricane Katrina. He entered the country through Los Angeles International Airport ("LAX") and was referred by Customs and Border Protection ("CBP") to "secondary" for examination of his luggage. A search conducted of his laptop computers at LAX revealed images of women Mr. Fahlberg encountered in Asia. The government determined that none of the images was contraband, nor is he charged with their

possession in this case. Customs detained Mr. Fahlberg's laptops and cell phone, however, at that time. Mr. Fahlberg waived his *Miranda* rights and provided a detailed interview, including biographical information and an explanation of the source of the pictures at issue.

Mr. Fahlberg was provided a US Customs form 6051D "Detention Notice and Custody Receipt for Detained Property" which stated that the reason for detention of his property was "to conduct forensic analysis of the computer" by means of "forensic analysis of computer images." *See,* Customs Form 6051D, attached as Exhibit A. The Customs form also indicated at the bottom, consistent with internal customs directives and what Mr. Fahlberg was told at LAX, that "Shipments may be detained for *up to 30 days* unless statutory authority or interagency agreement mandates that a longer period of time is require..." *Id.* (Emphasis added.)

In early and mid-July 2006, Mr. Fahlberg emailed the "detaining officer" Special Agent Daniel Lombardi regarding the status of his detained property. *See,* Declaration of Curtis Fahlberg at ¶3. Mr. Fahlberg provided SA Lombardi with the phone number to his FEMA trailer in Mississippi and later the new cell phone he was forced to purchase, so he could be notified promptly when his property would be returned. *Id.* After the mid-July 2006 email, Mr. Fahlberg waited patiently for a call from SA Lombardi for approximately 2 weeks or roughly until the 30 day period he was told it would take to return his laptop had elapsed. *Id.* at ¶4. Towards the end of July 2006, Mr. Fahlberg called SA Lombardi approximately 4 to 6 times a day, leaving messages directly and with the switchboard operator. *Id.* Mr. Fahlberg was never able to reach SA Lombardi, and at no point gave his consent for the detention of his property to exceed the 30 days promised. *Id.* Mr. Fahlberg was anxious to regain access to his laptops as they contained time sensitive financial and medical information. *Id.* at ¶5.

Meanwhile, on July 24, 2006, or approximately 28 days after the laptops were

seized, Special Agent Mark Mattison contacted United States Attorney Patricia Donahue regarding Mr. Fahlberg. *See,* Report of Investigation, Bates 00026, attached as Exhibit B. AUSA Donahue instructed SA Mattison to develop probable cause for a search warrant for Mr. Fahlberg's property in Mississippi, and to try to locate under-aged victims of Mr. Fahlberg's alleged sexual abuse in foreign countries to testify against him. *Id.*

On approximately August 10th or August 11th, 2006, SA Mattison called Mr. Fahlberg informing him that he was the new agent responsible for his property and requesting that Mr. Fahlberg send him his home address. Fahlberg Declaration at ¶6. Mr. Fahlberg emailed SA Mattison on August 11, 2006, complaining that the seizure of his property had already lasted 45 days and that SA Mattison was unable to give him a target date of completion. *Id.* at ¶7; Exhibit B. Mr. Fahlberg requested to speak with SA Mattison's supervisor regarding the delay, which was suggested by Mr. Fahlberg's local Gulfport Biloxi US Customs office *Id.* at ¶5.

On August 12, 2006, Mr. Fahlberg spoke with SA Mattison. *Id.* at ¶8; Exhibit B. Mr. Fahlberg informed him that had important financial and medical information he needed to access while in the United States. *Id.* SA Mattison informed him that the computer forensic analysis of the computers was taking longer than expected. *Id.*[1]

In approximately late August, 2006, SA Mattison called Mr. Fahlberg again and informed him that the search of his laptops was complete and they were ready to send them out to him. *Id.* at ¶9. Mr. Fahlberg informed SA Mattison that his returning flight home to Thailand was leaving on September 5, 2010 out of LAX, and with the uncertainty surrounding the exact date his laptops would be ready and the time for mailing, he was concerned he might not get his property back before he left

---

[1] This was apparently untrue as a Report produced in discovery indicates that SA Mattison received a copy of the forensic report that "detailed the potential evidence recovered from FAHLBERG's two laptop computers" in "July of 2006." *See,* Report of Investigation, at Bates 00022-00023, attached as Exhibit C.

the country. *Id.* At this point, now approximately 60 days since the original seizure, Agent Mattison suggested that Mr. Fahlberg pick his property up at LAX prior to his departure to Thailand. *Id.* Faced with the possibly that he would not receive his property by mail before his departure, or the certainty of receiving his laptops at LAX, Mr. Fahlberg reluctantly chose the latter. *Id.*

Prior to the late August, 2006 conversation with SA Mattison, on August 23, 2006, or 58 days after the seizure of Mr. Fahlberg's property, SA Mattison sent information regarding Mr. Fahlberg to Immigration and Customs Enforcement ("ICE") Counsel, William Wander, for review. Exhibit B, at Bates 00027. On August 30, 2006, Mr. Wander advised SA Mattison that "there was insufficient contraband on FAHLBERG's detained property for the seizure of the items and he advised SA Mattison to return FAHLBERG's property to him." *Id.* ICE ASAC/LAX Group Supervisor John Reynolds also agreed that FAHLBERG's property should be returned to him. *Id.*

On September 1, 2006, SA Mattison obtained Mr. Fahlberg's property from Digital Forensic Agent Margaret Condon. *Id.* On September 5, 2006, a full 71 days after the seizure of his property, Mr. Fahlberg's lap top computers was finally returned to him. *Id.* At SA Mattison's request, Mr. Fahlberg provided him with the address of his residence in Pattaya, Thailand. *Id.* at Bates 00028. Apparently on that same day, SA Mattison contacted ICE SSA Loan McIntosh-Rupp, who was assigned to the ICE office in Bangkok, Thailand. *Id.* At that time, SA Mattison sent an email to SSA McIntosh-Rupp containing all investigative materials regarding Fahlberg (presumably including information obtained from the property seized at LAX) for further investigation. *Id.* On September 7, 2006, SSA McIntosh-Rupp advised SA Mattison that she had forwarded the case information to ICE SSA Alex Ilusorio, who was assigned near Mr. Fahlberg's residence in Pattaya, Thailand. *Id.*

While Mr. Fahlberg's received his laptops, unbeknownst to him, the government did not destroy the copies it made of their contents. Rather, this

information was apparently used to attempt to locate alleged under-aged victims of Mr. Fahlberg. It was not until the summer of 2007, however, approximately one year after the initial search and seizure at LAX, that these alleged victims were ultimately located and interviewed.[2] Mr. Fahlberg himself was also under intense government scrutiny during this period. He was subjected to surveillance around his home in Pattaya, Thailand but no illegal conduct was observed. Mr. Fahlberg ultimately was arrested at his residence on June 9, 2009 – based in large part on the interviews with the alleged victims – almost 3 years after the initial search of his property at LAX.

## III.

## ARGUMENT

### A. THE SUSPICIONLESS BORDER SEARCH OF MR. FAHLBERG'S LAPTOPS INVADED HIS PRIVACY AND DIGNITY INTERESTS TO SUCH AN EXTENT THAT IT WAS UNREASONABLE UNDER THE FOURTH AMENDMENT

#### 1. The Fourth Amendment's Reasonableness Requirement Applies to Border Searches

All searches at the border are subject to the Fourth Amendment, and to the test of reasonableness. *United States v. Guadalupe-Garza*, 421 F.2d 876, 878 (9th Cir. 1970)(the constitutional safeguards found in the Fourth Amendment extend to persons crossing our borders as well as to persons crossing our streets). The Fourth Amendment's test of reasonableness requires that the need for the particular search must be balanced against the invasion that the search entails. *See e.g. Terry v. Ohio*, 392 U.S 1, 27 (1968); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)(holding

---

[2] L.T.K.G. and D.T.M.V. were subject to a video taped interview by ICE agents on July 17, 2007, and D.T.M.T. on July 18, 2007. L.T.K.G. and D.T.M.V. admitted to having met with the agents on a previous occasion and having been shown the photograph of Mr. Fahlberg; D.T.M.T. circumstantially appears to admit that as well. Therefore, the government made contact with the alleged victims prior to the July interview dates, probably during the summer of 2007. *See* Motion to Suppress Identification of L.T.K.G., D.T.M.V. and D.T.M.T., filed concurrently herewith.

reasonableness is measured by examining the "totality of the circumstances"); *Guadalupe-Garza*, 421 F.2d at 878 (standard of reasonableness requires a balancing of the scope of the particular intrusion, the manner of its conduct, and the justification for initiating it); *Henderson v. United States*, 390 F.2d 805, 807 (1967)("every search must be examined in the light of the Amendment's requirement that it not be 'unreasonable' . . . . this requirement applies to border searches").

No Supreme Court precedent, including *Flores-Montano,*[3] supports a sweeping proposition that all non-destructive border searches of an individual's property are reasonable *per se,* no matter what level of intrusion to privacy and dignity they present. On its face the Fourth Amendment[4] makes "...no differentiation between persons and property. It does not value property over human anatomy, nor differentiate between them. The Fourth Amendment without distinguishing between property and person simply forbids *all* unreasonable searches and seizures." *Blackford v. United States,* 247 F.2d 745, 750 (9th Cir. 1957).

The many types of searches that can occur fall along a spectrum of reasonableness, with body cavity searches at one extreme and ordinary luggage at the other. The wide continuum of searches in between is not amenable to an oversimplified dichotomy of simply: *property vs. person*. In fact, the border presents many "close calls," and there are searches of both one's person and one's property which can be found on either side of the reasonableness line.

For example, in *United States v. Alfonso,* 759 F.2d 728, 738 (9th Cir. 1985), the Ninth Circuit held that reasonable suspicion was required for customs agents to search

---

[3] *Flores- Montano* held that the "complex balancing tests to determine what is a 'routine' search of a *vehicle* as opposed to a more intrusive search of a person have no place in border searches of vehicles. . . .The dignity and privacy interests of a person being searched simply do not carry over to *vehicles*." United *States v. Flores-Montano*, 541 U.S. 149, 152 (2004)(emphasis added.)

[4] The Fourth Amendment declares "the right of the people to be secure in their *persons, houses, papers, and effects*, against unreasonable searches and seizures shall not be violated." Const. U.S. Amend. IV. (Emphasis added).

under the bed in the private living quarters on a ship which had crossed the border:

> Obviously a search of the private living quarters of a ship is more intrusive than a search of other areas. The private living quarters are at least analogous to a private dwelling. As a result, even in the context of the border search, the search of private living quarters on a ship should require something more than naked suspicion.

*See, also United States v. Cunningham*, 1996 WL 665747 (E.D. La. 1996)(also finding reasonable suspicion necessary to search living quarters on a ship); *and*, *United States v. Sanders*, 663 F.2d 1, 4 (2nd Cir. 1981)(search of a traveler's artificial leg, which was suspected of concealing cocaine, required "substantial suspicion"). Thus, while these border searches involved "property," because the invasion implicated important privacy and dignity interests, a higher standard, at least articulable suspicion, was necessary.

Moreover, simply because many of the items which may be found on a laptop computer are *individually* searchable without reasonable suspicion, does not necessarily mean that the laptop must be as well. Surely, in *Alfonso*, all of the individual items in the defendant's cabin – furniture, correspondence, toiletries, etc. – would have been searchable if individually hand carried across the border. When assembled together, however, in a space that approximated an individual's home, they are ascribed heightened qualities of privacy and dignity which deserve greater protection. *See*, Wayne Jekot, *Computer Forensics, Search Strategies, and the Particularity Requirement*, 12 U. Pittsburgh J. Tech. L. & Pol'y 2, 13 ("Given the storage capacity of today's computers, a warrant that allows a search of an entire computer could be compared to a warrant that authorizes the search of a home"); *State v. Stone*, 149 P.3d 547 (Kan. App. 2007)("the realities of massive modern computer storage negate a simple analogy to searches of closed containers or file cabinets...rather, [a computer] is the digital equivalent to its owner's home, capable of holding a universe of private information.")

As in the above cases, a laptop bears heightened qualities of privacy and dignity that distinguish it from other traditional closed containers that travelers carry

across the border. There is no Supreme Court precedent precluding this Court from finding that the Fourth Amendment's reasonableness requirement attaches to laptops and should require at least reasonable suspicion before their private files are rummaged through by the government at the border.

**2. This Court is Not Bound By *United States v. Arnold* as the Rationale of it's Three-judge Panel Has Been Subsequently Undercut by an *En Banc* Decision of the Ninth Circuit in *United States v. Comprehensive Drug Testing, Inc.*[5]**

Prior to Mr. Fahlberg's referral to "secondary" examination of his luggage, the facts are likely similar to that of *United States v. Arnold,* 533 F.3d 1003 (9th Cir. 2008).[6] In *Arnold*, less than a year before the search in this case, the defendant also arrived in LAX after a long flight from Asia. There, CBP Officer Laura Peng testified that on the evening of the search she was "targeting single men traveling from Asia who were in their '30s to 50s'". *See, United States v. Arnold,* 454 F.Supp.2d 999, 1005 (C.D. CA 2006)(district court opinion suppressing search reversed on appeal; *revd. United States v. Arnold*, 533 F.3d 1003 (9th Cir. 2008)).

Mr. Arnold challenged the suspicionless border search of his laptop because, as the Ninth Circuit characterized it, he argued "laptop computers are fundamentally different from traditional closed containers" and are distinguishable therefrom "based on its ability to store greater amounts of information and its unique role in modern life." *Arnold,* 533 F.3d 1003, 1006. The Ninth Circuit upheld the search, however, on the basis that he failed to persuade them "how the search of his laptop and its electronic contents is logically different from the suspionless search of traveler's

---

[5] To the extent that this Court feels it is bound by *United States v. Arnold*, Mr. Fahlberg preserves the arguments presented herein for potential appeal. Mr. Fahlberg also seeks to preserve the argument that the First Amendment implications of searching a laptop computer are relevant to the Fourth Amendment analysis and require heightened protection – which was rejected by *Arnold* and not specifically undercut by *Comprehensive Drug Testing.*

[6] The government has produced no documents in discovery reflecting the basis, if any, for referring Mr. Fahlberg to "secondary" inspection.

luggage that the Supreme Court and we have allowed." *Id*. at 1009. Essentially, the Ninth Circuit relied on existing pre-laptop era precedent to conclude that the search of all closed containers, including laptop computers, should be treated equally under the Fourth Amendment. *See, Arnold* at 1007("Furthermore, a "traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf [may] claim an equal right to conceal his possessions from official inspection as the sophisticated executive with locked attache case.")(citation omitted).

*Arnold's* faulty premise – that computers should enjoy no special protections under the Fourth Amendment beyond that of ordinary closed containers – has been subsequently undercut, however, by the *en banc* majority opinion in *United States v. Comprehensive Drug Testing, Inc.* 579 F.3d 989 (9th Cir. 2009). This Court is therefore no longer bound by *Arnold* as it's rationale has been undercut by higher authority. *See, Miller v. Gammie,* 335 F.3d 889, 899 (9th Cir. 2003)(holding that a district court or three-judge panel is not bound by precedent of a three-judge panel opinion whose rationale has been undercut by Supreme Court authority even if it has not been expressly overruled); *see also* Antonin Scalia, *Rule of Law as a Law of Rules*, 56 U. Chi. L.Rev. 1175, 1177 (1989)(Justice Scalia explains that lower courts are not simply bound by the holdings of higher courts but also by their "mode of analysis."); *County of Allegheny v. ACLU Greater Pittsburg Chapter*, 492 U.S. 573, 668 (1989)("As a general rule, the principle of *stare decisis* directs us to adhere not only to the holdings of prior cases, but also to their explications of the governing rules of law.")(Kennedy, J. concurring in part and dissenting in part).

In *Comprehensive Drug Testing*, ("*CDT*") the Government obtained a search warrant for electronic information concerning ten Major League Baseball players who tested positive for drug use. The government in that case conducted a search of the electronic drug testing records for all the players in Major League Baseball. *Id.* at 993. The Court reasoned that the search parameters for computer files should be tailored to find only the information described in the warrant. For instance, it stated

that if the government is permitted to seize information related to ten names, the search parameters "must be designed to discover data pertaining to those ten names only, not to others and not to those pertaining to other illegality." *Id.* at 999. The Court went on to recommend that future magistrates insist upon several restrictions when warrants seek to examine computer hard drives or electronic storage medium, including – that the government waive reliance upon the plain view doctrine for digital evidence, that the computer personnel not disclose any information not sought in the warrant to the investigators, and that the government destroy or return non-responsive data. *Id.* at 1006.

*CDT* clearly represents, albeit in the warrant context, this Circuit's authoritative view of computers as compared to traditional closed containers under the Fourth Amendment. *See, e.g. United States v. Kim*, 677 F.Supp.2d 930, 947 (S.D. Tex 2009) ("...*Comprehensive Drug Testing* does illustrate the Ninth's Circuit's perspective on government searches of digital media.") It is also clear that since *Arnold*, the Ninth Circuit has rejected the view that computers are merely glorified briefcases, and has embraced the fact that their unique qualities trigger heightened privacy concerns and therefore different Fourth Amendment analysis.

As Judge Callahan noted in her concurrence and dissent, *CDT* represents a "departure" from prior decisions of the Court, most notably, *United States v. Gibberson*, 527 F.3d 882 (9th Cir. 2008) which "declined to impose heightened Fourth Amendment protections in computer search cases as a result of a computer's ability to store large amounts of potentially intermingled information, and stating that such heightened protections must be "based on a principle that is not technology-specific.'" *CDT*, 579 F.3d at 1013 (Calahan, J. concurring in part and dissenting in part). She recognized that *CDT* was in fact a complete reversal in this area and grants new "heightened Fourth Amendment protections in the context of computers based on the nature of the technology involved...." *Id.*

The "technology specific" rationale that computers are fundamentally different

from traditional closed containers in the warrant context applies with equal force at the border. Here, as in *CDT*, the nature of the privacy interests involved are so great that this Court must tailor its Fourth Amendment jurisprudence to the new technology. *CDT*, unlike *Arnold*, recognized the reality of the way digital technology is used in modern life and the threat to personal privacy that inheres when the government is authorized to search and possibly indefinitely retain information contained therein. It thus represents another chapter in the well worn tradition of appropriately adapting Fourth Amendment analysis to changing technology by balancing the specific competing interests involved. *See, e.g., Kyllo v. United States*, 533 U.S. 27, 34 (2001) (requiring a warrant based on probable cause for government to use a thermal imaging device to detect activity inside a home); *Katz v. United States*, 389 U.S. 347 (1967) (extending Fourth Amendment protection to government seizure of telephone communications outside the home).

In the wake of *CDT*, this Court must not, as Arnold did, weigh law enforcement's interest on one side of the equation, but completely abdicate its responsibility to consider the privacy interests at stake on the other. To hold otherwise is to create a Fourth Amendment free zone for laptops and gives the government free reign to conduct arbitrary searches and examine personal data contained in confidential files without limit. This free reign is not limited by any judicial standard, only the time and curiosity of the border agent. It permits a curious border agent to boundlessly keep reading any entry in any file – which in Mr. Fahlberg's case included private medical and financial records – based on nothing.

Contrary to *CDT*, the *Arnold* panel failed to even attempt to grapple with the difference between a computer and a traditional closed container, and justified its sweeping grant of limitless border authority to search private computer files by merely asserting that the government does not have any obligation to use a least restrictive means to conduct a search at the border. *Arnold*, F.3d at 1008. It thus completely ignored the reality that a border search of a laptop raises

fundamentally different privacy considerations than the traditional examples of personal effects, wallets, pockets, etc. *Arnold*, 533 F.3d at 1007.

In fact, "[F]or most people, their computers are their most private spaces." *United States v. Gourde*, 440 F.3d 1065, 1072 (9th Cir. 2006)(en banc)(Kleinfeld, J. dissenting.) Computers are increasing relied upon in almost every facet of life. Today, a growing portion of our lives are conducted by, on, and through the medium of computers. An analogy to simple "closed containers" is dangerously inadequate, ignores the realities of modern existence, and "oversimplifies a complex area of Fourth Amendment doctrine." *See*, Raphael Winick, *Searches and Seizures of Computers and Computer Data*, 8 Harv. J.L. & Tech 75, 104 (1994).

A computer's ability to store thousands of files, pictures, or documents is only one of its many attributes. Its nature goes beyond a container; it is central to modern life. A laptop allows an individual to create stories, videos, instant messages, music, and interact in complex virtual worlds and online environments. People can shop, bank, and conduct business online, and can also schedule travel, home repairs, personal grooming, and medical appointments. *See, e.g.*, Susan W. Brenner, *Law in an Era of Pervasive Technology*, 15 Widener Law Journal 667, 732 (2006); see also, Orin Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 569 (2005)("[computers] are postal services, playgrounds, jukeboxes, dating services, movie theaters, daily planners, shopping malls, personal secretaries, virtual diaries, and more").

A laptop can contain an unprecedented amount of information. In fact, a person may have a laptop for the specific purpose of never having to leave information behind. Unlike a diary or a briefcase, however, a traveler cannot simply "remove" a pertinent page from their laptop to shield it from the prying eyes of customs officials. A border agent can search for deleted data as well as active files. When a file is deleted through the operating system, the underlying data remains on the hard drive until it is overwritten by other data. Even partially overwritten files can

be recovered. *See, generally* Computer Forensics, Search Strategies and the Particularity Requirement, 12 U. Pittsburgh J. Tech. L & Pol'y 2, 9 (2007); *see also, e.g., United States v. Romm*, 455 F.3d 990, 993 (9th Cir. 2006)(defendant convicted of receiving and possessing child pornography based on 40 images *deleted* from his internet cache and two images *deleted* from another part of his hard drive.) A search of a laptop will therefore reveal information a traveler has affirmatively tried "to leave at home."

Finally, any plausible comparison of the laptop to a glorified "brief case" or typewriter-calculator composite which simply contains electronic versions of letters, reports, and term papers has certainly been obliterated by the Internet. *See, Reno v. ACLU*, 521 U.S. 844, 863 (1997)([the internet] "is the most participatory form of mass speech yet developed, entitled to the highest protection from governmental intrusion.")(citations omitted.) Now laptops have moved beyond even simple emails: people exchange not just emails but whole documents, pictures and videos. Moreover, electronic conversations found on a laptop can be one to one, one to many, many to one, or many to many.

Thus, a laptop does not only contain personal information pertaining to the individual user but additional information pertaining to *everyone* with whom the user communicates electronically. *See*, Kerr, at 556 ("A single physical storage device can store the private files of thousands of different users."); *See* also, e.g., *United States v. Tank*, 200 F.3d 627, 629 (9th Cir. 2000)(computer search revealed text files containing online discussions between 16 members of an internet chat room); and, *United States v. Adjani*, 452 F.3d 1140 (9th Cir. 2006)(defendant's computer contained email communications between husband and wife).

Mr. Fahlberg submits that, at the border, the apt analogy to traditional closed container doctrine is to permit border agents, without reasonable suspicion, to turn on the laptop in order to determine that it is not a repository of physical contraband. If they are to engage in the wholesale examination of all the private digital files

contained therein, however, they should be required to have at least to develop reasonable suspicion. In this way, Fourth Amendment jurisprudence – even at an international airport – can be interpreted consistently with this advanced technology, in a way that accounts for security, while still protecting personal privacy and liberty interests in the age of computers.

**B. <u>THE MANNER IN WHICH THE SEARCH OF MR. FAHLBERG'S LAPTOPS WAS CONDUCTED IS DISTINGUISHABLE FROM THAT IN *ARNOLD*, AND WAS SO "PARTICULARLY OFFENSIVE" AS TO BE UNREASONABLE UNDER THE FOURTH AMENDMENT</u>**

While the panel in *Arnold* felt that *Flores-Montano* precluded finding any non-destructive search of property at the border unreasonable, it noted that the Supreme Court left open the possibility where the search was conducted "in a particularly offensive manner." *Arnold*, 533 F.3d at 1009(citing *Flores-Montano*, 541 U.S. at 155-156). In *Arnold*, CBP officer Laura Peng turned over Mr. Arnold's laptop and other electronic media to a colleague for examination who in turn called agents from ICE. *Id.* at 1005. The ICE agents found numerous images depicting what they believed to be child pornography. *Id.* The officers seized the computer and storage devices, but released Mr. Arnold. *Id*. Approximately two weeks later, agents obtained a warrant and conducted a more intensive forensic search of the seized computer devices. *Id.* Mr. Arnold ultimately was charged with the possession of the child pornography found. *Id.*

Based on the above facts where contraband *was* found shortly after the initial seizure, the panel in *Arnold* concluded that "whatever 'particularly offensive manner' might mean, this search certainly does not meet that test" and that Mr. Arnold "failed to distinguish how the search of his laptop and its electronic contents is logically different from the suspicionless border searches of travelers luggage that the Supreme Court and we have allowed." *Id.* at 1009. As demonstrated below, however, the search in Mr. Fahlberg's case is so dramatically different from that of *Arnold* (let

alone a search of ordinary luggage) that it should be considered particularly offensive and therefore unreasonable under the Fourth Amendment.

**1. The Duration of The Detention of Mr. Fahlberg's Laptops Was Particularly Offensive**

The 71 days that ICE SA Mattison detained Mr. Fahlberg's laptops without reasonable suspicion or probable cause is in stark contrast to the approximately two weeks the laptop in *Arnold* was detained. This unjustified extended detention was particularly offensive and therefore unreasonable under the Fourth Amendment. *See, Segura v. United States*, 468 U.S. 796, 812 (1984)("Of course, a seizure reasonable at its inception...may become unreasonable as a result of its duration or for other reasons.")

As set forth above, Mr. Fahlberg clearly expressed in his communications with SA Mattison that he would not consent to the detention of his laptops for longer than the law allows, and that they contained his only copies of time sensitive financial and medical information. *See*, Fahlberg Declaration at ¶9. In light of these statements, what makes the prolonged duration of the detention in this case especially egregious is that it was apparently wholly unnecessary. According to SA Mattison's report of investigation at some point in "July 2006" he "received a copy of the forensic report that detailed the potential evidence recovered from FAHLBERG's laptop computers." *See*, Exhibit C. Inexplicably, however, SA Mattison admits in his report that as late as August 12, 2006, he was still telling Mr. Fahlberg that "the computer forensic analysis was taking longer than expected but it should be completed soon." *See*, Exhibit B, at Bates 00027.

The unreasonableness of the duration of the detention in this case is further highlighted by the extent to which it deviates from ICEs own internal directives.[7] In

[7] CBP has its own set of directives going back as far as 2007. The most recent being CBP directive no. 3340-049, Border Search of Electronic Devices Containing Information, August 20, 2009. These directives are much more restrictive than the corresponding ICE directives in terms of the duration, retention, and

August 18, 2009, ICE issued directive No. 7-6.1 entitled "Border Searches of Electronic Devices." See, Exhibit D, attached. This directive "provides legal guidance and establishes policy and procedures within U.S. Immigration and Customs Enforcement (ICE) with regard to border search authority to search, detain, seize, retain, and share information contained in electronic devices possessed by individuals at the border..." *Id.* at 1.1. Directive 8.3 "Duration of Border Search" clearly states:

> 1) Special Agents are to complete the search of detained electronic devices, or copies of information therefore, in a reasonable time given the facts and circumstances of the particular search. *Searches are generally to be completed within 30 calendar days of the date of detention*, unless circumstances exist that warrant more time. Such circumstances must be documented in the appropriate ICE systems. Any detention exceeding 30 calendar days must be approved by the Group Supervisor or equivalent, and approved again every 15 calendar days thereafter, and the specific justification for additional time documented in the appropriate ICE systems.

*Id.* at 8.3(1)(emphasis added).[8]

30 days as the ordinary outer limit of the reasonable length of detention is consistent with what Mr. Fahlberg was specifically told by customs officials and what is printed at the bottom of the Customs Form 6051D he was given as a receipt for his detained property. *See*, Exhibit A. Mr. Fahlberg submits that 30 days is also consistent with what is reasonable under the Fourth Amendment absent extenuating circumstances delaying the search itself. It should be noted that 30 days is significantly longer than the 5 days CBP is expected to complete their searches

---

dissemination appropriate for electronic materials seized at the border. As the discovery indicates the case was primarily investigated by ICE after the initial search, this Motion focuses on the ICE directives.

[8] It is unclear what directives, if any, were in place at the time Mr. Fahlberg's laptops were detained. For example, the July 16, 2008 ICE Directive 7-6.0 entitled "Border Searches of Documents and Electronic Media" which was superceded by Directive 7-6.1 above, only requires that searches be conducted within "a reasonable time" but doesn't specify 30 days. As the July 16, 2008 Directive 7-6.0 superceded Customs Directive 3340-006A, entitled "Procedures for Examining Documents and Papers,"dated February 4, 2000, it appears likely that there were no specific ICE directives regarding border searches of electronic media prior to July 2008.

within. *See*, CBP Directive No. 3340-049, August 20, 2009, 5.3.1 (Unless extenuating circumstances exist, the detention of devices ordinarily should not exceed five (5) days.).

In this case, however, even though SA Mattison had completed the forensic examination of the computers by "July 2006", within the 30 day period, he made no effort to comply with the 30 day reasonable time limitation. There is no evidence to suggest that "circumstances" existed that warranted more time, let alone the required documentation of such circumstances in the appropriate ICE system was ever made.[9] Similarly, there is no indication that the appropriate Group Supervisor ever approved the detention over 30 days, nor the *three* subsequent 15 days periods, nor documented the specific justification for each additional time period as required. In fact, the first notation by SA Mattison reflecting contact with a Group Supervisor produced to the defense is on August 30, 2006 – approximately 60 days after the detention – where Group Supervisor John Reynolds instructed him to return the property to Fahlberg. See, Exhibit B, at Bates 00027.

In sum, SA Mattison's callous disregard for Mr. Fahlberg's possessory interest in his laptop computers after the forensic analysis was already complete and no contraband was found, was particularly offensive. SA Mattison capriciously deprived Mr. Fahlberg of his property contrary to ICEs own internal regulations and the Fourth Amendment, and failed to secure any of the appropriate approvals or document any alleged justification, both of which were presumably mandated to check such unreasonable governmental action. The 71 day detention of Mr. Fahlberg's laptops in this case thus constitutes a "unreasonable manner" of search in violation of the Fourth

[9] On April 13, 2010, counsel for Mr. Fahlberg sent the government correspondence memorializing the fact all internal ICE documentation regarding the search in this case, and the retention of the laptops, had previously been provided in discovery. *See* Exhibit E, April 13, 2010 correspondence. In subsequent conversations, counsel for the government confirmed that there was no other documentation. All documentation reflecting the search and retention of the laptops provided in the discovery is set out in Exhibits A, B and C, attached to this motion. *See*, Declaration of Ronald O. Kaye, at ¶

Amendment.

**2. The Indefinite Retention and Derivative Use of the Information Taken from Mr. Fahlberg's Laptop without Probable Cause was "Particularly Offensive"**

The retention and derivative use of the private data on Mr. Fahlberg's computer were particularly offensive, and in stark contrast to the search approved by the Ninth Circuit in *Arnold*. In *Arnold*, after the ICE agents found what they believed to be child pornography during "secondary examination", they detained the laptop at issue for a reasonable duration – two weeks – *before securing a warrant* to conduct a more thorough forensic examination. *Arnold* at 533 F.3d at 1005. Ultimately, child pornography was in fact discovered and Mr. Arnold was charged with the same. *Id.*

In the instant case, Mr. Fahlberg's laptops also were detained after the initial suspicionless search at "secondary" examination revealed evidence of purported child pornography. *See*, Exhibit B, at Bates 00026. ("FAHLBERG was in possession of a cell phone and two laptop computers that contained numerous images of possible underage females in various states of undress.") The Customs form 6051D stated the reason for the detention was "to conduct forensic analysis of the computer" by means of "forensic analysis of computer *images*." *See*, Exhibit A. By "July 2006" however, following the completed forensic analysis of the laptops, it was clear that no such contraband existed amongst the numerous personal files on Mr. Fahlberg's computers.

When no contraband was present on the computer and therefore Mr. Fahlberg was not attempting to bring contraband into the United States, it was incumbent upon ICE to return the property to Mr. Fahlberg, and destroy the copies of Mr. Fahlberg's personal files in ICEs possession. Rather, on July 24, 2006, SA Mattison was instructed by the United States Attorneys Office to "develop probable cause for a search warrant for FAHLBERG's residence in Pascagoula, Mississippi, and also try to locate underage victims of FAHLBERG's alleged sexual abuse in foreign countries

who would testify against FAHLBERG." *See*, Exhibit B, at Bates 00026. It wasn't until August 23, 2006 that SA Mattison finally sought higher level review from ICE Counsel Wadner regarding a possible seizure of Mr. Fahlberg's property. *Id.* at Bates 00027. On August 30, 2006, ICE Counsel Wandner advised SA Mattison "that there was insufficient contraband on FAHLBERG's detained property for the seizure of the items and he advised SA Mattison to return FAHLBERG's property to him. ICE ASAC/LAX Group Supervisor (GS) John Reynolds also agreed that FAHLBERG's property should be returned to him." *Id.*

On September 5, 2010 SA Mattison followed ICE counsel's instructions to finally return the laptops. This juncture represents perhaps the most troubling and "particularly offensive" portion of the search in this case. At this point, the forensic examination of the laptop revealed no evidence of the child pornography – contrary to the initial justification for the search – nor did any of the private contents yield sufficient probable cause to seize the laptops or serve search warrants on any of Mr. Fahlberg's properties. Even under *Arnold*, once the property was returned to Mr. Fahlberg, a border search reasonable under the Fourth Amendment would terminate there. It did not.

Rather, SA Mattison retained copies of Mr. Fahlberg's private files and handed them off to ICE agents in Thailand to start a new criminal investigation completely unrelated to any Customs purpose.[10] It was not until July 2007, however, or more than a year after the initial search and seizure at LAX, that any of the alleged victims identified on Mr. Fahlberg' computer were interviewed. It was not until June 9, 2009 – almost three years after the initial search – that Mr. Fahlberg was arrested. *See*,

---

[10] ICE Directive 4 entitled "Background" states that the searches of electronic devices are a crucial tool for "detecting information concerning terrorism, narcotics smuggling, and other national security matters; alien admissibility; contraband including child pornography; laundering monetary instruments; violations of copyright or trademark laws; and evidence of embargo violations or other import or export control laws." See, Exhibit D. Mr. Fahlberg submits that the derivative investigation in this case related to none of these legitimate customs purposes.

*United States v. Seljan*, 547 F.3d 993, 1016 (9th Cir. 2008) (Kozinsk, J. Dissent) ("There can be no doubt that the officers here saw their mission as far more than intercepting contraband: They viewed themselves as law enforcement officers in the full sense of the term, and their mission as directing evidence of *all* criminal activity.")

The indefinite retention and dissemination of copies of private files seized during an initial suspicionless border search, for which the government has no probable cause, was not endorsed or even contemplated by the panel in *Arnold*. This practice opens up a whole host of additional Fourth Amendment concerns and should be found by this Court to be particularly offensive. To hold otherwise would be to tacitly endorse a "border exception" whereby any international traveler is subjected to having Customs, without the reasonable suspicion under *Arnold*, simply insert a device into his laptop and make an instant flash copy. From there, that data could be indefinitely retained and disseminated to law enforcement or other governmental agencies at any point in the future for any purpose.

Under this regime, if any citizen was suspected of a domestic crime, however unrelated to the border or it's exceptions to the Fourth Amendment, local and federal law enforcement could check whether ICE ever encountered the individual, and see if they possess a mirror image of the suspect's laptop hard drive from their last international trip. If a copy was available, local law enforcement could utilize that private data to further its investigation. While it is reasonable for law enforcement to consult with Customs regarding a suspect's previous travel or points of entry, etc., it is quite different to receive exact copies of every email a suspect ever sent, his personal medical and financial records, and every personal note and photograph which were recovered from his laptop before he was ever even under any suspicion at all.

Given the ubiquity of both international travel and the use of electronic devices in modern life, it is not difficult to see how the this "border exception" could soon

swallow the Fourth Amendment rule against unreasonable search and seizure. If one accepts the premise that virtually everyone will make at least one international trip during their lives, and that they will inevitably carry some kind of electronic device with them, this not only gives the government unprecedented access to the private files of virtually every American without warrant or even reasonable suspicion, but allows them to indefinitely retain such information for any future law enforcement purpose.[11]

As Judge Bea recognized in her concurrence and dissent in *CDT*, while the courts "lack the competitive advantages of Congress to set out specific, bright-line rules through deliberation and testimony from interested parties" it "*is* our obligation, and our obligation alone, to determine what constitutes unreasonable searches and seizures." CDT, 579 F.3d at 1018 (Bea, J. concurring in part and dissenting in part). (Emphasis in the original).

This tension was exemplified in the seminal border search case of *United States v. Ramsey*, 431 U.S. 606 (1977), where the Supreme Court declined to impose a Fourth Amendment requirement that reasonable suspicion be necessary for the search of international mail because Congress and applicable postal regulations *already* imposed a "reasonable cause to suspect" test which the Court considered "a practical test which imposes a less stringent requirement than that of 'probable cause.'" *Id.* at 611-612. There is no such corresponding regulation protecting privacy interests here.

The Court's obligation is therefore heightened here where Congress has taken no action. After *Arnold* brought the issue of electronic searches at the border to the nation's attention, congress held hearings into the matter. A bill introduced in the

---

[11] As Judge Kozinski stated in his dissent in *United States v. Seljan*, 547 F.3d 993, 1015 (9th Cir. 2008)(Kozinsk, J. Dissent) "Imagine that the federal government decided to read every letter, every e-email, every diary, every document that crosses our borders, in order to increase the overall level of law enforcement by investigating crimes mentioned or documented in these writings. This would not be an effort to secure our borders-in fact, it would have nothing at all to do with the borders, except that the evidence would be collected there."

111th Congress, the Electronic Device Privacy Act of 2009 (H.R. 239), would prohibit laptop searches based solely on border search authority. It would establish "fundamental rules" prohibiting a federal border officer from searching or seizing a "digital electronic device" or "electronic storage media" based solely on the power of the United States to search and seize the effects of individuals seeking entry into the country. Instead, the legislation would allow such searches only in cases where border officers have reasonable suspicion that a device contains criminal evidence. Devices could be seized only if constitutional authority other than border search authority provided a justification. The bill would direct the Secretary of Homeland Security to promulgate rules regarding: maximum time periods during which border officers can detain devices; owners' rights to retrieve detained devices; and strategies for maintaining the integrity of all information detained and shared with other government agencies. The Bill ultimately was referred to House Subcommittee on Immigration, Citizenship, Security, Refugees, Border Security, and International Law in February 2009, but has never been acted upon.

Similarly the ICE directives themselves provide this Court with little confidence that the government should be allowed to "police themselves" on this issue. ICE Directive 8.5 entitled "Retention, Sharing, Safeguarding, and Destruction" controls. Directive 8.5(1)(b) and (c) provide that:

> Retention of Information in ICE Systems. To the extent authorized by law, ICE may retain information relevant to immigration, customs, and other law enforcement matters, in ICE systems if such retention is consistent with the privacy and data protection policies of the system in which such information is retained. For example, information entered into TECS during the course of an investigation will be retained consistent with the policies governing TECS.
>
> Sharing. Copies of information from electronic devices, or portions there of, which are retained in accordance with this section, maybe shared by ICE with Federal, state, local, and foreign law enforcement agencies in accordance with applicable law and policy. Sharing must be in compliance with the Privacy Act and applicable ICE privacy policies, such as the ICE Search, Arrest, and Seizure System of

Records Notice.

Exhibit D.

From the above, it is clear that ICE feels entitled to retain private information it gleans from the suspicionless search of electronic devices as long as it determines the information is "relevant" to "immigration, customs, *and other law enforcement matters*" in ICE systems, without regard to Fourth Amendment notions of reasonable suspicion or probable cause. *Id.* (Emphasis added). It may then freely share copies of this information with any "federal, state, local, and foreign law enforcement agencies..." again without regard to traditional Fourth Amendment standards and no matter how attenuated the information's possible connection to the international border or customs authority might be. *Id.* This cannot be the law. *See, United States v. $125,570 U.S. Currency,* 873 F.2d 1240 (9th Cir. 1989)(condemning using airline security and protection of the borders to justice unrelated general law enforcement objective); *United States v. Bulacan*, 156 F.3d 963, 967 (9th Cir. 1998)("court must take care to ensure that [a suspicionless contraband] search is not subverted into a general search for evidence of crime" because of the "vast potential for abuse" and intrusion "into the privacy of ordinary citizens.")

As the majority in *CDT* stated, the problem with applying traditional Fourth Amendment rubrics such as the "plain view doctrine" to computers is:

> ...There is no way to be sure exactly what an electronic file contains without somehow examining its contents-either by opening it and looking, using specialized forensic software, keyword searching or some other technique. But electronic files are generally found on media that also contain thousands or millions of other files among which the sought-after data may be stored or concealed. By necessity, government efforts to locate particular files will require examining a great many other files to exclude the possibility that the sought-after data are concealed there.

*Id.* at 1104.

"Since the government agents ultimately decide how much to actually take, this will create a powerful incentive for them to seize more rather than less..." *Id.* at 998.

That is precisely what happened in Mr. Fahlberg's case and will continue to happen if this the court does not intervene and alter ICE's far reaching practices.

The stated intent on Customs form 6051D was to perform a forensic analysis of computer images. As noted in *CDT*, "the government has sophisticated hashing tools at its disposal that allow the identification of well-known illegal files (such as child pornography) without actually opening the files themselves." *Id.* at 999.[12] None of these reasonable limitations were imposed in this case. Once it was clear to ICE that the computer did not contain the contraband they were looking for (or any contraband for that matter), it unilaterally expanded the search to pry into Mr. Fahlberg's private emails and correspondence. Once this did not yield sufficient probable cause to obtain a warrant, unlike *Arnold*, it then sent a copy of Mr. Fahlberg's private files to law enforcement half way around the world to use in an investigation wholly unrelated to the border and customs enforcement. The government must not be allowed to conduct suspicionless searches and retain private data indefinitely in the event it might be "relevant" to some future criminal investigation.

*CDT* was careful to recognize that it was not just the initial search, but also the *retention* of private electronic information seized by the government that creates serious Fourth Amendment concerns. Consequently, the Ninth Circuit mandated that law enforcement set out in the warrant that the return "include a sworn certificate that the government has *destroyed or returned* all copies of data that it is not entitled to keep. If the government believes it is entitled to retain data as to which no probable cause was shown in the original warrant, it may seek a new warrant or justify the warrantless seizure by some means other than plain view." *Id.* at 1001.

In this case the government essentially stretched the border exception to the Fourth Amendment beyond all recognition and past any rational point where it was

---

[12] *See also* Verne Kopytoff, *Google Reveals Tool That Seeks Similar Images*, S.F. CHRON., April 21, 2009, at C3 (noting that Google "introduced an experimental tool Monday [April 20, 2009] that allows users to narrow their search results to photographs that are alike in terms of their content, perspective and color").

intended to be apply. Even if this Court feels bound to follow the *Arnold* precedent in terms of the initial suspicionless search, the subsequent indefinite retention and dissemination of the private information obtained without probable cause and unrelated to any Customs purpose is distinguishable and constitutes a particularly offensive manner of search that should not be upheld by this Court.

## III.

## CONCLUSION

The airport search of the Mr. Fahlberg's laptop computers was not supported by reasonable suspicion. The government must sustain the burden of establishing the constitutionality of the search, detention, indefinite retention, and dissemination of the private materials taken. Because they cannot do so the evidence seized as well as all derivative evidence including statements and evidence seized from the later search of Mr. Fahlberg's residence must be suppressed.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

DATED: May 31, 2010

By /S/
RONALD O. KAYE
Attorneys for Curtis David Fahlberg