1  RONALD O. KAYE (No. 145051)
   KEVIN J. LaHUE
2  KAYE, McLANE & BEDNARSKI, LLP
   234 E. Colorado Blvd.  Suite 230
3  Pasadena, California 91101
   Telephone: (626) 844-7660
4  Facsimile: (626) 844-7670
   rok@kmbllp.com
5
6  Attorneys for Defendant
   CURTIS DAVID FAHLBERG
7
8
                    UNITED STATES DISTRICT COURT
9
                  CENTRAL DISTRICT OF CALIFORNIA
10
                        WESTERN DIVISION
11

12  UNITED STATES OF AMERICA,        )  CASE NO. 09-00683-MMM
                                     )
13              Plaintiff,           )  NOTICE OF MOTION;  MOTION
                                     )  TO SUPPRESS IDENTIFICATION
14         v.                        )  TESTIMONY OF L.T.K.G.,
                                     )  D.T.M.V., AND D.T.M.T.;
15                                   )  MEMORANDUM OF POINTS AND
    CURTIS DAVID FAHLBERG,           )  AUTHORITIES; DECLARATIONS;
16                                   )  EXHIBITS FILED
                Defendant.           )  CONCURRENTLY HEREWITH
17                                   )
    _____)
18                                      Hearing Date:   June 28, 2010
                                        Hearing Time:  1:15 p.m.
19                                      Court: Hon. Margaret M. Morrow

20  TO: UNITED STATES ATTORNEY ANDRE BIROTTE, JR. AND ASSISTANT

21  UNITED STATES ATTORNEY ROBERT DUGDALE:

22         PLEASE TAKE NOTICE that on June 28, 2010 at 1:15 a.m., or as soon

23  thereafter as counsel may be heard, defendant Curtis David Fahlberg will make the

24  following motion:

25  //

26  //

27  //

28

**<u>MOTION</u>**

Defendant Curtis David Fahlberg, through his counsel of record, Ronald O. Kaye, hereby moves this Honorable Court for an order:

(1)  to exclude from trial the use of, or reference to, any eyewitness identification testimony or other statements by witnesses L.T.K.G., D.T.M.V., and D.T.M.T. that Mr. Fahlberg is the person who had prior sexual relations with them, based on the unduly suggestive procedure of their photo identification of Mr. Fahlberg, and the unreliability of their identification;

(2) as a lesser alternative, to grant Mr. Fahlberg an evidentiary hearing in order for the Court to determine whether witnesses L.T.K.G., D.T.M.V., and D.T.M.T.'s identification is reliable, and after that hearing, rule on whether to exclude the testimony of these witnesses as requested above.

This motion is based upon the attached Memorandum of Points and Authorities, the declaration of Dr. Michael Paul Maloney, the Declaration of Mr. Chetra Keho, the Declaration of Professor Emanuel Dialma, all files and records in this case, and any further evidence that may be adduced at the hearing on this motion.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

DATED: May 31, 2010                    By_____/S/_____
                                                            RONALD O. KAYE
                                                            Attorneys for Curtis David Fahlberg

2

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES CITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . 1

    I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    II.   BACKGROUND AND EXPERT ANALYSIS OF THE
        INTERVIEWS  OF THE VICTIM GIRLS WHO ALLEGEDLY
        WERE INVOLVED IN THE CHARGED OFFENSES  . . . . . . . . . . 5

    III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

A.   THE SUGGESTIVE AND UNRELIABLE NATURE OF L.T.K.G.,
    D.T.M.V., AND D.T.M.T.'s IDENTIFICATION RENDER IT
    CONSTITUTIONALLY INADMISSIBLE IN A CRIMINAL CASE  . . . 11

        1.   L.T.K.G., D.T.M.V., and D.T.M.T.'s Identification of Mr.
            Fahlberg Was the Product of Impermissibly Suggestive
            Procedures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        2.   Reliability Is The Linchpin In Determining The Admissibility
            Of Identification Testimony  . . . . . . . . . . . . . . . . . . . . . . . . . 12

            a.   The Opportunity of the Witness to View the Criminal
                 at the Time of the Crime  . . . . . . . . . . . . . . . . . . . . . . 14

            b.   The Witness' Degree of Attention  . . . . . . . . . . . . . . . 16

            c.   The Accuracy of the Witness' Prior Description of the
                 Criminal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            d.   The Level of Certainty Demonstrated by the Witness
                 at the Confrontation  . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

# TABLE OF CONTENTS (CONT.)

       e.     The Length of Time Between the Crime and the
Confrontation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.    THIS COURT SHOULD PRECLUDE ANY TESTIMONY WITH
RESPECT TO AN IN-COURT IDENTIFICATION . . . . . . . . . . . . . . . . 19

C.    THE PREJUDICIAL EFFECT OF L.T.K.G., D.T.M.V. AND D.T.M.T.'s
IDENTIFICATIONS AND TESTIMONY PURPORTING TO
RECOGNIZE MR. FAHLBERG OUTWEIGHS THEIR PROBATIVE
VALUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D.    IN THE ALTERNATIVE TO AN ORDER SUPPRESSING THE PRE-
TRIAL AND IN-COURT IDENTIFICATIONS, THE DEFENSE
REQUESTS A PRETRIAL HEARING WHERE THE COURT CAN
ASSESS THE RELIABILITY OF THE VICTIM GIRLS'
IDENTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Dunnigan v. Keane*, 137 F.3d 117 (2d Cir.1998), ........................................ 2

*Georges v. Government of Virgin Islands*,

   119 F. Supp. 2d 514 (D. Virgin Islands 2000) ........................................ 22

*Manson v. Brathwaite* 432 U.S. 98 (1977) .................................................. 12

*Neil v. Biggers*, 409 U.S. 1988 (1972) .................................................. 11,12

*Plastipak Packaging, Inc. v. DePasquale*,

   75 Fed.Appx. 86, 90 (3rd Cir. 2003) ........................................ 22

*Precision Piping and Instruments, Inc. v. E.I. du Pont Nemous*,

   951 F.2d 613 (4th Cir. 1991) .................................................. 22

*Simmons v. United States*, 390 U.S. 377 (1968) ........................................ 11

*United States v. Barron*, 575 F.2d 752 (9th Cir. 1978) ............................. 12

*United States v. Carbajal*, 956 F.2d 924 (9th Cir. 1992) .......................... 13

*United States v. Concepcion*, 983 F.2d 369 (2d Cir.1992) ........................ 20

*United States v. Drougas*, 748 F.2d 8 (1st Cir. 1984) .............................. 19

*United States v. Enjady* (10th Cir. 1998) 134 F.3d 1427 .......................... 21

*United States Field*, 625 F.2d 862 (9th Cir. 1980) .......................... 11,12,19

*United States v. Hanigan*, 681 F.2d 1127 (9th Cir. 1982) .................. 11,12

*United States v. Jones*, 123 Fed. Appx. 773, 775 (9th Cir. 2005) ............. 22

*United States v. Monks*, 774 F.2d 945 (9th Cir. 1985) .............................. 12

*United States v. Porter*, 430 F. Supp. 208 (D.C.N.Y. 1977) ..................... 11

*United States v. Tortora*, 30 F.3d 334 (2d Cir.1994) ................................ 20

*United States v. Wade*, 388 U.S. 219 (1967)

*Watkins v. Sowders*, 449 U.S. 341, 101 S. Ct. 654 (U.S.Ky.,1981) ............ 4

### STATE CASES

*State v. Fulton* (1987) 742 P.2d 1208 ........................................ 22

1
2

# <u>TABLE OF CONTENTS (CONT.)</u>

3

## FEDERAL STATUTES

4

18 U.S.C. § 2423(c) ................................................................... 1,2

5
6

## JOURNALS, TREATISES, ETC.

7
Bradfield, A. L., Wells, G.L, & Olson, E.A. (2002). The damaging effect of
confirming feedback on the relation between eyewitness certainty and
identification accuracy. *Journal of Applied Psychology, 87,* 112-120 ...... 17

8
9
Charman, S. D. & Wells, G. L. (2008). Can eyewitnesses correct for
external influences on their lineup identifications? *Journal of Experimental
Psychology: Applied, 14,* 5-20 .................................................. 18

10
11
Dodd, D. H., & Bradshaw, J. M . (1980). Leading questions and memory:
Pragmatic constraints. *Journal of Verbal Learning and Verbal Behavior,
19,* 695-704 ......................................................................... 13

12
13
Douglass, A. B,, & McQuiston-Surrett, D. M. (2006). Post identification
feedback: Exploring the effects of sequential photospreads and
eyewitnesses" awareness of the identification task. *Applied Cognitive
Psychology, 20,* 991-1007 ........................................................ 17

14
15
Douglass, A. B., & Steblay, N . (2006). *Applied Cognitive Psychology, 18,*
901-912 ............................................................................... 17

16
17
Lampinen, J.M., Scott, J., Pratt, D,, Ledding, J.K., & Arnal, J.D. (2007).
'Good, you identified the suspect.. .but please ignore this feedback': Can
warnings eliminate the effects of post-identification feedback? *Applied
Cognitive Psychology, 21,* 1037-1056 ........................................ 17

18
19
Neuscahtz, J. S., Lawson, D. S., Fairless, A. H., Powers, R. A., Neuscahtz,
J. S., Goodsell, C. A., & Toglia, M . P. (2007) ............................. 17

20
21
Neuschatz, J. S., Preston, E. L,, Burkett, A. D., Toglia, M. R., Lampinen, J.
M., Neuschatz, J. S., Fairless, A. H., Lawson, D. S., Powers, R. A., &
Goodsell, C. A. (2005). The effects of post-identification feedback and age
on retrospective eyewitness memory. *Applied Cognitive Psychology, 19,*
435-453 ............................................................................... 18

22
23
Peter Westen, *Confrontation and Compulsory Process: A Unified Theory
of Evidence for Criminal Cases*, 91 HARV. L. REV. 567, 598 (1978) .... 21

24
25
Quinlivan, D. S., Neuschatz, J. S., Jimenez, A., Cling, A. D., Douglass, A.
B., & Goodsell, C. A. (2009). Do prophylactics prevent inflation? Post-
identification feedback and the effectiveness of procedures to protect
against confidence-inflation in earwitnesses. *Law & Human Behavior, 33,*
111-121 ............................................................................... 18

26
27
Semmler, C , & Brewer, N . (2006). Post-identification feedback effects on
face recognition confidence: Evidence for metacognitive influences.
*Applied Cognitive Psychology, 20,* 895-916 ............................... 18

28

# TABLE OF CONTENTS (CONT.)

Semmler, C, Brewer, N., & Wells, G. L. (2004). Effects of postidentification feedback on eyewitness identification and nonidentification. *Journal of Applied Psychology, 89,* 334-346 .............. 18

Skagerberg, E. M. (2007). Susceptibility to postidentification feedback is affected by source credibility. *Applied Cognitive Psychology, 23,* 506-523 ................................................. 18

Skagerberg, E. M . & Wright, D. B. (2009). Susceptibility to postidentification feedback is affected by source credibility. *Applied Cognitive Psychology, 23,* 506-523 ........................... 13

Smith, S.M., Lindsay, R.C.L., &Pryke, S. (2000). Postdictors of eyewitness errors: Can false identification be diagnosed? *Journal of Applied Psychology, 85,* 542-550 ...................... 18

Smith, V. L., & Ellsworth, P. C. (1987). The social psychology of eyewitness accuracy: Misleading questions and communicator expertise. *Journal of Applied Psychology, 72,* 294-300 .......................... 13

Wells, G.L., & Bradfield, A.L. (1998). "Good, you identified the suspect:" Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360-376 ........................ 18

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The government has charged Mr. Curtis Fahlberg in the Central District of California with illicit sexual acts with minors, a violation of 18 U.S.C. § 2423(c). The illicit sexual acts purportedly occurred with Vietnamese child sex workers who worked in brothels in the Svay Pak area of Cambodia between September 28, 2003 and June 27, 2006.[1] No specific dates have been provided as to when the alleged acts occurred.

On July 17th and 18th, 2007, the three victim girls in this case – L.T.K.G., D.T.M.V. and D.T.M.T. – were interviewed at the U.S. Embassy by one or two Special Agents of the United States Immigration and Customs Enforcement (ICE); a bilingual Cambodian Investigator who acted as the Khmer interpreter; and one or two representatives of the Non-governmental Organization, HAGAR.  The interviews were videotaped.  During the videotaped interview of each victim girl, the government showed a single photograph of Mr. Fahlberg – there was no photo spread reflecting alternatives to Mr. Fahlberg's photograph.  Further, during the interviews of L.T.K.G. and D.T.M.V. on July 17, 2007, the ICE agent specifically highlighted the fact that Mr. Fahlberg's photograph was shown to each of the victim girls on a previous date.  During the interview of D.T.M.T. on July 18, 2007, although not as explicit as in the interviews of L.T.K.G. and D.T.M.V., it appears that she too was shown the photograph of Mr. Fahlberg prior to the interview. *See* Declaration of Dr. Michael Paul Maloney at ¶ 6(g).

The government has advised the defense that it intends on presenting the

---

[1]        Media reports reveal that child prostitution in the Svay Pak area all but ceased in 2005. "The Impact of Closing Svay Pak: Study of Police and International NGO Assisted Interventions in Svay Pak, Kingdom of Cambodia," published in January 2005, by Dr. Frederic thomas, referenced in humantrafficking.org November 2005.

1

1  testimony of the three victim girls in this case at trial.  In contrast to other cases in this

2  district which have been brought against defendants under 18 U.S.C. § 2423(c), there

3  is no allegation that Mr. Fahlberg took some level of possession of these girls such as

4  sex slavery, there is no allegation that the girls lived with Mr. Fahlberg, but rather, the

5  parties agree that the girls were working in brothels.  Consequently, as child sex

6  workers working in brothels, the girls engaged in sexual conduct with multiple

7  foreign customers.  Further, it appears that the victim girls were in the protective

8  custody of the Non-governmental Organization (NGO), HAGAR, for several years

9  after the period in which they worked as child sex workers.  Thus, there appears to be

10  a several year lapse between when they last saw any of the foreigners with whom they

11  had sexual relations, and the date when they were asked to identify Mr. Fahlberg.

12  Based on these factors, it is fair to say that at best their ability to accurately identify

13  the foreigners that they engaged in sexual conduct is substantially compromised.

14      From this backdrop, attached hereto is the declaration of Dr. Michael P.

15  Maloney, a psychologist[2] who is an expert in the area of sex crimes, particularly in

16  assessing the susceptibility of child witnesses to the influence of their interviewers

17  and those who prepare them for their interviews.  As described below, Dr. Maloney,

18  with the assistance of Khmer interpreter Chetra Keo,[3] has reviewed the video tapes of

19  each victim girl's interview, and has highlighted multiple bases demonstrating that the

20  victim girls' testimony is not authentic, appears practiced, and is unreliable.

21      Juxtaposed with the analysis of Dr. Maloney, attached hereto is the declaration

22

23

---

24      [2]   Dr. Maloney presently is the Mental Health Clinical District Chief,
        Department of Mental Health, Los Angeles County, Jail Mental Health Services.  His
25      Curriculum Vitae is attached to his declaration.

26      [3]   Concurrently with filing of this motion, the defense is filing copies of the
        July, 2007 video taped interviews of the victim girls with the Court in an under seal
27      filing.  The defense has requested the transcripts of these interviews, but the
        government has represented that they are not yet available.
28

of Professor Emmanuel Dialma, an expert on sex trafficking in Cambodia.[4]  Professor Dialma provides the Court with background on this population - Vietnamese child sex workers in Svay Pak, Cambodia.  As described below, based on their position at the bottom of the hierarchal social order within Cambodia, and their cultural disposition, Professor Dialma explains how this group is particularly prone to shape their answers to correspond to the expectations of the interviewer, thereby giving false answers in order to be polite and non-confrontational.

Based on the unduly suggestive nature of the photo identification in which a single photograph of Mr. Fahlberg was shown to the victim girls – who had previously viewed the photograph in a practice session with the ICE agents and representatives of the NGO, in conjunction with the lack of reliability of their identification, the defense requests that the Court suppress the victim girls identification testimony.  In the alternative, if the Court requires closer examination of the reliability of the victim girls prior to ruling on this motion, the defense requests that the Court order an evidentiary hearing, preferably in the United States District Court, where the victim girls can be examined without the assistance of representatives of the NGO or representatives of the government.  If that procedure is too cumbersome, the defense requests that the Court order the government to produce the victim girls for purposes of depositions in Phnom Penh, Cambodia, where the parties are scheduled to take Rule 15 depositions on July 19th and July 20th, 2010.  In that way the Court can review the deposition testimony and assess the reliability of the victim girls.

The defense requests that the Court decide this issue pretrial, and not rely on cross-examination at trial as a basis to protect Mr. Fahlberg's right against wrongful

---

[4]      Professor Dialma is the Director of International Relations & Cooperation Division and Professor in Build Bright University, in Phnom Penh, since 2008.  Professor Dialma previously was the Legal Advisor and Training Director in an anti-trafficking NGO, AFESIP Cambodia (Acting for Women in Distressing Situations), in Phnom Penh.

identification by the victim girls.  If, as the defense argues, the victim girls'
identification testimony of Mr. Fahlberg is not reliable and the product of suggestive
identification techniques, due process requires that the jury not hear the victim girls'
testimony.  With such volatile charges, and the certainty  that the government will
emphasize other highly prejudicial, circumstantial evidence impuning Mr. Fahlberg's
character at trial, to permit the jury to hear the victim girls' identification testimony of
Mr. Fahlberg essentially will secure his conviction, regardless of how unreliable, and
how untruthful it may be.

> Nor can it be assumed, as the Court has, that cross-examination will protect the accused in this circumstance. That is no more true here than it was in *Jackson*, where the defendant was also allowed to cross-examine on the question of voluntariness. Cross-examination, of course, affects the weight and credibility given by the jury to evidence, but cross-examination is both an ineffective and a wrong tool for purging inadmissible identification evidence from the jurors' minds. It is an ineffective tool because all of the scientific evidence suggests that much eyewitness identification testimony has an unduly powerful effect on jurors. Thus, the jury is likely to give the erroneously admitted evidence substantial weight, however skillful the cross-examination. See generally E. Loftus, Eyewitness Testimony 9 (1979). Cross-examination is also a wrong tool in the sense that jury instructions are the means normally employed to cure the erroneous introduction of evidence. At best, cross-examination might diminish the weight the jury accords to the inadmissible evidence. The likelihood is, however, that the jury would continue to give the improperly admitted evidence substantial weight, even if properly instructed to disregard it.

*Watkins v. Sowders*, 449 U.S. 341, 356-357, 101 S.Ct. 654, 663 (U.S.Ky.,1981),
 (Brennan and Marshall dissenting).

      If convicted of committing the acts he is accused of, Mr. Fahlberg will not only
lose his freedom – probably for the rest of his life – but he will wear the scarlet letter
of being a pedophile.  Moreover, he will be a pariah in the prison system, constantly
fearful that he will be attacked by other inmates, or in the alternative, living a life of
solitary confinement.  With so much at stake, this Court should insure that he receives
a fair trial.  Based on the government's contamination of the victim girls in their

4

1   interviews, and their demonstrated lack of reliability, Mr. Fahlberg's fundamental

2   right to a fair trial requires that the identification testimony be suppressed.

3                                              **II.**

4   **BACKGROUND AND EXPERT ANALYSIS OF THE INTERVIEWS OF THE**

5                    **VICTIM GIRLS WHO ALLEGEDLY**

6                    **WERE INVOLVED IN THE CHARGED OFFENSES**

7        In July of 2007, L.T.K.G., D.T.M.V and D.T.M.T. were taken to the United

8   States Embassy to identify photographs of Mr. Fahlberg. It appears that the victim

9   girls had been under protective status of the NGO HAGAR for a substantial period of

10  time prior to the showing of the photographs.  Photographs of each girl, fully clothed,

11  were found on Mr. Fahlberg's computer.  There is no other evidence found linking

12  him to these particular victim girls.

13       In the interviews, representatives of the NGO and the ICE are present. As Dr.

14  Maloney states:

15               I raise the fact that each of these interviews had an extensive
                 number of participants because the presence of such an extensive
16               group of individuals in an interview with a minor can have a
                 significant effect on the child's expectations, behavior and
17               response style.

18  Maloney Dec. ¶ 3.

19       Throughout the interviews, the HAGAR representatives, the ICE agent, and

20  particularly the DSS Investigator who acted as the interpreter, repeatedly interfere

21  with the ability of a neutral observer to assess how the victim girls would provide

22  information.  They use leading questions where the victim girls simply affirmatively

23  repeat the end of the questions (Maloney Dec. ¶¶ 5(i), 5(l); ¶¶ 6(d); 6(g)); and

24  multiple choice questions where a specific choice is emphasized (Maloney Dec. ¶

25  4(e).  What is even more problematic, is that in all three interviews DSS Investigator

26  Sarin Vann, *acting* as the interpreter (who appears to not be a trained interpreter, *see*

27  Keo Dec. ¶ 1) repeatedly intervenes and takes over the interview in Khmer.  This

28  ranges from emphasizing a particular multiple choice answers with (Maloney Dec. ¶

                                              5

4(i)), to challenging the victim girls answers, thereby triggering another response by the girl (Maloney Dec. ¶¶ 5(i), 5(j), 5(k)).

The lack of integrity of this process is manifest. By blatantly assisting the victim girls with their answers, the interviewers and the interpreter interfere with the viewer's ability to assess the reliability of the victim girls' identification of Mr. Fahlberg. But regardless of this interference, each victim girl does demonstrate significant flaws in their memories about the events which allegedly occurred, regardless of the fact that each victim girl was previously prepared for the interview, and was shown the single photograph of Mr. Fahlberg before. The video recordings reveal the unduly suggestive nature of the victim girls identification and their lack of reliability.

In his declaration, Dr. Maloney describes particular points which undermine the victim girls' identification. These include:

**L.T.K.G.**:

• L.T.K.G. responds to questions in a monotonic fashion with an unusually quick response time to questions and a lack of emotion when describing intercourse as a child. Her responses reflect substantial practice. Maloney Dec. ¶¶ 4(c), 4(d), 4(g).

• L.T.K.G. uses the volatile word "rape" in Khmer which would not be part of her vocabulary, particularly as a child sex worker, but more likely a term taught to her by the NGO representatives or the government interviewers. Maloney Dec.¶ 4(f); Keo Dec. ¶ 5(a).

• L.T.K.G. has no recollection of how many foreigners she was with sexually during her time at the brothel, but estimates "many." Maloney Dec. ¶ 4(h).

• L.T.K.G. provides no identifying information at all for Mr. Fahlberg, but wrongly identifies him as French, raising the likelihood that she does not distinguish him from other foreigners. Maloney Dec. ¶ 4(i).

\\

6

**D.T.M.V.**:

- D.T.M.V. often does not appear to be answering all the questions of Special Agent Moore; rather, the acting interpreter, DSS Investigator Sarin Vann is answering Moore's questions – there appears to be no spontaneous information coming from D.T.M.V. in the beginning of the interview. Maloney Dec. ¶¶ 5(d), 5(e).

- D.T.M.V. states that she is 11 years old, but when trying to depict when the sexual acts allegedly occurred with Mr. Fahlberg, she states it happened during the month of January when she was 6 or 7 years old. The specificity of this response reveals preparation. It is very unlikely that D.T.M.V. would be able to accurately assess the month, or the year when this sex act occurred. Maloney Dec. ¶ 5(f).

- D.T.M.V. approximates that the duration of the sexual act with Mr. Fahlberg an event which allegedly occurred 4 or 5 years earlier, was one half hour. Based on her lack of sophistication demonstrated in the interview and the fact that the incident allegedly occurred 4 to 5 years earlier, it is extremely unlikely that she would be able to accurately gage the duration of time. Similarly, rather than revealing accuracy, this specificity reveals preparation. Maloney Dec. ¶ 5(f).

- Throughout the interview, DSS Investigator Sarin Vann prods D.T.M.V. to correct her answers. D.T.M.V. first states that she was with Mr. Fahlberg on one occasion, and then, with prodding by DSS Investigator Sarin Vann, D.T.M.V. corrects herself and states 2 or 3 times. D.T.M.V. first states that she never saw Mr. Fahlberg with other girls, and then is urged to change her answer from no to yes. D.T.M.V. first states that she never saw Mr. Fahlberg's penis, and then is pressured to change her answer, responding that it was long, big and curvy. Maloney Dec. ¶¶ 5(i), 5(j), 5(k).

- Finally, at the end of the interview, Special Agent Moore attempts to have D.T.M.V. confirm that she truly remembers Mr. Fahlberg. DSS Investigator

7

Sarin Vann states to the young girl: "do you remember clearly," to which she parrots "clearly." He adds "100%", to which she scratches her face and parrots again "100%." This technique appears to be used in order to bolster what the agents must perceive as a problematic interview. Further, Dr. Maloney opines that it seems ludicrous that a girl of this background would be able to gage percentages. Maloney Dec. ¶ 5(l).

**D.T.M.T.**:

- D.T.M.T. has no recollection who took the photograph of her. Maloney Dec. ¶ 6(b).

- D.T.M.T. has no recollection when she started working at Svay Pak, nor how long she remained there. Maloney Dec. ¶ 6(c)

- D.T.M.T., like L.T.K.G., uses the volatile word "rape" in Khmer which would not be part of her vocabulary, but more likely that of the NGO representative. Maloney Dec. ¶ 6(e); Keo Dec. ¶ 5(a).

- D.T.M.T. has no identifying information about Mr. Fahlberg – she does not recall his name, his nationality, when they first met, or any distinguishing feature. Maloney Dec. ¶ 6(h).

- D.T.M.T. admitted to having sex with foreigners often. Maloney Dec. ¶ 6(d).

- D.T.M.T. confuses the amount of time she spent with Mr. Fahlberg - 2 or 3 times; or 2 or 3 times per week; and she says she saw him quite often - 3 to 4 times per week. This confusion reveals that she cannot adequately adopt the script. Clearly, as demonstrated by the government's travel records, Mr. Fahlberg visited Cambodia on short visits, and could not be the constant visitor of the brothel as D.T.M.T. implies. Maloney Dec. ¶ 6(i), 6(j).

As Dr. Maloney states in his declaration, the victim girls' responses, coupled with the pervasive, corrupting influence of the agents, and particularly the interpreter, reveals the lack of reliability of the photo identification. What is an equally troubling part of this equation is the fact that this population – Vietnamese child sex workers –

8

are particularly susceptible to the influence of the questioners and will craft their answers to correspond to the expectations of the questioners – in this case, foreign male officials who connote power and authority.  Professor Dialma, who served as legal counsel to the NGO AFESIP, describes in his declaration:

>From my personal experience, discussions with colleagues, and academic research, I am very familiar with the background of Vietnamese child sex workers working in brothels in the Svay Pak area outside of Phnom Penh, Cambodia.  These girls generally are the children of immigrants who migrated illegally to Cambodia from Southern Vietnam (Mekong Delta).  These girls are routinely pushed into prostitution by their parents.  They are taught at an early age that they are the most powerless individuals in Cambodian society and have little impact in controlling the direction of their lives. Since their parents are supporting the abusive environments they find themselves in, these girls generally perceive that they have no way of escaping or challenging their predicament. Vietnamese girls who have been subjected to prostitution, particularly when ordered to do so by their parents, have had virtually no means of having an input on the direction of their lives.

>These Vietnamese girls working in these brothels are required to act in a "polite" way, and are taught to fulfill the expectations of adults.  This includes interviewers from groups / agencies that are intervening to protect them.  They are very compliant with the moral authority, be it parents, NGO representatives, police and adults in general.

>Essentially, in Cambodian society, women are much less powerful than men; Vietnamese immigrant women are much less powerful than Khmer women; and children are much less powerful than adults. In Asia, the bottom persons of the social hierarchy (small wage earners, menial laborers, children, etc.) are accustomed to satisfy higher persons, because they are obliged to do so by their conditions as well as the social code of behavior - especially Vietnamese immigrants in Cambodia and especially children. Further, culturally, South East Asian people (including Viet and Khmer –Vietnamese from Viet ethnics and Cambodian from  Khmer ethnic groups), are very often accustomed to not being truthful or "lying" according to the western culture and values, just to satisfy the person that is speaking to them. In the South East Asian culture, particularly for a young girl, it is impolite to say "no" and from a local point of view, it is better to say "yes" if you don't know, instead of saying "no" to the interviewer (or any person with a moral authority), which is considered as  offensive and impolite. In the local culture, this conduct will not be considered a "lie" and is not reproach able, but as a correct answer induced by the questions.  If it is later deemed that the answer is not correct, it is because of the question itself not being framed correctly or not being pertinent, or because of the way the question was asked, i.e., the tone of the voice of the questioner. Therefore

9

1       the answer, even if not truthful, cannot be attacked if the
2       motivation of the answer is intended to provide satisfaction,
    harmony and peace for the interviewer.

3       Further, prostitutes in Cambodia, particularly child prostitutes, are
4       indoctrinated in a lifestyle of "lying." The prostitution activity
    requires prostitutes to know how to satisfy the client, including
5       flattery and lying about their background. For example, the child
    prostitute is required to tell the western sex customer "I missed
6       you," regardless of the fact that the child prostitute may have only
    met the customer one previous time and has no affection for the
7       customer. Also, in the midst of their prostitution activities, child
    prostitutes are required to "lie" about their activities, thereby not
8       pointing blame at their parents or the brothel owners and
    management.

9       Based on my experience, statements by Vietnamese female child
    sex workers accusing men of engaging in illicit sexual conduct
10      with them (false or true) are very easy to bring out from these
    girls. I am familiar with several cases in which false testimonies by
11      such girls occurred. The NGO AFESIP in which I was working as
    a legal, political advisor, and campaign director in 2003-2005, was
12      "tricked" by young girls on several occasions to accuse people of
    being involved in child prostitution. . . .
13

    A common problem we found in our experience at AFESIP is that
14      the Vietnamese child prostitutes would follow whatever direction
    the police or NGO staff would head them toward in their answers.
15      We found that the girls were easily led to answer a question a
    particular way – leading questions generally produced an
16      affirmative response.

17  Dialma Dec. ¶¶ 4- 9.

18        The review of the interviews of the victim girls, juxtaposed with their cultural

19  background, objectively reveals a lack of confidence in their testimony. Add on the

20  factor that victim girls were shown the single photograph of the defendant prior to the

21  interviews, reveals a photo identification scenario which violates the defendant's right

22  to due process.

23  \\

24  \\

25  \\

26  \\

27

28

10

# III.

## ARGUMENT

**A.    THE SUGGESTIVE AND UNRELIABLE NATURE OF L.T.K.G., D.T.M.V., AND D.T.M.T.'s IDENTIFICATION RENDER IT CONSTITUTIONALLY INADMISSIBLE IN A CRIMINAL CASE.**

The Supreme Court has recognized that photographic lineups, and the conditions under which they are conducted, have serious potential to generate inaccurate identifications. The Court ruled that identifications tainted by the unreliability of the witness's recollection, or by suggestive lineup procedures, violate due process rights if admitted. *Neil v. Biggers* (1972) 409 US 188, 198. *Neil v. Biggers* (1972) 409 US 188, 198. *U.S. v. Field,* 625 F.2d 862 (9th Cir. 1980), ("In applying that analysis, the reliability of identification evidence is tested by weighing the indicia of reliability against the corrupting tendencies of the suggestive pretrial identification procedure.").

### 1.    L.T.K.G., D.T.M.V., and D.T.M.T.'s Identification of Mr. Fahlberg Was the Product of Impermissibly Suggestive Procedures

Identification procedures that emphasize a single individual's photograph may be unduly suggestive. *Simmons v. U.S.*, 390 U.S. 377, 383 (1968); *U.S. v. Hanigan*, 681 F.2d 1127, 1133 (9th Cir. 1982); *see also*, *United States v. Porter*, 430 F.Supp. 208 (D.C.N.Y. 1977)("I find that the evidence adduced from the single-photo identification must be suppressed because the identification procedures were so unnecessarily suggestive and so conducive to irreparable mistaken identification that the defendant would be denied due process of law if this evidence was admitted at trial. See *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)")

The procedure used to secure L.T.K.G., D.T.M.V., and D.T.M.T.'s identification – based on the showing of a single photograph, often with Mr. Fahlberg present, is the epitome of an impermissibly suggestive photo lineup.  What causes this

11

1   showing to go even beyond this implicit level of suggestibility is the fact that L.T.K.G

2   and D.T.M.V. explicitly were previously shown the photograph of Mr. Fahlberg, and

3   the interview of D.T.M.T reveals that it is entirely likely that she too was shown Mr.

4   Fahlberg's photograph in a "practice run."

5       **2.**     <u>**Reliability Is The Linchpin In Determining The Admissibility Of**</u>

6               <u>**Identification Testimony**</u>

7       According to the Supreme Court: "Reliability is the linchpin in determining the

8   admissibility of identification testimony." *Manson v. Brathwaite* (1977) 432 U.S. 98,

9   114. The Court identified five indicators to be used when assessing a witness's

10   reliability. These include: 1) the opportunity of the witness to view the criminal at the

11   time of the crime; 2) the witness' degree of attention; 3) the accuracy of the witness'

12   prior description of the criminal; 4) the level of certainty demonstrated by the witness

13   at the confrontation; and 5) the length of time between the crime and the

14   confrontation. *Neil v. Biggers*, 409 U.S. at 199-200.

15       After examining the reliability of a witness's identification, the court must

16   examine whether the suggestive lineup procedures further tainted the witness's

17   veracity. If there is any indication that the lineup procedure was suggestive or

18   questionable, the resulting identification may be admitted only if the reliability of the

19   witness substantially outweighs the corrupting influence of the improper procedure.

20       Most Ninth Circuit cases on the subject apply this balancing test. See *U.S. v.*

21   *Barron*, 575 F.2d 752 (9th Cir. 1978) (court evaluated the five reliability factors, found

22   reliability, then determined that the photo lineup procedure was not impermissibly

23   suggestive); *U.S. v. Field,* 625 F.2d 862 (9th Cir. 1980), ("the reliability of

24   identification evidence is tested by weighing the indicia of reliability against the

25   corrupting tendencies of the suggestive pretrial identification procedure."); *U.S. v.*

26   *Hanigan*, 681 F.2d 1127 (9th Cir. 1982) ("This conclusion is supported by weighing

27   the five factors against the corrupting effect of any suggestiveness."); *U.S. v. Monks*,

28   774 F.2d 945 (9th Cir. 1985) ("We therefore conclude that the high degree of

1    reliability suggested by our consideration above of the five factors outweighs the

2    corrupting effect of the unbalances in the photo display."); *U.S. v. Carbajal*, 956 F.2d

3    924 (9th Cir. 1992) (where the court found that a photo lineup was not impermissibly

4    suggestive, but because it was slightly suggestive, examined the five factors of

5    reliability and weighed them against the identification).

6        The significance of this discussion in the present context is that Mr. Fahlberg

7    contends: 1) that L.T.K.G., D.T.M.V., and D.T.M.T.'s identification of Mr. Fahlberg

8    from a single photograph was suggestive, and the reliability of the identification does

9    not substantially outweigh the suggestiveness, and 2) regardless of whether the

10   identification procedure was suggestive, L.T.K.G., D.T.M.V., and D.T.M.T.

11   identification of Mr. Fahlberg is so unreliable as to require suppression for lack of

12   reliability under the *Manson/Biggers* test.

13       A review of Dr. Maloney's analysis of the interviews of L.T.K.G., D.T.M.V.,

14   and D.T.M.T., reveals the lack of reliability of these witnesses.  Rather than having an

15   interview which provides the Court with the opportunity to assess the reliability of

16   these witnesses, the interviews of the victims are tainted from the start.

17       Further, when taking into account the cultural factors raised by Professor

18   Dialma from their background as a Vietnamese child sex worker in Svay Pak,

19   Cambodia, these eyewitnesses are more easily manipulated and more receptive to

20   what others might suggest to them is the "correct" answer. The suggestability of the

21   witness is exacerbated further when the witness – as in this case – attributes high

22   credibility to the source of the suggested information.[5]

23       The five factors in the *Manson/Biggers* test are somewhat difficult to apply to

24   the instant identification performed by young girls, who have encountered devastating

25   _____

26        [5]    E.g., see Smith, V. L., & Ellsworth, P. C. (1987). The social psychology
     of eyewitness accuracy: Misleading questions and communicator expertise. *Journal of*
27   *Applied Psychology, 72,* 294-300; Dodd, D. H., & Bradshaw, J. M. (1980). Leading questions
     and memory: Pragmatic constraints. *Journal of Verbal Learning and Verbal Behavior, 19,* 695-
28   704; Skagerberg, E. M. & Wright, D. B. (2009). Susceptibility to postidentification feedback is
     affected by source credibility. *Applied Cognitive Psychology, 23,* 506-523.

abuse, and who culturally have a propensity to not tell the truth, but rather, to provide the answers that the interviewers are looking for.  Juxtapose these characteristics with strong evidence that there has been "practice sessions" with the government agents, and leading questions in which answers are prodded or created by an interpreter, and the accuracy of these five factors in determining reliability is problematic.

However, even using the *Manson/Biggers* factors, the reliability of the identification of Mr. Fahlberg by L.T.K.G., D.T.M.V., and D.T.M.T. does not save an obviously suggestive photo identification:

### a.   The Opportunity of the Witness to View the Criminal at the Time of the Crime

Unlike a bank teller witnessing a robbery, or a bystander witnessing a murder, the victim girls in this case were not subject to a rare event where the opportunity to view the defendant would indelibly be imprinted in their brains.  Tragically, these girls were subject to abuse by multiple men.  When D.T.M.T. was asked how often she had sex with a foreigner, her response was "often." Maloney Dec. at ¶6(d). L.T.K.G. could not recall how many foreigner she had been with sexually and could not give an estimate, but stated she had been with "many."  *Id.* ¶4(h). Presumably, D.T.M.V. similarly had many foreigners engage in sexual acts with her.

Logically, one would assume that these girls, who engaged in sexual acts with foreigners, had a great opportunity to view the men with whom they were engaged in sexual relations.  This assumption, however, does not ring true in this context.  Where each girl was involved with multiple partners, of a different race,[6] speaking a different language, it is natural that the girls would tend to not to be able identify a particular individual they were involved with.  Moreover, as described by D.T.M.T. in her

---

[6]    It is well established that cross-race identification is inherently much more flawed than identifications of individuals within the same race, particularly among children. *See* Innocence Project Fact Sheets, *Eyewitness Misidentification* and *Facts on Post-Conviction DNA Exonerations*, *at* http://www.innocenceproject.org.

interview, while at the brothel, she was routinely taken into a room along with other young girls, but was often not chosen by the foreigner. Keo Dec. ¶ 5(c).  Thus, the victim girls were in presence of many foreigners at the brothels, even if they were not engaged in sexual relations with them.

For example, L.T.K.G. describes the defendant as being "French."  First, Mr. Fahlberg is not French, and does not speak French.  Further, as Dr. Maloney states in his declaration, "the fact that L.T.K.G. lumped the defendant into the general category of 'French' raises the likelihood that she did not distinguish him from the other foreigners." Maloney Dec. at ¶4(i).

Presumably, the government will emphasize that photographs of each of the victim girls' were found on Mr. Fahlberg's lap top, and therefore, the girls knew Mr. Fahlberg, and clearly had a great opportunity to view him.  Confidence in the victim girls identification of Mr. Fahlberg based on this fact is misplaced.

The problem of mistaken identification is not restricted to situations in which the witness and the perpetrator are total strangers.  The DNA exoneration of William Harris illustrates this point.[7] The victim witness knew William Harris and, when shown a lineup with Harris in it, said that he was not the person and was confident of that because she knew Harris. Later, she learned that serology testing showed her attacker to be Harris. [In fact, the serologist, Fred Zane, had made up the results and never actually performed the test.] Based on this information, she asked to view the lineup again and confidently picked Harris. Harris was convicted but later exonerated when DNA testing showed that he was not the perpetrator.

\\

---

[7]     http://www.innocenceproject.org/Content/172.php

**b. The Witness' Degree of Attention**

In a normal abusive sexual encounter, the degree of attention that the victim has on the perpetrator is likely very great. The victim may be consciously remembering details of the perpetrator in order to identify him later.  But in this scenario, the degree of attention is questionable.  In this brothel environment, it is reasonable to assume that the girls are not focusing on who they are with, but rather, when the painful interaction with the foreigner is going to be over.  Further, presumably, survival in this abusive environment hinges upon the victim girls ability to disassociate themselves from the sexual acts they are engaged in.

**c. The Accuracy of the Witness' Prior Description of the Criminal**

There is no prior description which can be analyzed in this case.  In fact, none of the girls give any description whatsoever –  nothing pertaining to Mr. Fahlberg's face, his build, his manner of speech, his gate – these identifications are completely devoid of any description.  Further, with explicit evidence demonstrating that L.T.K.G. and D.T.M.V. were both shown Mr. Fahlberg's photograph from the start, and strong evidence suggesting that D.T.M.T. was shown Mr. Fahlberg's photograph as well, any possible description by the girls, regardless of its consistency with Mr. Fahlberg's appearance, would be thoroughly tainted.

**d.    The Level of Certainty Demonstrated by the Witness at the Confrontation**

The only victim girl who gives any level of certainty is D.T.M.V., who parrots the statements of DSS Sarin Vann:

> "do you remember clearly," to which she parrots "clearly."  He adds "100%", to which she scratches her face and parrots again "100%."

Maloney Dec. ¶5(l).

As by Dr. Maloney, and is supported by common sense, the ability of this young girl to gage an identification of an event that purportedly occurred several years ago is not credible.  Moreover, it is an example of what Dr. Dialma describes in

16

1   his declaration as following the leading questions of the interviewer and trying to

2   meet the interviewer's expectations. Dialma Dec. ¶ 9.

3        L.T.K.G. and D.T.M.T. do not give a level of certainty, but admittedly do not

4   equivocate in their recognition of Mr. Fahlberg.  However, all of the surrounding

5   circumstances of the interview highlighted by Dr. Maloney reveal that any

6   acknowledgment of a level of certainty by these identifications is not relevant.  Each

7   girl likely was shown the photograph prior to the video taped identification.  Thus, it

8   is natural that they recognize Mr. Fahlberg – they recently were shown his

9   photograph.

10       Moreover, well established research has shown repeatedly that eyewitness

11  identification confidence is readily contaminated by external information given to the

12  eyewitness. Such confidence or certainty is likely to come from external sources, such

13  as suggestions from a lineup administrator, being told of other evidence against the

14  accused. In this case, due to existence of practice sessions and the showing of a single

15  photograph, contamination is transparent. Studies conducted in the United States,

16  Australia, Canada, Great Britain, and South Africa converge on the conclusion that

17  the confidence that an eyewitness expresses in his or her identification is readily

18  influenced by suggesting to the eyewitness that she or he identified the "right"

19  person".[8] This effect is stronger for witnesses who are mistaken than for witnesses

20  _____

21       [8]     Bradfield, A. L., Wells, G.L., & Olson, E.A. (2002). The damaging effect
    of confirming feedback on the relation between eyewitness certainty and identification
22  accuracy. *Journal of Applied Psychology, 87,* 112-120; Charman, S. D., & Wells, G.
    L. (2008). Can eyewitnesses correct for external influences on their lineup
23  identifications? The actual/counterfactual assessment paradigm. *Journal of
    Experimental Psychology:Applied, 14,* No. 1, 5-20; Douglass, A. B., & McQuiston-
24  Surrett, D. M. (2006). Post identification feedback: Exploring the effects of sequential
    photospreads and eyewitnesses" awareness of the identification task. *Applied
25  Cognitive Psychology, 20,* 991-1007; Douglass, A. B., & Steblay, N . (2006). *Applied
    Cognitive Psychology, 18,* 901-912; Lampinen, J.M., Scott, J., Pratt, D,, Ledding, J.K.,
26  & Arnal, J.D. (2007). 'Good, you identified the suspect.. .but please ignore this
    feedback': Can warnings eliminate the effects of post-identification feedback? *Applied
27  Cognitive Psychology, 21,* 1037-1056; Neuscahtz, J. S., Lawson, D. S., Fairless, A. H.,
    Powers, R. A., Neuscahtz, J. S., Goodsell, C. A., & Toglia, M . P. (2007). The
28  mitigating effects of suspicion on post-identification feedback and on retrospective
    eyewitness memory. *Law and Human Behavior, 31,* 231-247; Neuschatz, J. S.,

17

1  who are accurate, illustrating once again that witnesses with weaker memories are

2  more malleable. In some cases, witnesses are able to realize later that they were

3  manipulated and that they would have given a different answer (e.g., not made any

4  identification or expressed uncertainty) if the suggestive procedure had not been

5  used.[9]

6      As Professor Dialma states in his declaration, these Vietnamese child sex

7  workers, are particularly susceptible to influence, and therefore any weight given to

8  their level of certainty should be carefully scrutinized by the Court.

9      **e.**    **The Length of Time Between the Crime and the Confrontation**

10      It is unclear what the time gap was between the victims alleged encounter with

11  Mr. Fahlberg and the July 17th and July 18th, 2007 identifications – the descriptions of

12  dates by the victims girls seem at best speculative.  D.T.M.V. who was 11 years old at

13  the time of the interview, states that her encounter with Mr. Fahlberg happened during

14  the month of January, when she was 6 or 7 years old. Maloney Dec. ¶5(f).  If she is

15  correct, then her alleged encounter with Mr. Fahlberg occurred over four years prior

16  to her identification.

17

---

18  Preston, E. L., Burkett, A. D., Toglia, M. R., Lampinen, J. M., Neuschatz, J. S.,
19  Fairless, A. H., Lawson, D. S., Powers, R. A., & Goodsell, C. A. (2005). The effects of post-identification feedback and age on retrospective eyewitness memory. *Applied Cognitive Psychology, 19,* 435-453; Quinlivan, D. S., Neuschatz, J. S., Jimenez, A.,
20  Cling, A. D., Douglass, A. B., & Goodsell, C. A. (2009). Do prophylactics prevent inflation? Post-identification feedback and the effectiveness of procedures to protect
21  against confidence-inflation in earwitnesses. *Law & Human Behavior, 33,* 111-121; Semmler, C., & Brewer, N . (2006). Post-identification feedback effects on face
22  recognition confidence: Evidence for metacognitive influences. *Applied Cognitive Psychology, 20,* 895-916; Semmler, C, Brewer, N., & Wells, G. L. (2004). Effects of
23  postidentification feedback on eyewitness identification and nonidentification. *Journal of Applied Psychology, 89,* 334-346; Skagerberg, E. M. (2007). Susceptibility
24  to postidentification feedback is affected by source credibility. *Applied Cognitive Psychology, 23,* 506-523; Smith, S.M., Lindsay, R.C.L., &Pryke, S. (2000).
25  Postdictors of eyewitness errors: Can false identification be diagnosed? *Journal of Applied Psychology, 85,* 542-550; Wells, G.L., & Bradfield, A.L. (1998). "Good, you
26  identified the suspect:" Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360-376.

27     [9]    Charman, S. D. & Wells, G. L. (2008). Can eyewitnesses correct for
28  external influences on their lineup identifications? *Journal of Experimental Psychology: Applied, 14,* 5-20.

L.T.K.G., who during her interview states that she is 14 years old, estimates that she was 12 years old when she was with Mr. Fahlberg – a two year time span. Keo Dec. ¶5(b).

At the beginning of the interview, D.T.M.T. is shown a photograph of herself, presumably the photograph that was copied from Mr. Fahlberg's computer.  D.T.M.T. does not recall when the photograph was taken or how old she was when the photo was taken. Maloney Dec.¶6(b).  She also states that she does not know when she was with Mr. Fahlberg. Keo Dec. ¶5(d).

There is no clear testimony about when the encounter with Mr. Fahlberg allegedly occurred with any of these victim girls.  What is clear, however, is the fact that it purportedly occurred *years* prior to the identification.   With these problematic identifications stemming from a single photo, after a "practice run," the length of time between the alleged sexual conduct and the identification supports the lack of reliability of the identification.

The case of *United States v. Drougas*, 748 F.2d 8, 28 (1ˢᵗ Cir. 1984) is illustrative of the problem of an identification occurring years after the event in question. In that case, the court observed that "a five-year gap between the crime and the photographic identification is very much greater than would ordinarily be permissible to find an in-court identification reliable."

**B.      THIS COURT SHOULD PRECLUDE ANY TESTIMONY WITH RESPECT TO AN IN-COURT IDENTIFICATION.**

The same five factors enunciated in *Biggers, supra*, for judging the admissibly of tainted out-of-court identifications are also applied to the admissibility to in-court identification.  *United States v. Field*, 625 F.2d 862, 867 (9th Cir. 1980).  Here, the suggestive photo spread likely set an impression in the witness' mind of the image of Mr. Fahlberg.  This fact alone increases the likelihood of misidentification at trial. "A conviction based on identification testimony following pretrial identification violates the defendant's constitutional right to due process whenever the pretrial

1   identification procedure is so "impermissibly suggestive as to give rise to a very
2   substantial likelihood of irreparable misidentification." *Thigpen v. Cory,* 804 F.2d
3   893, 898 (6th Cir. 1986); *quoting Simmons v. United States,* 390 U.S. 377, 384, 88
4   S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *United States v. Valdivia*, 492 F.2d 199, 210
5   (9th Cir. 1973), *cert. denied*, 416 U.S. 940 (1974). Misidentification based upon a
6   tainted and unreliable pretrial procedure would violate Mr. Fahlberg's right to due
7   process. *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967).

8        The Second Circuit decision in *United States v. Tortora*, 30 F.3d 334, 338 (2d
9   Cir.1994) provides a standard for whether a witness may identify the defendant at trial
10  after a pre-trial objection to an identification. "First, the court inquires whether the
11  pre-trial identification procedures were unduly suggestive. Second, if the procedures
12  were unduly suggestive, the court must ask 'whether an in-court identification will be
13  the product of the suggestive procedures or whether instead it is independently
14  reliable.'" *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir.1992), cert. denied
15  510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993).

16       As demonstrated above, it is hard to argue that the production of a single
17  photograph of Mr. Fahlberg after a "practice session" is not unduly suggestive. As for
18  the second prong, based on the declarations of Professor Dialma and Dr. Maloney, an
19  argument that an in-court identification by these victim girls would be anything but
20  the product of the suggestive procedures is ludicrous.  These victim girls, who have a
21  cultural propensity to follow the directions of those in authority, who have been
22  unconstitutionally contaminated throughout the pre-trial identification, and who have
23  revealed repeated indicia of unreliability during their interview, will identify Mr.
24  Fahlberg regardless of whether he engaged in any sexual misconduct or not.

25       The defense asks the Court to consider the factors these victim girls will
26  encounter which will cause them to pick at trial the same person who they chose in
27  the suggestive photo identification.  First, these girls, who probably have never been
28  outside of Cambodia: will be brought by airplane to the United States; will live in a

modern hotel; will have their own caretakers; and will be provided unusual foods and luxuries they are completely unaccustomed to. Then, they will be escorted through Los Angeles and placed in front of a jury of foreigners, speaking a different language, in a formal setting which is beyond anything they have ever seen before.  And either explicitly or implicitly, the victim girls will know that all of these extraordinary activities and significant expenses had been incurred solely for the purpose of identifying the man they identified in the single photograph in July of 2007 (which may have been reinforced numerous times prior to trial).

Then the girls will take the witness stand and there will be no doubt in their mind what they are expected to do.  They will, quite understandably, feel that whoever was responsible for the abuse that they suffered should be brought to justice – in fact, it is likely that they have been empowered or encouraged to work toward this end while they have been living in the NGO.  Under these circumstances, there will be tremendous pressure to identify Mr. Fahlberg as the person who engaged in this illicit sexual conduct, regardless of how unsure they probably are.

Based on these factors, the Court should exclude the in-court identification by L.T.K.G., D.T.M.V and D.T.M.T.

## C.  THE PREJUDICIAL EFFECT OF L.T.K.G., D.T.M.V. AND D.T.M.T.'s IDENTIFICATIONS AND TESTIMONY PURPORTING TO RECOGNIZE MR. FAHLBERG OUTWEIGHS THEIR PROBATIVE VALUE.

Even if the Court were to decide L.T.K.G, D.T.M.V. and D.T.M.T.'s identification testimony is not inadmissible under *Manson/Biggers,* it remains inherently unreliable and should be excluded under FRE 403.

In order to comply with the due process clause, the court, acting under Rule 403, must bar evidence which is inherently too unreliable for rational evaluation by the jury. *See United States v. Enjady* (10th Cir. 1998) 134 F.3d 1427, 1433-35; Peter Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for*

21

*Criminal Cases*, 91 HARV. L. REV. 567, 598 (1978).

Inherently unreliable evidence is irrelevant evidence, and the court's power to exclude such evidence under Rule 403 has been recognized by both federal and state courts. *See, e.g., Georges v. Government of Virgin Islands*, 119 F.Supp.2d 514, 524 (D. Virgin Islands 2000) (court excluded testimony based on a witness's four-year-old memory because it was not reliable and thus the prejudice outweighed its probative value); *Plastipak Packaging, Inc. v. DePasquale*, 75 Fed.Appx. 86, 90 (3rd Cir. 2003) (deposition testimony of witness was so unreliable that its probative value was substantially outweighed by the danger of prejudice and confusion, thus warranting exclusion, in light of concerns regarding the witness's credibility, uncertainty as to the basis for his statements, contradictory testimony from other witnesses, multiple layers of hearsay and the inability of the jury to assess witness's credibility); *Precision Piping and Instruments, Inc. v. E.I. du Pont Nemous*, 951 F.2d 613, 620 (4th Cir. 1991) (trial judge has discretion to exclude statement of multiple hearsay under FRE 403, even if each included portion meets the requirements of an exception, where the statement is so unreliable that  its probative value is outweighed by the danger of prejudice and confusion); *U.S. v. Jones*, 123 Fed.Appx. 773, 775 (9th Cir. 2005) (cross-examination regarding citizen complaints against officers could have been properly excluded under FRE 403 due to the "inherently unreliable" nature of un-sustained complaints, confusion and waste of time); *State v. Fulton* (1987) 742 P.2d 1208 (where the Utah Supreme Court found that Rule 403 could be used to exclude inherently unreliable testimony).

In a criminal case, where Mr. Fahlberg's life is hanging in the balance, such inherently suspect evidence must be viewed cautiously before an irreversible error has occurred.

\\

\\

1   **D.    IN THE ALTERNATIVE TO AN ORDER SUPPRESSING THE PRE-**
2   **TRIAL AND IN-COURT IDENTIFICATIONS, THE DEFENSE**
3   **REQUESTS A PRETRIAL HEARING WHERE THE COURT CAN**
4   **ASSESS THE RELIABILITY OF THE VICTIM GIRLS'**
5   **IDENTIFICATION**

6   If the Court is reluctant to suppress the victim girls' identification based on the
7   state of the record, the defense request an evidentiary hearing to enable the Court to
8   assess the reliability of these witnesses.   The defense believes the best arena to hold
9   this hearing would be by way of live testimony in a pretrial hearing before the Court.
10  However, the defense recognizes that government may argue that there are legitimate
11  financial and logistical problems to bringing the victim girls to the United States.  If
12  the Court agrees with the government, then the defense requests the Court order the
13  government to produce these witnesses for deposition while the parties are in
14  Cambodia engaged in other Rule 15 depositions on July 19th and 20th, 2010.

15  With respect to whether a pretrial hearing is required,"[w]here there is a
16  contention that the pretrial identification was the result of impermissibly suggestive
17  procedures, a *Wade* hearing [*United States v. Wade*, 388 U.S. 219 (1967)] is
18  advisable." *Dunnigan v. Keane*, 137 F.3d 117, 128-29 (2d Cir.1998), *cert. denied* 525
19  U.S. 840, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998).

20  Further, Rule 12(e) of the Federal Rules of Criminal Procedure requires the
21  Court to state the essential findings in support of the ruling on a suppression hearing
22  on the record.  It is the position of the defense that based on the declarations of Dr.
23  Maloney and Professor Edialma, the record in this case is sufficient to support the
24  suppression of the identification testimony of L.T.K.G., D.T.M.V and D.T.M.T.  If
25  the Court is not prepared to rule as such, and since the ruling sought in this motion is
26  heavily dependent upon the facts of this case, an evidentiary hearing will be
27  necessary.  Further, if the Court is considering to deny this motion, it is the position of
28  the defense that it is premature to do so without an evidentiary hearing.

# IV.

## CONCLUSION

No party can condone the tragic abuse that the victim girls in this case have suffered from;  but that abuse does not justify a blatant violation of Mr. Fahlberg's constitutional rights.  The defense anticipates that the government will respond to this motion by listing other damaging circumstantial evidence and will argue that this circumstantial evidence corroborates the victim girls testimony.  But there is no evidence that corroborates Mr. Fahlberg having sexual relations with the victim girls in this case, there is no witness other than these girls who can testify that Mr. Fahlberg ever had sexual relations with a minor, and further, Mr. Fahlberg specifically denies having sexual relations with child prostitutes in brothels in Cambodia.

No crime has a greater stigma in our society, and perhaps the world over, than being accused of acts of pedophilia.  And there is no greater tragedy in the criminal justice system than being falsely accused of this crime.  The precariousness of a conviction based on child witness testimony where there is evidence of manipulation by the government, and where a substantial showing has been made that the witnesses are prone to fabricating their responses based on the expectations of their questioners cannot be overstated.  In the United States convictions child molestation have been reversed based on improper interview techniques *after* the individual had already served a lengthy prison sentence, and the children whose testimony was the primary evidence against the defendant had subsequently recanted their testimony.[1]  It is based on identification testimony such as that of L.T.K.G., D.T.M.V and D.T.M.T. which cause wrongful convictions for child molestation to occur.

---

[1]  *See* Exhibit A, *In the Matter of the Claim of John Stoll*, Claim No. G550759, in which the defendant served 19 years in custody and, based on a finding by the Kern County Superior Court in granting a Petition for Writ of Habeas Corpus that the child testimony against the defendant was procured by improper interview techniques, and supported by the recantation of five former children who were purportedly victims.

24

1       Based on the proffered testimony provided by Dr. Maloney and Professor

2  Dialma – and even without this testimony – based on: 1) the presentation of a single

3  photograph of Mr. Fahlberg; 2) the fact that a practice session occurred with each

4  victim girl prior to the video taped interview; and 3) the transparent manipulation of

5  the  interviews of L.T.K.G., D.T.M.V and D.T.M.T. by the government agents, the

6  Court should suppress the victim girls' identifications.

7

8                                       Respectfully submitted,

9

10                                  KAYE, McLANE & BEDNARSKI, LLP

11

12  DATED: May 31, 2010         By_____/S/_____

                                     RONALD O. KAYE

13                                 Attorneys for Curtis David Fahlberg

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28