RONALD O. KAYE (No. 145051)
KEVIN J. LaHUE
KAYE, McLANE & BEDNARSKI, LLP
234 E. Colorado Blvd.  Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
rok@kmbllp.com

Attorneys for Defendant
CURTIS DAVID FAHLBERG

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 09-00683-MMM |
| Plaintiff, | REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION TESTIMONY OF L.T.K.G., D.T.M.V., AND D.T.M.T.; DECLARATIONS. |
| v. | |
| CURTIS DAVID FAHLBERG, | |
| Defendant. | Hearing Date:   June 28, 2010 Hearing Time:   1:15 p.m. Court: Hon. Margaret M. Morrow |

Defendant Curtis David Fahlberg, by and through his counsel of record, Ronald

Kaye, respectfully submits this Reply to the Government's Opposition to Defendant's

Motion to Suppress Victim Identification Testimony.

\\

\\

\\

\\

\\

\\

\\

1    This Reply is based upon the attached Memorandum of Points and Authorities, the

2  attached declarations, all files and records in this case, and any further evidence that may

3  be adduced at the hearing on this motion.

4

5                                        Respectfully submitted,

6

7                                        KAYE, McLANE & BEDNARSKI, LLP

8

9  DATED: June 21, 2010              By_____/S/_____
                                        RONALD O. KAYE
10                                      Attorneys for Curtis David Fahlberg

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES CITED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

MEMORANDUM OF POINTS AND AUTHORITIES

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.   THE PHOTO IDENTIFICATIONS OF
          MR. FAHLBERG WERE UNNECESSARILY
          SUGGESTIVE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.   THE IDENTIFICATION TESTIMONY BY THE
          VICTIM GIRLS IS NOT RELIABLE. . . . . . . . . . . . . . . . . . . . . 7

          1.   Defendant's Experts Provide Clear and Persuasive
               Expert Opinions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          2.   The Presence of Numerous Photographs of the
               Victim Girls on Mr. Fahlberg's Computers Does
               Not Salvage the Reliability Problems of the Victim
               Girls Identifications. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          3.   L.T.K.G.'s Statements Against Mr. Fahlberg
               are Not Reliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          4.   The Report of D.T.M.V's Statements Against Mr.
               Fahlberg By Itself Does Not Support the Reliability
               of her Identification. . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          5.   The Two to Four Year Time Gap Between the
               Alleged Sexual Contact and the Identifications of
               Mr. Fahlberg is Particularly Troubling in This Case. . . 17

i

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3   *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476 (9th Cir. 1991). ..... 10, 11

4   *Manson v. Brathwaite*, 432 U.S. 98 (1977). ................................... 2

5   *Mysholowsky v. People*, 535 F.2d 194 (2nd Cir. 1976). ............................... 4

6   *Neil v. Biggers*, 409 U.S. 188 (1972). ........................................... 2

7   *United States v. Ash*, 413 U.S. 300 (1973)................................... 5

8   *United States v. Baxter*, 492 F.2d 150 (9th Cir. 1973)............................. 3, 5

9   *United States v. Donelson*, 450 F.3d 768 (8th Cir. 2006)............................. 3

10   *United States v. Carbajal*, 956 F.2d 924 (9th Cir. 1992). ............................. 8

11   *United States v. Field*, 625 F.2d 862 (9th Cir. 1980). ................................. 8

12   *United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000)............................. 11

13   *United States v. Monks*, 774 F.2d 945 (9th Cir. 1985)................................. 8

14   *United States v. Finley*, 245 F.3d 199 (2nd Cir. 2001). ............................. 20

15   *United States v. Higginbotham*, 539 F.2d 17 (9th Cir. 1976). ..................... 3

16   *United States v. Lawrence*, 349 F.3d 109 (3rd Cir. 2003). ......................... 3

17   *Wiggins v. Greiner*, 2005 WL 1182091 (2nd Cir. 2005)......................... 3, 4

18

### JOURNALS AND TREATISES

19   Loftus, E. F. (1979). *Eyewitness testimony.* Cambridge, MA: Harvard

20   University Press. ........................................................................... 18

21   Loftus, E. F., & Greene, E. (1980). Warning: Even memory for faces

22   may be contagious. *Law and Human Behavior, 4,* 323-334........................ 18

23   Loftus, E. F., Miller, D. G., & Burns, H. J. (1978). Semantic integration

24   of verbal information into visual memory. *Journal of Experimental*

25   *Psychology: Human Learning and Memory, 4,* 19-31.. ............................. 18

26   Ost, J. Vrij, A., Costall, A , & Bull, R. (2002). Crashing memories and

27   reality monitoring: Distinguishing between perceptions, imaginations,

28   and false memories. *Applied Cognitive Psychology, 16,* 125-134............... 17

## TABLE OF AUTHORITIES (CONT.)

Talarico, J . M . & Rubin, D.C. (2003), Confidence, not consistency, characterizes flashbulb memories. *Psychological Science, 14,* 455-461...... 17

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The defense and its experts have honestly and vigorously highlighted for the Court multiple bases on which the photo identifications (and naturally, the resulting in court identifications) of the victim girls was unnecessarily suggestive and are not salvaged by their reliability.

In its Opposition, the government makes one thing clear: it hopes that its efforts at ridiculing defense counsel, defaming his experts, and focusing on collateral evidence which prejudices Mr. Fahlberg will prevent the Court from digging deeper to assess whether the identification testimony of L.T.K.G., D.T.M.V. and D.T.M.T is sufficiently reliable to satisfy due process. Even on its face, however, if one should juxtapose the substantial showing of both the suggestability of the victim girls and the inherent problems with their reliability, the failure to further assess the reliability of the victim girls identification may result in the wrong man going to trial on these charges.

Moreover, and beyond what is ascertainable from the videotaped interviews, the government agent's reports and the expert opinions, is the strong possibility that there were multiple practice sessions where Mr. Fahlberg's single photograph was shown to the victim girls – beyond the ones disclosed by the government agents – with the NGO HAGAR representatives, which could have significantly affected the victim girls identification of Mr. Fahlberg.

The obvious response to an accusation of coaching witnesses would be for the government to highlight statements of the victim girls that are both independently corroborated and were not known to the government prior to the videotaped photo identification sessions. The government's has conspicuously failed to provide any information which demonstrates that the victim girls had any accurate information

1

1  about Mr. Fahlberg which was unknown to the government agents prior to the
2  interviews.

3      If Mr. Fahlberg is going to have a fair trial in which his due process rights are
4  protected, the Court must at minimum assess the reliability of the victim girls
5  testimony in a pretrial setting. With the inherent difficulties in defending such a case
6  before a jury, and the significant exposure which Mr. Fahlberg faces, it is the right
7  outcome at this juncture of this case.

8

9                                   **II.**

10                              **ARGUMENT**

11  **A.    THE PHOTO IDENTIFICATIONS OF MR. FAHLBERG WERE**
12         **UNNECESSARILY SUGGESTIVE**

13     It appears that both parties are reasonably in agreement about the underlying
14  legal test for suggestability and reliability set out in *Neil v. Biggers* 409 US 188
15  (1972) and *Manson v. Brathwaite* 432 U.S. 98 (1977). As for the factual support of
16  the unnecessarily suggestive photo identifications, no matter how the government
17  tries to spin its interpretation of the suggestiveness prong, the parties also agree that:

18  •    A single photo of Mr. Fahlberg (not as part of a photo spread) was shown to all
19       three victim girls, L.T.K.G. (with Mr. Fahlberg, Opp. at 4), D.T.M.V. (Gov't
20       Opp. at 8) and D.T.M.T. Gov't Opp. at 6.

21  •    L.T.K.G. and D.T.M.T. had a "practice session"[1] with the government in which

22

---

23          [1]    It is difficult to understand the significance of the government's emphasis
24  that  Special Agent Moore's practice session with the victim girls  "directly preceded
    the portion of the interview that was videotaped." Gov't Opp. at 16. If the interviewer
25  wants to taint the witness' videotaped interview, naturally he would want to have the
    witness videotaped close in time to the "practice session," particularly with inherently
26  unsophisticated witnesses, so that they could most accurately parrot the responses
    which were previously practiced.
27          Moreover, one wonders what possible purpose could a practice session in which
    the photograph of Mr. Fahlberg was shown prior to the videotaping of the victim girls
28  have other than to coach these witnesses.

they were shown the photograph of Mr. Fahlberg prior to the videotaped identification. Gov't Opp. - Moore Dec. at ¶ 4. Even if the Court should accept the report of the non-videotaped interview of D.T.M.V. as true, she too was shown a  single photograph of Mr. Fahlberg prior to her purported identification. Gov't Opp. Exh. A at p. 4.

Further, the very cases cited by the government in its Opposition, compared to the showing of a single photograph after a practice session, reveals the highly suggestive nature of the identification of Mr. Fahlberg by the victim girls (*see* Gov't Opp. at 14.): *United States v. Donelson*, 450 F.3d 768, 773 (8th Cir. 2006)(a six man line up of individuals with similar physical characteristics was shown to the victim in the hospital); *United States v. Lawrence*, 349 F.3d 109, 112 (3rd Cir. 2003)(a six man photo array, with similar characteristics as the shooter, was shown to the witness); *United States v. Baxter*, 492 F.2d 150, 172 (9th Cir. 1973)("This is not a case in which the only photograph the witnesses saw was one of the defendant. . . . They were shown hundreds of photographs both before and after viewing the picture of Baxter."); *United States v. Higginbotham*, 539 F.2d 17, 20 (9th Cir. 1976)(Oregon state police created a photospread where 18 black and white photographs of white, middle-aged men, including three photos of the two suspects, were shown to the witnesses).

Even the case of *Wiggins v. Greiner*, 2005 WL 1182091 (2nd Cir. 2005) cited by the government (Gov' Opp. at 14), supports the threshold determination that the showing of a single photograph of the defendant is inherently a suggestive procedure. The district court in *Wiggins* noted: "that this court has 'consistently condemned the exhibition of a single photograph as a suggestive practice, and where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one." *Wiggins* at *3 (citations omitted). Thus, it was the reliability of the identification in *Wiggins* which enabled a single photograph identification to survive: "Even if we were to resolve the issue of suggestivity in favor of Wiggins, we could nevertheless conclude from the totality of the circumstances evidenced by both the suppression hearing and

1    trial records that the eyewitness had a sufficient independent basis for making a

2    reliable in-court identification." *Wiggins* at *3. Thus, as the government attempts to

3    argue in the instant case, it was *only* the reliability of the identification in the *Wiggins*

4    case which allowed this suggestive photo identification, with a single photograph, to

5    survive.

6    In contrast to the instant case, in *Wiggins*, the eyewitness testified that he saw

7    the suspect two or three times per week in the neighborhood for a period of seven

8    months – between 56 and 84 times. This identification differs dramatically from this

9    context where victim Vietnamese child sex workers saw a vast number of foreigners

10   over the several year term of their tenure in the brothel. *See Infra* at B(2).

11   Ultimately, after reviewing Defendant's moving papers, even the government

12   had to concede that "an out-of-court identification achieved through the use of a

13   single photograph, [is] clearly not the preferable way to effect an identification."

14   Gov't Opp. at 13.

15   Moreover, as emphasized by the Second Circuit in *Mysholowsky v. People*, 535

16   F.2d 194, 197 (2nd Cir. 1976), cited in *Wiggins*, the government has shown *no*

17   "extenuating circumstances [which] justify the procedure [of utilizing a single

18   photograph]." Presumably, in July of 2007 when the interviews occurred, Special

19   Agent Moore and Special Agent Robert King (who also participated in the interviews

20   of L.T.K.G. and D.T.M.E.) were trained and aware of the standard law enforcement

21   photo identification technique of using multiple photographs, and purposefully chose

22   to use a single photograph for the identification of Mr. Fahlberg. There could be no

23   extenuating circumstances justifying the use of a single photograph other than

24   guaranteeing that the identification was successful. ICE agents in Southeast Asia had

25   been investigating the Fahlberg case September of 2006; within 10 months they had

26   the capacity to create a photospread of several 60 year old adult white males; and the

27   meetings with the girls were planned and not spontaneous.

28   Notably, the Ninth Circuit has held that: "[S]uch procedures [presenting a

4

1   single photograph of the suspect to a witness] would not be necessary . . .  where

2   substantial evidence without the identification points to that suspect as the criminal."

3   *United States v. Baxter,*  492 F.2d 150, 171 (9th Cir. 1973).  As predicted in

4   Defendant's moving papers, the government has littered its pleading with references

5   to collateral evidence – photographs of young Asian girls, e-mails, and  downloaded

6   perverted stories – which  it fully exploits as supporting its position that Mr. Fahlberg

7   was engaged in illicit sexual misconduct with minors abroad. Gov't Opp. at 3. Thus,

8   using the *Baxter* standard, after the review of Mr. Fahlberg's computers, the

9   government believed it had substantial evidence supporting Mr. Fahlberg's guilt prior

10  to the showing of the single photograph.  Thus, there are no possible extenuating

11  circumstances to justify these trained agents decision to taint the photo identification

12  of Mr. Fahlberg with the unnecessarily suggestive use of a single photograph.

13         The Supreme Court in *United States v. Ash*, 413 U.S. 300 (1973) held:

14              Pretrial photographic identifications, however, are hardly unique
                in offering possibilities for the actions of the prosecutor unfairly to
15              prejudice the accused. Evidence favorable to the accused may be
                withheld; testimony of witnesses may be manipulated; the results
16              of laboratory tests may be contrived. In many ways the prosecutor,
                by accident or by design, may improperly subvert the trial. The
17              primary safeguard against abuses of this kind is the ethical
                responsibility of the prosecutor, who, as so often has been said,
18              may 'strike hard blows' but not 'foul ones.' *If that safeguard fails,
                review remains available under due process standards.*
19
20  *Id.* at 320, citations omitted. (Emphasis added).

21         In the instant case, the prosecutor was 10,000 miles away and presumably had

22  no idea what type of suggestive photo identification procedures the ICE agents were

23  pursuing.  They were given the mandate by an Assistant United States Attorney in

24  July of 2006 "to locate underage victims of FAHLBERG's alleged sexual abuse in

25  foreign countries who would testify against FAHLBERG." *See* Exhibit B to

26  Defendant's Motion to Suppress Evidence at p. 2.  Clearly these agents were not

27  under the supervision of anyone who had the legal authority to intervene and require

28  that a fair photo identification be utilized, because if they had been they would never

1  have had a "practice session" with the victim girls, and never would have resorted to

2  the use of a single photograph of Mr. Fahlberg on repeated occasions.  As the

3  Supreme Court expressed in *Ash*, without the protection of the prosecutor, due

4  process standards require that the Court examine this photo identification more

5  closely.

6  But beyond what is clearly a flawed identification technique by trained law

7  enforcement agents, what this Court must consider is the realistic chain of events, and

8  the resulting impact therefrom, when a single photograph of Mr. Fahlberg was shown

9  to the victim girls on several occasions,[2] including the likelihood that Mr. Fahlberg's

10  photograph was shown to the victim girls by the representatives of the NGO HAGAR.

11  In its Opposition, the government describes how the photographs of the girls

12  from the Svay Pak area of Cambodia were "circulated and distributed" to NGOs

13  operating in Cambodia.  Gov't Opp. at 3.  Presumably, Mr. Fahlberg's image was

14  present in several of these distributed photographs – at minimum, the photograph of

15  Mr. Fahlberg with L.T.K.G. Gov't Opp. at 19. The defense asks, what is the

16  likelihood that the same agents who elected to engage in a practice session utilizing a

17  single photograph identification technique also sent a photograph of Mr. Fahlberg in

18  order to assist the NGO representatives in their interaction with the victim girls?  And

19  in this vein, what is the likelihood that the NGO representatives who received Mr.

20  _____

21  [2]      The defense submits that the language set out on page 11 of his Motion

22  "based on the showing of a single photograph, *often with Mr. Fahlberg present*, is the
    epitome of an impermissibly suggestive photo lineup" is not the clearest of arguments.
    It is no mystery that defense counsel intended to argue, and it took little insight for the

23  government to understand the intent: that the showing of a single photograph of the
    defendant, often with him present *in the photograph with one of the victim girls*, is the

24  epitome of an impermissibly suggestive photo lineup.  Of all possible parties, the
    government was most aware that Mr. Fahlberg was not physically present during the

25  photo identification.

26  When the government states "it is difficult to decipher what defense counsel is
    attempting to imply by this confusing and inaccurate statement," defense counsel

27  wonders whether the government prefers to play a shell game of semantics and
    ridicule in order to bully its way to victory, rather than focusing on the facts of the

28  case. Gov't Opp. at 13.

6

1   Fahlberg's photograph would present this photograph to the victim girls to, at best,

2   determine whether they recognized Mr. Fahlberg, or at worst, advise the victim girls

3   that Mr. Fahlberg was a person who law enforcement believed engaged in illicit

4   sexual activities with minors at brothels in Svay Pak.[3]

5          As Professor Dialma stated in his declaration filed with Defendant's moving

6   papers:

7                 These Vietnamese girls working in these brothels are required to act
                  in a "polite" way, and are taught to fulfill the expectations of adults.
8                 This includes interviewers from groups / agencies that are
                  intervening to protect them. They are very compliant with the moral
9                 authority, be it parents, NGO representatives, police and adults in
                  general.
10

11  Dialma Dec. at ¶ 5, attached to Defendant's Motion.

12         Once the ball was set in motion and the victim girls were shown the single

13  photograph of Mr. Fahlberg by the NGO representatives, or at minimum, by law

14  enforcement, the victim girls were highly likely to choose Mr. Fahlberg as the man

15  who had violated them, regardless of whether that was the truth.  The unnecessary

16  suggestiveness of the photo identifications is undebatable.

17  **B.     THE IDENTIFICATION TESTIMONY BY THE VICTIM GIRLS IS
           NOT RELIABLE**
18

19         Faced with this overwhelming evidence of suggestivity, and at minimum, the

20  reasonable circumstantial evidence that the reliability of an identification several

21  years later by victim girls who work in brothels receiving repeat customers is suspect,

22  the government apparently needed to roll up its sleeves and get dirty.  Defaming

23  Defendant's experts and ridiculing defense counsel appears to be the appropriate

24  tactic where logic and evidence do not favor the government.

25         But the defense asks the Court to objectively view what is highly likely to have

26  occurred here.  Ultimately, the Court must engage in a balancing test, weighing

27  _____

28         [3]      What the representatives of the NGO HAGAR presented to the victim
    girls would be discovered through an evidentiary hearing with the victim girls.

1   suggestivity against reliability.  *U.S. v. Field,* 625 F.2d 862 (9th Cir. 1980), ("the

2   reliability of identification evidence is tested by weighing the indicia of reliability

3   against the corrupting tendencies of the suggestive pretrial identification procedure.");

4   *U.S. v. Monks*, 774 F.2d 945 (9th Cir. 1985) ("We therefore conclude that the high

5   degree of reliability suggested by our consideration above of the five factors

6   outweighs the corrupting effect of the unbalances in the photo display."); *U.S. v.*

7   *Carbajal*, 956 F.2d 924 (9th Cir. 1992) (where the court found that a photo lineup was

8   not impermissibly suggestive, but because it was slightly suggestive, examined the

9   five factors of reliability and weighed them against the identification).

10       In the instant case, outside of a hypothetical specific statement caught on the

11  videotape where the ICE agent points to Mr. Fahlberg's photograph and says to a

12  victim girl: "this is the man who molested you," it is hard to imagine a more

13  suggestive photo identification procedure than what is before the Court.

14  Consequently, the reliability of the victim girls must be particularly high in order to

15  salvage this photo identification.

16       As described below, the reliability of L.T.K.G., D.T.M.V. and D.T.M.T.'s

17  identification is fraught with problems, which does not sanitize this transparently

18  suggestive identification.

19       **1.    Defendant's Experts Provide Clear and Persuasive Expert**

20              **Opinions**

21       First and foremost, the lack of reliability of the victim girls testimony is

22  supported by careful analysis, and extensive expert experience, by Defendant's "cadre

23  of paid" experts (Gov't Opp. at 15, and 11).[4]  Dr. Maloney is the Mental Health

24  Clinical District Chief, Department of Mental Health, for the Los Angeles County,

25  Jail Mental Health Services.  Expert testimony is by no means the primary means in

26  _____

27       [4]      To the best of defense counsel's knowledge, the vast majority of experts, retained on behalf of the United States Attorney's Office and the Office of the Federal

28  Public Defender for assistance in litigation in the Central District of California, other than actual government employees, are "paid."

which he earns his living.  And Professor Dialma, in his position as prior counsel for the anti-trafficking NGO, AFESIP Cambodia (Acting for Women in Distressing Situations), in Phnom Penh, has served several years of his professional life combating sex trafficking of minors in Cambodia.  Neither expert is the "hired gun" that the government condemns.

Further, with regard to Professor Dialma, defense counsel specifically made a clear decision, which was agreed to by Professor Dialma, and which was explicitly highlighted for the Court in Professor Dialma's declaration, that he would not review the underlying case materials so as not to taint his opinion.  *See* Declaration of Counsel at ¶ 2.  It is Dr. Maloney who has the expertise to assess the particular responses of the victim girls, and it is Professor Dialma who has the expertise to provide the Court with the background of this particular ethnic and cultural population.  Rather than "piling on" expert opinions, the Defendant's experts discretely and appropriately opined on areas relevant to their expertise, and did not expand beyond that role.

Consequently, contrary to government's accusation, it was not that Professor Dialma "has never bothered to review any materials from this case,"or "did not take the time to learn any of the facts of this case" (  Gov't Opp. at 17), Defense counsel consciously chose not to present Professor Dialma either with the government reports, the victim girls' videotaped interviews with the ICE agents or with Dr. Maloney's conclusions. That way, Professor Dialma would only provide the ethnic and cultural background of this group for the Court to make its decisions.

Further, contrary to the government's ranting, Professor Dialma does not "make[] the blanket statement that the victims in this case must be lying because of their former status as child prostitutes." Gov't Opp. at 17.  In order to best serve the Court, and to preserve the integrity of his expert opinion, Professor Dialma does not opine whether the victim girls are lying or not.  He does not have the necessary information, probably does not have the necessary expertise, and is not permitted to

9

1    make this credibility call for the Court.

2         Ultimately, it is unreasonable for the government to object so vigorously to

3    Professor Dialma's opinion. The Ninth Circuit has approved the use of expert

4    testimony about the culture, language and motivation of individuals who have a

5    background far removed from that of the jury or of the Court.

6         In *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476 (9th Cir. 1991), the

7    plaintiffs, Hmong refugee women from Laos, sued the defendant, a government

8    official, for repeatedly raping them.  Plaintiffs' counsel offered the testimony of an

9    epidemiologist with the Seattle Department of Health to explain why the plaintiffs

10   repeatedly acquiesced to the advances of the government official, and why they did

11   not disclose the fact that he raped them immediately after the violations.  The district

12   court permitted the cultural expert to testify:

13            generally as to the Hmong culture, but [he was precluded from
               testifying] as to his opinion regarding the specifics of this case,
14            such as whether there was a rape or why these particular plaintiffs
               did not report the rape.

15
               At trial, [the expert] explained that Hmong women are generally
16            submissive, and are raised to respect and obey men. He described
               the role of Hmong women in marriage; their attitudes towards sex,
17            discussion of sex, and extramarital affairs. Most significantly, [the
               expert] explained that upon fleeing from Laos, Hmong refugees
18            were reliant on government officials for their needs and would not
               survive in the United States without government assistance.
19            Because of this reliance on government assistance, the Hmong
               have developed an awe of persons in government positions.
20
21   *Id.* at 481.

22        The Ninth Circuit upheld the admission of this expert testimony, holding that:

23            the testimony was relevant to assist the trier of fact to understand
               certain behavior of the parties here that might otherwise be
24            confusing and to explain the cause, effect and nature of long term
               Hmong reliance on governmental agencies for support. The
25            testimony was prejudicial to Xiong because it supported plaintiffs
               assertions that he raped them. It was not, however, unduly
26            prejudicial because of its limited scope and its direct relevance to
               the issues in the case.

27   *Id.* at 481-482.

28        Similar to the decision in *Dang Vang*, Professor Dialma's testimony is highly

                                           10

relevant to provide necessary cultural background information about Vietnamese child sex workers in Cambodia to the Court, and appropriately, the defense did not disclose the facts of this case to him, which the *Dang Vang* court similarly precluded any reference to from the cultural expert's trial testimony.

Further, particularly in the Central District of California – especially in local RICO gang cases, where the defendants speak English and/or Spanish, live in the United States, and share at minimum similar mass medial cultural norms with the jurors, the government vigorously defends its right to offer gang expert testimony to explain exactly what the defendant gangsters mean through their wiretap communications. *See U.S. v. Hankey*, 203 F.3d 1160, 1169-70(9th Cir. 2000)(gang expert with substantial experience about gang's "colors," signs, and activities, could testify about the "code of silence" and "retaliation" characteristics of the gang). It is difficult to imagine how the testimony of an expert who opines on the culture of Vietnamese children, sold into sex slavery in a hostile foreign country, should be any less credible or relevant.

The defense will not reiterate the opinions of these experts – they are clearly set out in Defendant's moving papers. But their credibility, based on sworn declarations, bolstered by curriculum vitaes which reveal relevant expertise in their field, should be respected. The government's scorched earth campaign to attack their testimony only highlights how compelling Dr. Maloney and Professor Dialma's testimony actually is.

**2.     The Presence of Numerous Photographs of the Victim Girls on Mr. Fahlberg's Computers Does Not Salvage the Reliability Problems of the Victim Girls Identifications**

Outside of the character attacks against defense counsel and his experts, the primary argument by the government to support the reliability of the victim girls identification is the fact that there are numerous photographs of the victim girls on Mr. Fahlberg's computers. What these photographs admittedly demonstrate, however, is that Mr. Fahlberg was physically present with these victim girls. Simply

11

put, just because Mr. Fahlberg "previously encountered" these victim girls does not mean that he had sexual contact with them. Gov't Opp. at 11.

What the Court should focus on with regard to the victim girls' identifications is how they differ from the more common, child molestation cases, where child witness identifications are more reliable. In the common child molestation case, the victim child is confronted with a dramatic, assaultive encounter, either with someone he / she knows well, or a random stranger. He or she then brings this molestation to the attention of another adult, and there is rapid follow-up investigation.

In the instant context, however, sometimes more than 20 victim girls, were routinely paraded into a room to be viewed by foreigner clients visiting the brothel. *See* depiction of D.T.M.T's interview at Gov't Opp. at 6. Then, the victim girls were either chosen or not chosen to have sexual relations with the foreigners. As stated in their interviews, L.T.K.G. stated that she had sexual relations with "many" foreigners, and when D.T.M.T. was asked how often she had sex with a foreigner, her response was "often." Maloney Dec. at ¶¶ 4(h), 6(d). Without question, the victim girls repeatedly saw many, many foreigners.

We cannot assume that Mr. Fahlberg had sexual relations with the girls that he took photographs of. As demonstrated in the attached declaration of Professor Dialma, approximately 90 % of the prostitutes at Svay Pak brothels in the years 2002-2005 were the age of majority. Thus, contrary to the government's theory, Mr. Fahlberg could have just as likely been frequenting the brothels to have sexual relations with adult prostitutes, and took photographs of the young girls he saw at the brothel, without ever having sex with them.[5]

What supports this explanation for the photographs on the lap top is that there is not one photograph of any of the victim girls, or for that matter, any of the girls

---

[5]    It is critical to note that Mr. Fahlberg is not on trial for frequenting brothels in Cambodia, nor even for having sexual relations with child prostitutes in general. Rather, it is the responsibility of the Court to determine whether the reliability of these *three specific victims* comports with due process.

from the Svay Pak brothels, which are nude.  As the government so eagerly exploits

in its depiction of the contents of Mr. Fahlberg's laptops, there are many photographs

of girls that are "completely nude, and in others, the girl or girls shown in the

photograph are topless or wearing nothing but a towel wrapped around their waist."

Gov't Opp. at 3.[6]  Notably, however, unlike other photographs of other young women

on Mr. Fahlberg's computers, there are no naked photographs of these victim girls.

Specifically, this is in direct contradiction to the interview of L.T.K.G. where

she states that Mr. Fahlberg would "take nude photographs of her as well."  Gov't

Opp. at 6.  If, as the government suggests, Mr. Fahlberg kept photographs of these

girls as "mementos"(Gov't Opp. at 11), and he had multiple nude photos of other

women on his computers, why did he not save nude photographs of L.T.K.G?  Each

and every computer owned by Mr. Fahlberg – those seized in the United States at that

airport and those seized from his residence in Thailand – has been carefully

scrutinized by the government's forensic experts.  If such a photograph existed, or at

one time existed and was deleted, it would be know to the government.  The absence

of these alleged nude photographs of L.T.K.G., or any other of the victim girls at Svay

Pak, further supports their lack of reliability.

### 3.    L.T.K.G.'s Statements Against Mr. Fahlberg are Not Reliable

As described above, the first issue that causes concern about the reliability of

L.T.K.G. is the fact that, contrary to her interview, there are no nude photographs of

L.T.K.G on any of Mr. Fahlberg's computers.

The other factor that the government highlights is the fact that L.T.K.G.

specifically identified Mr. Fahlberg as "CD."  Gov't Opp. at 15.  What is unclear,

---

[6]    After reviewing the photographs at ICE Forensic Headquarters, there appear to be no photographs of nude pre-pubescent girls, and the two photographs which the government has labeled as child pornography is reasonably viewed as that of an adult woman.  Further, the photographs of the nude woman appear to be in  Mr. Fahlberg's apartment in Thailand, not in a brothel context. Declaration of Counsel at ¶ 3, attached hereto.

however, is whether there was a previous discussion where the name "CD" was used prior to this interview.  It is clear that the government was aware of the name as early as July of 2006 – approximately one year before the interview of L.T.K.G. – through the review of Mr. Fahlberg's e-mails. Gov't Opp. at n.4. It is also clear that the government agents met with L.T.K.G. prior to her interview, and more than likely, that the representatives of the NGO HAGAR also met with L.T.K.G. about the purpose of her interview with the government agents.

Inherently, the Court should ask, how likely is it that this non-English speaking victim girl, who admittedly has not seen Mr. Fahlberg for two years, who has been with multiple foreigners, would independently remember what his name was? Without an evidentiary hearing, it is difficult for the Court to determine whether the purported identification of "CD" was not intentionally, or inadvertently, shared with L.T.K.G. prior to the July 17, 2007 interview.

### 4. The Report of D.T.M.V's Statements Against Mr. Fahlberg By Itself Does Not Support the Reliability of her Identification

The primary focus of the government's argument concerning D.T.M.V. appears to be the fact that defense counsel confused D.T.M.E. with D.T.M.V. in Defendant's moving papers.  The government believes it is of such relevance to the merits to its Opposition that it raise this fact five separate times. Gov't Opp. at 2, 7, 10, n.10, 13.[7]

Outside of ridiculing defense counsel, the government argues that the written report attached as Exhibit A to its Opposition fully substantiates D.T.M.V.'s reliability.  First, where three video taped interviews provide substantial evidence of

---

[7]     The likelihood of confusion with the use of initials for the lengthy names of the victim girls is further demonstrated by the government's own unintentional use of the initials L.T.K.G. for victim girl D.T.M.T. *See* Gov't Opp. at n.6.  Further, the interview notes of D.T.M.E., the victim girl who defense counsel confused with D.T.M.V., has her name written out that translates to the initials D.T.M.Y. *See* Declaration of Counsel at ¶ 4. Finally, the government's efforts to impute this error to Dr. Maloney as well as defense counsel is misplaced. Gov't Opp. at n.7.  The inaccurate tracking of the initials of the victim girls is entirely defense counsel's doing, and has nothing to do with Dr. Maloney. Declaration of Counsel at ¶ 5.

1    suggestive techniques by the same government agents – ICE Agent Paul Moore and

2    particularly DSS Investigator Sarin Vann acting as an interpreter – why should this

3    Court assume that a report of an interview over a month later accurately describes

4    what occurred in the interview of D.T.M.V.  Although the government hopes the

5    Court will consider the videotaped interview of D.T.M.E. as having "no significance,"

6    the suggestive techniques used in that interview, as highlighted by Dr. Maloney in his

7    declaration, as well as in the videotaped interviews of L.T.K.G. and D.T.M.T., should

8    give this Court little confidence that D.T.M.V.'s interview was without the suggestive

9    influence by the government agents.

10        But also, why was there no videotaped recording of D.T.M.V., particularly after

11   L.T.K.G., D.T.M.E., and D.T.M.T. were videotaped over a month earlier.  The

12   government wants the Court to believe that D.T.M.V. did not want to be videotaped,

13   and the agents agreed to that condition.  But in the hand written notes, presumably

14   written contemporaneously with the interview, there is no reference to D.T.M.V's

15   refusal to be videotaped. *See* Declaration of Counsel at ¶ 6. Only in the typed report

16   from September 26, 2007 – 25 days after the interview – does the agent who drafted

17   the report state that D.T.M.V. requested not to be videotaped.  One would think that a

18   procedure that the government believed was necessary in all the July, 2007 interviews

19   of the victim girls would at least be referred to in the contemporaneous hand written

20   notes.  With such an important interview, probably all the government needed to say

21   to D.T.M.V. was that it was important for the case for her interview to be videotaped,

22   and more than likely D.TM.V. would have agreed.  More likely, after engaging in

23   several videotaped interviews which candidly reveal manipulation by the agents with

24   particularly unsophisticated witnesses, the government reassessed its strategy and

25   chose to not videotape D.T.M.V.

26        Moreover, the government attempts to rebut Professor Dialma's opinion about

27   the likelihood of Vietnamese child sex workers conforming to the expectations of

28   interviewers by highlighting D.T.M.V.'s purported initial "false" denial of identifying

1   Mr. Fahlberg.  What the government does not address is the fact that D.T.M.V. was

2   initially in the presence of her grandmother and two local Svay Pak community police

3   officials.  Gov't Opp. at Ex. A, p. 4.  It is unclear how this dynamic played out: would

4   it be problematic for D.T.M.V. to cooperate with foreign law enforcement and

5   identify a westerner in front of the local police officials who have a notorious

6   reputation of accepting bribes and abusing child prostitutes?

7        And when D.T.M.V. purportedly identified Mr. Fahlberg, she was accompanied

8   by "an adult female that wished to remain anonymous during the interview." *Id* at 6.

9   Of course, the defense would want to know who was this individual, what was her

10  relationship to D.T.M.V., what did she say during the interview, etc.  Without a

11  videotape, the Court can only speculate – which further supports the need for an

12  evidentiary hearing in which D.T.M.V. will explain the circumstances surrounding

13  her interview.

14       It is very convenient for the government to argue that the Court should discount

15  Defendant's Motion with regard to D.T.M.V. because of a lack of any specific

16  evidence undermining her reliability. Gov't Opp. at 10.  But the argument requesting

17  the suppression of the photo identification of D.T.M.V. is not a "new argument" at all;

18  rather the Court should examine the totality of the circumstances surrounding the

19  videotaped interview of the three other victim girls presented in Defendant's moving

20  papers and apply them to the non-videotaped interview of D.T.M.V.

21       Common sense dictates that where government agents engaged in

22  unconstitutional practices, on the same type of witness, on the same case, less than

23  two months prior to the interview of D.T.M.V., the Court should want to analyze the

24  suggestive nature and the reliability of D.T.M.V.'s photo identification more closely.

25  It is not the fault of the defense that the government did not videotape this interview,

26  and thereby fail to provide the defense with the same vantage point to assess this

27  interview.  Consequently, an evidentiary hearing is particularly important for this

28

16

victim girl.[8]

5.    **The Two to Four Year Time Gap Between the Alleged Sexual
      Contact and the Identifications of Mr. Fahlberg is Particularly
      Troubling in This Case**

Eyewitness research shows that the only direction that memory can go with time is down. Importantly, as memory fades it is not simply the case that people report that they do not recall, they fill in their poor memory with information that is not true. For example, 50% of people's memories for details of the September 11th World Trade Center attacks were recalled differently 32 weeks later (rather than saying they could not recall).[9] Also, after only several months, 44% of those interviewed recalled seeing the crash of Princess Diana's car in Paris, France on television.  In truth, this crash was never recorded.[10]

In this case, however, the impact of time is compounded by the facts surrounding the identification by these victim girls. In a common sexual molestation case, the victim overwhelmingly is not the victim of countless violations by different perpetrators.  In that context, particularly if the victim knew the perpetrator – e.g., a relative or a teacher – the accuracy of the victim's memory will naturally fade with time, but at least there is only one perpetrator, and there is not the strong possibility of mixing the memories of multiple possible contacts.

In the instant case, these victim girls had sexual contact with foreigners "many" times in the case of L.T.K.G., and quite "often" in the case of D.T.M.T.  Further,

---

[8]    Defense counsel does not find the need to specifically reply to the government's arguments with regard to the reliability of the photo identification of D.T.M.T. in this Reply.  Defendant's moving papers provide a substantial basis for this argument.

[9]    Talarico, J . M . & Rubin, D.C. (2003), Confidence, not consistency, characterizes flashbulb memories. *Psychological Science, 14,* 455-461.

[10]    Ost, J. Vrij, A., Costall, A , & Bull, R. (2002). Crashing memories and reality monitoring: Distinguishing between perceptions, imaginations, and false memories. *Applied Cognitive Psychology, 16,* 125-134.

17

outside of having sexual contact with foreigners, the victim girls encountered foreigners who visited the brothels and viewed the victim girls in a group.  Add several years to this memory, and it is undebatable that the memory of these victim girls is suspect.

Memory research has uncovered the fact that memory testimony changes as people encounter additional information after the witnessed event.[11] This additional information (called post-event information) need not be accurate or true in order to become a part of the eyewitness's memory report. For example, after witnesses overheard a co-witness mention that a man they just viewed had crooked teeth or wavy hair or a mustache (when in fact none of these were true of the man they saw), over 30% later mentioned the false information in their own descriptions.[12] In general, the weaker the memory of the witness (e.g., due to longer retention intervals), the more receptive the witness is to incorporating post-event information into memory. Even delays as short as one week increase receptivity to incorrect post-event information compared to one-day delays.[13]

In the instant case, there is no dispute that the events at issue occurred years before the identification.  The time delay alone heightens the likelihood of a false memory / identification occurring.  But juxtapose this factor with: 1) the showing of a single photograph during a practice session, 2) the expert testimony of Dr. Maloney reflecting the lack of integrity of the videotaped interviews (let alone what the practice session entailed), 3) Dr. Dealma's expert testimony reflecting the cultural tendencies of child Vietnamese sex workers who are immigrants in Cambodia, and 4)

---

[11]    Loftus, E. F. (1979). *Eyewitness testimony.* Cambridge, MA: Harvard University Press.

[12]    Loftus, E. F., & Greene, E. (1980). Warning: Even memory for faces may be contagious. *Law and Human Behavior, 4,* 323-334.

[13]    Loftus, E. F., Miller, D. G., & Burns, H. J. (1978). Semantic integration of verbal information into visual memory. *Journal of Experimental Psychology: Human Learning and Memory, 4,* 19-31.

the strong possibility that some level of "preparation" was performed by the NGO HAGAR representatives, and the resulting problematic nature of the victim girls identifications could not be more transparent.

**C.**     **IF THE COURT SHOULD NOT EXCLUDE THE IDENTIFICATION OF THE VICTIM GIRLS FROM TRIAL BASED ON THE PLEADINGS, A PRETRIAL EVIDENTIARY HEARING IS NECESSARY IN THIS CASE**

The effort by the government to paint Mr. Fahlberg as an insatiable pedophile before the Court speaks volumes on what will occur at trial before a jury.  Regardless of how unreliably the victim girls testify, and how likely it is that the government agents acted inappropriately in orchestrating the identification of Mr. Fahlberg with the victim girls, the jury will be unwilling to listen.  They will focus on the implicit or explicit argument that Mr. Fahlberg is a danger to the community, and the likely motivation for their guilty verdict will be the perceived need to incarcerate him indefinitely.

Further, the effort to demonstrate the victim girls unreliability at a hearing will inherently taint the credibility of defense counsel. Clearly these girls are tragic victims of a great injustice, and defense counsel, who must zealously represent his client, will naturally be seen as another violator, even though he is doing what is required in our system of justice.  This is exactly the type of issue that requires the dispassionate judgement of the Court.

A pretrial hearing in which the Court can assess the victim girls' responses under examination is required.  Unlike *United States v. Finley*, 245 F.3d 199, 204 (2nd Cir. 2001) (Gov't Opp. at 24) where the court held that the sworn affidavit of the government agent was sufficient in lieu of an evidentiary hearing, the focus of Defendant's request for an evidentiary hearing is the victim girls themselves, not a seasoned law enforcement officer.

These victim girls, who, based on the evidence before the Court, have: 1) been exposed to an extremely suggestive photo identification; 2) engaged in at least one

19

practice session; 3) been manipulated in their videotaped interview; 4) a cultural propensity that may lead to them meeting the expectations of a person of authority in an identification; 5) made their identifications years after the event; and 6) been victims of numerous other foreign clients in a brothel setting, must be further scrutinized by the Court if Mr. Fahlberg's due process rights are to be honored.

There is no question that Mr. Fahlberg faces great hurdles when fighting these particularly dastardly charges. But he very well may be innocent of these charges, and the Constitution presumes him to be so. Consequently, he needs the protection of the Court to preserve a fair trial. A pretrial hearing is the necessary procedural step to further this goal.

### III.

### CONCLUSION

For the above reasons, Defendant respectfully requests the Court grant Defendant's Motion to Suppress the Photo Identification of L.T.K.G., D.T.M.V. and D.T.M.E., or grant an evidentiary hearing in which the victim girls testify in front of the Court. If the Court is inclined to grant the evidentiary hearing, the defense requests that it occur immediately in the federal district court, or by way of deposition when the parties are engaged in the previously scheduled depositions in Phnom Penh, Cambodia on July 19th and 20th, 2010.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

DATED: June 21, 2010          By_____/S/_____
                              RONALD O. KAYE
                              Attorneys for Curtis David Fahlberg

20