RONALD O. KAYE (No. 145051)
KEVIN J. LaHUE (No. 237556)
KAYE, McLANE & BEDNARSKI, LLP
234 E. Colorado Blvd.  Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
rok@kmbllp.com

Attorneys for Defendant
CURTIS DAVID FAHLBERG

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>      v.<br><br>CURTIS DAVID FAHLBERG,<br><br>            Defendant. | CASE NO. 09-00683-MMM<br><br>REPLY TO GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS EVIDENCE CONTAINED ON ELECTRONIC MEDIA; DECLARATION OF COUNSEL; EXHIBIT<br><br>Hearing Date:   June 28, 2010<br>Hearing Time:  1:15 p.m.<br>Court: Hon. Margaret M. Morrow |

        Defendant Curtis David Fahlberg, by and through his counsel of record, Ronald

Kaye, respectfully submits this Reply to the Government's Opposition to Defendant's

Motion to Suppress Victim Identification Testimony.

\\

\\

\\

\\

\\

This Reply is based upon the attached Memorandum of Points and Authorities, declaration of counsel, exhibits, all files and records in this case, and any further evidence that may be adduced at the hearing on this motion.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

DATED: June 21, 2010          By_____/S/_____
                                 RONALD O. KAYE
                                 Attorneys for Curtis David Fahlberg

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES CITED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . 1

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  UPDATED STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . 1

III.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  THE INITIAL SEARCH OF MR. FAHLBERG'S LAPTOP COMPUTERS AT THE AIRPORT WAS NOT BASED ON REASONABLE SUSPICION. . . . . . . . . . 3

    B.  THE SUBSEQUENT SEIZURE AND OFFSITE SEARCH OF MR. FAHLBERG'S LAPTOP COMPUTERS WERE NOT WITHIN THE BORDER EXCEPTIONS, AND THEREFORE REQUIRED A WARRANT, OR IN THE ALTERNATIVE, WAS AN EXTENDED BORDER SEARCH WHICH WAS NOT SUPPORTED BY THE REQUISITE REASONABLE SUSPICION. . . . . . . . . . . . . 4

        1.  The Subsequent Offsite Search of Mr. Fahlberg's Laptop Computers Was Not a Border Search and Required a Warrant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.  The Offsite Warrantless Search was At Most an Extended Border Search Which was Not Supported by The Required Reasonable Suspicion. . . . . . . . . . . 13

    C.  THE GOVERNMENT'S RETENTION OF COPIES OF MR. FAHLBERG'S PRIVATE FILES FOR WHICH IT DETERMINED IT HAD NO PROBABLE CAUSE WAS UNCONSTITUTIONAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alexander v. United States*, 362 F.2d 379 (9th Cir.1966). ........................... 14

*Almeida-Sanchez v. United States*, 413 U.S. 266 (1973). ........................... 5

*Berger v. New York*, 388 U.S. 41 (1967). .................................................... 22

*Brower v. County of Inyo*, 489 U.S. 593 (1989). ........................................... 6

*Heidy v. United States Customs Service*,

  681 F. Supp. 1445 (C.D.Cal.,1988.). ..................................................... 21

*Katz v. United States*, 389 U.S. 347 (1967). ............................................... 22

*Johnson v. United States*, 333 U.S. 10 (1948). ........................................... 11

*Mincey v. Arizona*, 437 U.S. 385 (1978)..................................................... 10

*Terry v. Ohio*, 392 U.S. 1 (1968). ....................................................... 10, 11

*United States v. Alfonso*, 759 F.2d 728 (9th Cir.1985). ............................... 14

*United States v. Arnold,* 523 F.3d 941 (9th Cir. 2008). ................................ 10

*United States v. Bilir*, 592 F.2d 735 (9th Cir.1979)..................................... 14

*United States v. Brunette*, 256 F.3d 14 (1 st Cir. 2001). ....................... 15, 16

*United States v. Cardona*, 769 F.2d 625 (9th Cir.1985). ............... 14, 19, 20

*United States v. Comprehensive Drug Testing, Inc.*,

  579 F.3d 989 (9th Cir. 2009)............................................................ 24

*United States v. Cotterman*,

  2009 U.S. Dist. LEXIS 14300 (D. Ariz., February 24, 2009). ................. 9

*United States v. Heckenkamp*, 482 F.3d 1142 (9th Cir. 2007)...................... 5

*United States v. Jacobsen*, 466 U.S. 109 (1984)........................................... 4

*United States v. Laich*,

  2010 13 U.S. Dist. LEXIS 4931 (E. Dist. MI, January 20, 2010). ......... 11

*United States v. Moore*, 423 F. Supp. 858 (D.C.W.Va. 1976.).................... 21

*United States v. Ogbuehi*, 18 F.3d 807 (9th Cir. 1994)............................... 11

## TABLE OF AUTHORITIES

*United States v. Olmstead*, 277 U.S. 438 (1928). ..........…….................. 23

*United States v. Place*, 462 U.S. 696 (1983)................…….................. 7

*United States v. Sahanajana*, 430 F.3d 1049 (9th Cir.2005). ......................... 6

*United States v. Seljan*, 547 F.3d 993 (9th Cir. 2008). ..…............................ 13

*United States v. Walter*, 447 U.S. 649 (1980). ..............…….................. 5

*United States v. Whiting*, 781 F.2d 692 (9th Cir.1986)..…............................ 14

*United States v. Wu*,

    2010 U.S. Dist. LEXIS 4439 (D.Mass., Jan. 21, 2010). ........................ 10

*United States v. Ziegler*, 474 F.3d 1184 (9th Cir. 2007)............................. 22


### STATE CASES


*New Hampshire v. Nelson*, 842 A.2d 83 (N.H. 2004)............................ 23, 24


### TREATISES AND LAW REVIEWS


Black's Law Dictionary 1252 (8th ed. 2004). ................................... 22


Scott J. Upright  Suspicionless Border Seizures of Electronic Files: The

Over Extension of the Border Search Exception to The Fourth Amendment,

William and Mary Law Review, October, 2009.............................. 20, 21, 22


Shira A. Scheindlin & Johnathan M. Redgrave, Special Masters and

E-Discovery: The Intersection of Two Recent Revisions to the Federal

Rules of Civil Procedure, 30 Cardozo L. Rev. 347, 355 (2008)............. 23

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

There is no dispute that the Fourth Amendment's reasonableness requirement applies at the border. The question before this Court is whether at some point an initial suspicionless search of private computer files, followed by a subsequent offsite warrantless search days and miles away, followed by a warrantless copying, indefinite retention and sharing with multiple other government agencies becomes unreasonable. The Defendant submits that for the Fourth Amendment to protect unreasonable invasions of privacy at the border with regard to electronic media, the answer must be yes.

### II.

### UPDATED STATEMENT OF FACTS[1]

When Mr. Fahlberg arrived at LAX airport on the evening of June 26, 2006, he was subjected to a "routine screening" of his laptop computers and cellular telephone. The initial search of his property was conducted by CBP Officer Peter Hur, who provided no declaration in support of the government's Opposition, and apparently had no articulable reasonable suspicion justifying his search of these private electronic files.  After Agent Hur's initial search, he contacted ICE Special Agent Daniel Lombardi, and told him that he suspected Mr. Fahlberg was transporting child pornography into the United States. *See*, Declaration of Agent Lombardi at ¶ 3. Officer Hur advised Agent Lombardi that during the course of his search, he found images of what appeared to be "minors in various states of undress." *Id.* at ¶ 4.  No specific description of those images is provided by Agent Lombardi or otherwise.

During Agent Lombardi's subsequent search of the computers he found "a

---

[1]    As the government has provided many new facts relevant to the search of Mr. Fahlberg's computer in its Opposition, Defendant briefly reiterates them here to orient the Court in considering his responsive arguments.

1

number of pictures of different females who appeared to be under the age of 18 in various states of dress..." *Id.* at ¶ 5.  Apparently the only picture that he can remember specifically was on Mr. Fahlberg's phone and depicted "a young Asian female, who clearly appeared to be under the age of 18, taking a picture of herself, while standing in front of a mirror in Fahlberg's bedroom, as Fahlberg was laying on his bed with his shirt off." *Id.*  This picture has not been recovered by the government from the phone and apparently no longer exists for the Court to review. *See,* Declaration of Counsel at ¶ 4.[2]

At that  point, Agent Lombardi claims to have developed reasonable suspicion based on: a) numerous images depicting many different children in various states of undress, in many cases, located in what appeared to be a bedroom, b) the fact that Mr. Fahlberg was residing in Thailand at the time, which "I know to be an area of world where young children are made available to be sexually abused by foreign travelers," and c) the fact Mr. Fahlberg was a United States citizen.  Lombardi Dec. at ¶ 7.  Purportedly based on this suspicion, Mr. Fahlberg's property was given to ICE Special Agent Mattison on the morning of June 27, 2010, who delivered them to ICE Special Agent Margaret Condon at ICE computer forensic group in Long Beach, some 20 miles away, for further warrantless search. *Id.*  at ¶ 10.

The warrantless offsite forensic search of the laptop computers "began" the "very day that the computer was detained at the airport" but was not "completed" until more than two weeks later on July 17, 2006. *See,* Declaration of Agent Condon at ¶ 3.  During this search, the government claims in its Opposition, for the first time in this proceeding, to have discovered "at least two images of suspected child

---

[2]     The government attempts to bolster Agent Lombardi's testimony with a subsequent computer analysis indicating when certain images on the laptops were viewed.  This is addressed *infra,* at Part B(2).

2

pornography." *Id.*[3]  Also, at some point during this offsite forensic search, the government made an "imaged" copy of Mr. Fahlberg's laptop harddrives.  *Id.* at ¶6.

Agent Mattison admits that as early as August 11, 2006, or almost one month after the forensic search of the laptops was completed, Mr. Fahlberg contacted him and asked that his *laptop computers* be returned as they contained time sensitive information.  Mattison Decl. ¶ 5.[4]  For the first time in its Opposition, the government now asserts that it failed to return the laptop computers at that time because its review of the *cellular telephone* was incomplete.  *Id.*  Mr. Fahlberg's property ultimately was returned to him on September 6, 2006, or approximately 70 days after their initial seizure.  *Id.* at ¶ 6.  Without Mr. Fahlberg's knowledge, the government retained copies of private information contained on Mr. Fahlberg's laptop computers and forwarded them to the ICE office in Bangkok, Thailand, for the criminal investigation which forms the basis of the charges in this case.  *Id.*

### III.

### ARGUMENT

A.  **THE INITIAL SEARCH OF MR. FAHLBERG'S LAPTOP COMPUTERS AT THE AIRPORT WAS NOT BASED ON REASONABLE SUSPICION**

By failing to even provide a declaration of CBP Officer Hur, who initially selected Mr. Fahlberg for secondary examination and conducted the first warrantless search of the private files on his lap top computers at LAX, the government has shown no evidence that it acted with articulable reasonable suspicion at that point.  This is not a case where the government is alleging that Mr. Fahlberg demonstrated

---

[3]     The defense contends that it was obvious that these images were *not* child pornography, *infra*, at Part B(2).

[4]     It is not disputed that Mr. Fahlberg began contacting Agent Lombardi, as the "detaining officer" listed on his Customs Form 6051D, in early and mid July, 2006 regarding the return of his property.  Declaration of Curtis Fahlberg attached to Defendant's moving papers at ¶ 3.

3

behavioral or physiological indicators while in the Customs line such as perspiring or stuttering when answering questions, had any specific suspicious prior criminal record, or that the agents received any prior "tip" regarding this international traveler.[5] Therefore, to the extent that the Court embraces Mr. Fahlberg's argument that *CDT* has significantly undermined the holding in *United States v. Arnold*, such that warrantless border searches of electronic devices require at least reasonable suspicion, the initial LAX search of his electronic devices and all fruits therefrom must be suppressed.

**B.** **THE SUBSEQUENT SEIZURE AND OFFSITE SEARCH OF MR. FAHLBERG'S LAPTOP COMPUTERS WERE NOT WITHIN THE BORDER EXCEPTIONS, AND THEREFORE REQUIRED A WARRANT, OR IN THE ALTERNATIVE, WAS AN EXTENDED BORDER SEARCH WHICH WAS NOT SUPPORTED BY THE REQUISITE REASONABLE SUSPICION**

The government argues that the images found during the initial border search justify any subsequent search and retention of Mr. Fahlberg's property. Even if the Court finds that the initial search at LAX was valid under *Arnold*, that does not preclude a finding that the subsequent offsite search and seizure were unconstitutional without a warrant. The fact that Agent Lombardi discovered questionable images in Mr. Fahlberg's property does not mean that it "contained contraband and little else." *United States v. Jacobsen*, 466 U.S. 109, 121 (1984). Thus, this is not a situation where the subsequent searches of Mr. Fahlberg's property could only have revealed the presence of contraband "and no other arguably 'private' fact." *Id.* at 123. Further, as Mr. Fahlberg was released from LAX and allowed to continue on his way to Mississippi, it was not a search incident to arrest.

---

[5] In fact, Mr. Fahlberg apparently wasn't even interviewed until *after* the search of his laptop computers at LAX. *See,* Lombardi Declaration at ¶ 6 ("After viewing the images...the decision was made to interview Fahlberg.")

4

It is now indisputable authority that a person's reasonable expectation of privacy in containers extends to the files stored inside a computer. *United States v. Heckenkamp*, 482 F.3d 1142, 1147 (9th Cir. 2007). Moreover, *Arnold* did not overturn the principle that, in general, "[a] container which can support a reasonable expectation of privacy may not be searched, even on probable cause, without a warrant." *Jacobsen*, 466 U.S. 119 n. 17 (citations omitted); *see also United States v. Walter*, 447 U.S. 649, 654, (1980) ("an officer's authority to possess a package is distinct from his authority to examine its contents"). Therefore, the offsite warrantless forensic search in this case is too attenuated to be considered a border search of any variety, and no other recognized exception to the warrant requirement justifies this search.

1. **The Subsequent Offsite Search of Mr. Fahlberg's Laptop Computers Was Not a Border Search and Required a Warrant**

The border search exception is limited to searches at the border or its functional equivalent. For example, the Supreme Court reversed the conviction of a defendant whose vehicle was stopped and searched by an INS agent while traveling on a road in the United States, "that lies at all points at least 20 miles north of the Mexican border," finding that the search could not be justified as a border search. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272-273 (1973).

After Agent Lombardi seized Mr. Fahlberg's laptop computers and sent the computer to an off-site facility for forensic searches, the computers were no longer at the border or its functional equivalent. Therefore the border search exception to the warrant requirement no longer applied. At that point, it was not only reasonably practicable, but entirely appropriate, for the authorities to seek a warrant to conduct further searches of Mr. Fahlberg's computer. Once the authorities had the computers in their possession, if the evidence revealed during the initial search at LAX was as inculpatory as the government claims, the agents presumably would have had little trouble doing so.

1    A search of an item after it is seized by Customs agents occurs apart from their

2    authority to conduct border searches. The genesis of that authority was described by

3    the Ninth Circuit in *Alexander* v. *United States,* 362 Fold 379,381-382 (9th Cir.

4    1966), as quoted in *United States* v. *Sahanajana,* 430 F.3d 1049, 1054 at n.1 (9th

5    Cir.2005):

6    In conferring upon Customs officers such broad authority,
     circumscribed only by Constitutional limitations of the Fourth

7    Amendment, the Congress has in effect declared that a search
     which would be "unreasonable" within the  meaning of the Fourth

8    Amendment, if conducted by police officers in the ordinary case,
     *would be a reasonable search if conducted by Customs officials in*

9    *lawful pursuit of unlawful imports.* Judicial recognition of this
     distinction has given rise to the term "border search", in order to

10   distinguish official searches which are reasonable because made
     solely in the enforcement of Customs laws from other official

11   searches made in connection with general law enforcement.

12   (Emphasis in original.)

13    The *Alexander* Court clearly reflects the rationale for the border search

14   exception: that it is done solely in the enforcement of Customs laws. Once the item is

15   searched at the border or its functional equivalent, and it is seized because it contains

16   suspected contraband, the search done "solely in the enforcement of Customs laws" is

17   complete,  as the purpose of the Customs laws is to prevent unlawful imports from

18   entering the United States. Any search subsequent to seizure by Customs agents of an

19   item containing suspected contraband is necessarily made in connection with general

20   law enforcement. Thus, the exception that exists at the border disappears as soon as

21   the item is seized.

22    While the term "detention" has been used throughout the pleadings to describe

23   the government's taking Mr. Fahlberg's property at the airport, for Fourth

24   Amendment purposes, it constituted a seizure.  Certainly, Agent Lombardi's  act of

25   taking control of Mr. Fahlberg's computers, giving him a "Notice of Detention" and

26   retaining physical custody of the computers after Mr. Fahlberg left was, "an

27   intentional acquisition of physical control," such as the Supreme Court defined

28   "seizure" for constitutional purposes in *Brower v. County of Inyo,* 489 U.S. 593, 596

6

1    (1989).

2       The Supreme Court recognized in *United States* v. *Place,* 462 U.S. 696, 705-

3   706 (1983) that seizures of different durations could require different levels of

4   justification. Thus, the *Place* Court held that a brief, temporary detention of a

5   person's luggage at an airport could be justified by *Terry's* reasonable suspicion

6   standard. *Id.* at 706. Though the *Place* Court was unwilling to establish a bright line

7   for the duration for such a temporary detention, it held that the 90-minute seizure of

8   that appellant's luggage was too lengthy to be justified merely by *Terry's* articulable,

9   reasonable suspicion. *Id.* In holding that the 90-minute detention of the appellant's

10   bags was more than a *Terry* detention, the *Place* Court reviewed the length of the

11   detention and the extent to which it interfered with the appellant's personal liberty. *Id.*

12   at 709.

13       The seizure of Mr. Fahlberg's computers for more than 70 days and transported

14   away from the point of its initial detention before it was subjected to search was

15   significantly more intrusive and egregious than that in *Place*.

16       Also, even though the agents permitted Mr. Fahlberg to leave and gave him a

17   "Detention Notice and Custody Receipt for Detained Property," he was not informed

18   of exactly when or how the property would be returned. Obviously, a laptop

19   computer is likely to hold information just as important to a traveler as might his

20   luggage.[6] Thus, the seizure of Mr. Fahlberg's computer placed a restraint on his

21   liberty at least equal to the seizure of luggage in *Place*.

22       The *Place* Court also stated that "in assessing the effect of the length of the

23   detention, we take into account whether the police diligently pursue their

24   investigation." *Id* at 709. The government has provided no compelling justification

25   for why it took 70 days to return Mr. Fahlberg's computer to him. It is clear that the

26

27         _____

28        [6]     Mr. Fahlberg's laptop contained private financial and medical records which he specifically needed during his brief stay in the United States. Fahlberg Dec. at ¶ 5, filed with Defendant's moving papers.

forensic search of his lap top computers was completed at the latest by July 17, 2010. Agent Mattison, however, inexplicably waited until August 23, 2006, or more than a month later to even *seek* review of the items found by ICE Counsel, William Wander, and ICE ASAC/LAX Group Supervisor John Reynolds. *See,* Exhibit B attached to Motion to Suppress, at Bates 00027. Within a week, or on August 30, 2006, these individuals were able to quickly advise SA Mattison that "there was insufficient contraband on FAHLBERG's detained property for the seizure of the items and he advised SA Mattison to return FAHLBER's property to him." *Id.* The delay in contacting Group Supervisor John Reynold was especially egregious considering that he participated in the original decision to seize Mr. Fahlberg's computers and apparently works in the same unit at LAX as Agent Mattison. *See,* Lombardi Declaration at ¶6 ("After viewing the images of minor females in various states of dress found on Fahlberg's cell phone and laptop computers, I conferred with Contraband Group Supervisor ("GS") John Reynolds. . ."); Declaration of Mattison ¶ 1 (indicating that like Group Supervisor John Reynolds he is currently assigned "to ICE Office of the Assistant Special Agent in Charge, Los Angeles International Airport ('ASAC/LAX').")

The government's justification, provided for the first time in its Opposition, regarding this the delay in searching *other* digital files is unpersuasive. Agent Mattison states in his declaration at ¶ 4:

> Although the forensic analysis of defendant's laptop computers was completed within two weeks of when these items were detained at Los Angeles International Airport, the forensic analysis of defendant's cellular telephone was not completed within this time period. During July 2006 and August 2006, I was advised that attempts were being made to copy the images located on defendant's cellular telephone and to conduct a forensic examination of that cellular telephone. Those attempts were unsuccessful and ultimately did not prove successful.

It is difficult to see what possible relationship existed between Agent Mattison's failure to diligently return the laptop computers – of which a determination that a lack of probable cause existed to seize them had already quickly

1    been made – and the continuing forensic search of the cellular telephone.

2         In contrast, in *United States v. Cotterman* 2009 U.S.Dist. LEXIS 14300, (D.

3    Ariz., February 24, 2009), the agents seized two laptop computers and a camera at the

4    airport on a Friday morning. *Cotterman at* \*2. Even though the search of the laptop

5    computers was not completed until Sunday, "[o]n Saturday [the agent] determined

6    there was no contraband on the camera, and it was returned *that day* to the

7    Cottermans." *Id.* (Emphasis added.)  In light of the fact that Mr. Fahlberg repeatedly

8    emphasized the importance of the data on his laptops (as well as indicated that he had

9    purchased a new cell phone) this delay is unreasonable and the government's

10    repeated assertion of their "diligence" lacks credibility.

11         In the wake of *Arnold,* district courts within the Ninth Circuit are already

12    recognizing that an offsite forensic examination of a computer seized at the border

13    must be supported by a warrant.  For example, the *Cotterman* court granted the

14    defendant's motion to suppress, noting that, while the search of the defendant's

15    computer would have been a justifiable border search if it had been done at the

16    border at which the defendant was stopped, it could not be justified as a border search

17    at the non-border location. The *Cotterman* court noted that: "The search could have

18    been done, (while not necessarily to the convenience of the agents) at the border

19    because the technician could have traveled down from Tucson with his laptop

20    computer to do the analysis." *Id.* at \*1.  The most important factors in that case were:

21    1) the time that elapsed between the border "seizure" –  48 hours, and 2) the distance

22    between the border and the laboratory where the examination took place: 170 miles.

23         Mr. Fahlberg's case is similar in those two important respects. The offsite

24    search began at a minimum 24–48 hours after the border seizure, and wasn't

25    completed until almost two weeks later.  As for the second factor, while the distance

26

27

28

9

from LAX to the to the CBP laboratory may have been only approximately 20 miles,[7]
that reveals a sufficient distance from the airport where it should no longer be
considered the border. As the *Cotterman* court recognized, it is not the convenience
of the agents that is important to consider, it is the degree of intrusion on an
individual's liberty and property without an impartial finding of probable cause that
controls.[8]

The standard procedure of seizing a computer and then obtaining a warrant for
a later forensic search had been followed in *Arnold, supra*, 533 F.3d at 1005, where,
"[t]he officers seized the computer and storage devices but released [the petitioner].
*Two weeks later, federal agents obtained a warrant*." (Emphasis added.) Indeed, that
appears to be the usual and customary procedure followed by customs agents in
searching seized computers. See, *e.g. United States v. Wu*, 2010 U.S.Dist. LEXIS
4439, at 6 (D.Mass., Jan. 21, 2010) and *United States v. Pickett*, 2009
U.S. Dist. LEXIS 69710, at 2-3 (E.D.La., Sept. 16, 2008), where the agents obtained
a search warrant *even after obtaining a signed consent* to search the computer.

Just as no exigency exists once police have secured a home in which evidence
is believed to be hidden, the need to protect national security from a person bringing
contraband materials into the country has come to an end once the container
suspected of holding contraband has been seized. As the Supreme Court reiterated in
*Mincey v. Arizona*, 437 U.S. 385, 393 (1978), the scope of a warrantless search must
be strictly circumscribed by the exigencies that justify its initiation. Citing *Terry v.
Ohio*, 392 U.S. 1, 25-26 (1968).

To validate a subsequent forensic search of a computer, conducted at a site

---

[7]    The defense believes that the forensic search of Mr. Fahlberg's computer was conducted at the ICE offices in Long Beach located at 501 W. Ocean Blvd. Long Beach, CA 90802 where defense counsel reviewed computer evidence in this case on June 16, 2010.

[8]    The Supreme Court considered 20 miles sufficient distance to not constitute the border in *Almeida-Sanchez, supra*.

miles from the "functional equivalent of the border" weeks or months after the initial search, would be to create another exception to the warrant requirement, as that search can in no way be considered a "border search." In this vein, the *Mincey* Court overturned the Arizona Supreme Court's "murder scene" exception to the warrant requirement and instead held that evidence seized by homicide investigators who conducted an extensive, warrantless search of the home of a defendant after he engaged in a fatal gun battle at that home should have been suppressed. This remedy occurred even though police had probable cause to believe that evidence of a crime was to be found at the home, because the search was not supported by any exception to the warrant requirement.

In so holding, it noted Justice White's eloquent explanation of the warrant requirement:

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."

*Id*. at 395, quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948).

Even in those few cases where a subsequent search was authorized as a border search, the searches were considered border searches only because they were, "so spatially and temporally close to [the border] that they are considered border searches." *United States v. Ogbuehi*, 18 F.3d 807, 813 (9th Cir. 1994)(the search "occur[ed] minutes after he crossed the border and 60 feet from the Customs Office door.")

In contrast, the searches in this case occurred at an offsite facility, weeks after the initial search. Thus, this search was far removed from being a border search, and therefore required a warrant.

The parallel case of *United States v. Laich,* 2010 13 U.S. Dist. LEXIS 4931 (E. Dist. MI, January 20,2010) is particularly instructive of how district courts have

intervened to prevent the manipulation of the border search exception.  In *Laich*, CPB

agents seized a traveler's computer upon his arrival in the country, based on his

presence on a TECS watch list and the request of an ICE agent, who informed CPB

agents that the traveler was suspected of possessing child pornography. The CBP

agents permitted the traveler to leave the airport, but retained his computer and

forwarded it to the ICE agent.  The agent later ordered a forensic examination, the

results of which formed the basis for an affidavit to search the appellant's house.

The *Laich* court ordered the information obtained from that forensic

examination stricken from the warrant affidavit.  *Id.* at 15. In so doing, it

distinguished the border search justification of the search from the Fourth

Amendment analysis required for the seizure and later forensic search.  The court

recognized that the information given by ICE agent's to CBP agents provided at most

reasonable suspicion to briefly detain the laptop at the border, but in no way

provided probable cause for the lengthier seizure. *Id.* Moreover, in holding that,

*regardless of the justification for the seizure*, the subsequent warrantless search was

invalid, the *Laich* court stated:

> Furthermore, there has been no proffered evidence from the
> Government that would justify the subsequent warrantless
> forensic examination of Laich's computer. Inasmuch as the laptop
> was Laich's personal property, he had a reasonable expectation of
> privacy in the computer and its contents. [] Although there may be
> situations in which law enforcement officers may seize the
> personal property of an individual and hold it until a search
> warrant is obtained [], no such effort was undertaken here.
> Furthermore, the Government has not pointed to any exigency or
> other circumstance that would justify the Court in making an
> exception to the general rule that searches must be conducted only
> with prior approval by a judge or magistrate.

*Id.* at 15. (Citation omitted).

It should be noted that the *Laich* court specifically rejected the government's

extended border search justification argument and emphasized: "the right to be free

from extensive searches and seizures like the one at issue here should be well known

to any reasonable law enforcement officer." *Laich* at n. 9. The defense submits that

12

1   the extended border search rational should similarly be rejected here as the majority

2   of cases which created and shaped this doctrine dealt only with a search conducted

3   *before* the discovery of any evidence that triggered Customs officials decision to

4   seize the items searched as containing contraband.

5        **2.**     **The Offsite Warrantless Search was At Most an Extended Border**

6            **Search Which was Not Supported by The Required Reasonable**

7            **Suspicion**

8        The government's argument that the offsite warrantless search of Mr.

9   Fahlberg's property was somehow justified as an ordinary border search because

10  "[t]he items seized from defendant on June 27, 2006 were never cleared by customs

11  and remained in the custody of ICE until they were returned to defendant" and

12  therefore "did not implicate any heightened expectation of privacy on the part of

13  defendant" is misplaced.  Gov't Opp at n. 12.   Acceptance of this argument would

14  undermine the  all the extended border search cases which focus on reasonable

15  suspicion, time and distance, and the diligent effort of the government as the

16  requirements for the additional invasion of privacy occasioned by searches separated

17  in time and place from a border.  In fact, the government's requested vast expansion

18  of the "clearing customs" rational would result in an exception which swallows the

19  rule generally requiring warrants for the search of private property.  Under that

20  theory, border agents would  not even need to take their "peek" as they did in *United*

21  *States v. Seljan,* 547 F.3d 993 (9th Cir. 2008).   The government could simply seize

22  random (or even all) computers from travelers, not "clear" them from Customs, and

23  send them off for intrusive searches whenever and wherever the agents desired. This

24  proposition, that essentially the government may extend the border as it sees fit,

25  surely fails constitutional scrutiny.

26       If the Court should hold that the offsite warrantless search of Mr. Fahlberg's

27  computer did not require probable cause and a warrant, it should, at minimum, find

28  that it was an extended border search which required reasonable suspicion, as it was

conducted days after and miles later.  When a search is removed in time and place from the border, courts have repeatedly held that this represents a greater intrusion on an individual's privacy requiring that – under the totality of the circumstances – customs officers have  reasonable suspicion of criminal activity in order to justify the search. This is the so-called "extended border search." *United States v. Whiting*, 781 F.2d 692, 695 (9th Cir.1986); *United States v. Cardona*, 769 F.2d 625, 628 (9th Cir.1985); *United States v. Alfonso*, 759 F.2d 728, 734 (9th Cir.1985); *United States v. Bilir*, 592 F.2d 735, 740-741 (9th Cir.1979).

As the Court in *United States v. Alfonso*, 759 F.2d 728 (9th Cir. 1985) stated:

> We recognize, of course, that time and place are relevant, since the level of suspicion for extended border searches is stricter than the standard for ordinary border searches. Extended border searches occur after the actual entry has been effected and intrude more on an individual's normal expectation of privacy. Therefore, extended border searches must be justified by "reasonable suspicion" that the subject of the search was involved in criminal activity, rather than simply mere suspicion or no suspicion.

*Id.* at 734.

In order to determine whether the search was supported by reasonable suspicion in this context, the Court must examine the totality of the circumstances, such as the time and distance elapsed, whether there was a lapse in surveillance, and the diligence of law enforcement. *Id.* at 735 (citing *Alexander v. United States*, 362 F.2d 379, 382 (9th Cir.1966).  As the defense already has addressed the issues of time, distance and diligence of law enforcement above, and submits that they all further militate *against* a finding of reasonable suspicion, it will focus on the facts of the LAX search itself herein.

As noted above, in apparent reliance on *Arnold,* the government presented no articulable facts related to any suspicious demeanor, actions, words, or criminal history of Mr. Fahlberg prior to the initial LAX search of his computer.  In fact, he was never even interviewed prior to the initial search.  Rather, as the government concedes, the only possible basis for the reasonable suspicion justifying the

14

subsequent offsite forensic examination was provided by "information uncovered during the initial review of these items that took place at Los Angeles International Airport." Gov't Opp. at n. 12.

The entirety of Agent Lombardi's basis for developing reasonable suspicion is set forth in ¶ 5 of his declaration:

> During the review of the cell phone and computers that Fahlberg had attempted to pass through customs, I saw that Fahlberg had a number of pictures of different females who appeared to be under the age of 18 in various states of dress, stored in file folders located on Fahlberg's laptop computers. I saw similar images stored on his Samsung camera phone. For instance, I recall seeing a photograph stored on Fahlberg's camera phone of a young Asian female, who clearly appeared to be under the age of 18, taking a picture of herself, while standing in front of a mirror in Fahlberg's bedroom, as Fahlberg was laying on his bed with shirt off.

The relevant inquiry therefore rests not on what materials were later found, but instead on what materials Agent Lombardi initially observed,[9] because the seizure was complete once he took possession of the laptops in exchange for a "Notice of Detention." Whether that seizure was justified rests necessarily on a subjective determination about the legality of the images observed by Agent Lombardi. As the First Circuit stated in *United States v. Brunette,* 256 F.3d 14 (l st Cir. 2001): "As the district court recognized, 'the identification of images that are lascivious will almost always involve, to some degree, a subjective and conclusory determination on the part of the viewer.' That inherent subjectivity is precisely why the determination should be made by a judge, not an agent." *Id.* at 18. Agent Lombardi's minimal description of the image indicates that he did not conduct an objective analysis about the content of the picture(s) that he saw, and his attribution of some criminal purpose to Mr. Fahlberg's innocent conduct indicates that he was acting on a hunch rather than on the basis of articulable suspicion.

---

[9]     While CBP Officer Peter Hur apparently made the initial search of Mr. Fahlberg's laptop and participated in the decision that reasonable suspicion had been developed, as the government did not submit a declaration from this Agent the defense submits that his testimony not be considered here.

15

It appears that Agent Lombardi can only recall a single image found on Mr. Fahlberg's cellular phone.[10] The government was somehow unable to recover this crucial image from the cellular phone nor make any reasonable copy (such as taking a photograph of the phone's display) despite the admitted ability to do so. Declaration of Condon at ¶ 9 (noting that data on the cellular phone could be extracted by manually viewing each screen and noting the information). It is thus not available for the Court to review.

Even accepting Agent Lombardi's description of this single photograph, however, it hardly provides reasonable suspicion justifying the subsequent wholesale forensic examination of all of Mr. Fahlberg's private forensic files. While Agent Lombardi describes the girl depicted as allegedly "clearly" appearing to be under the age of 18, he provides no basis for that conclusion. Declaration of Lombardi at ¶ 5. Nor does he provide any basis for his conclusion that the picture was taken in "Mr. Fahlberg's bedroom," nor that Mr. Fahlberg was laying on "his" bed. *Id.* There is no allegation that this image is suspected of being child pornography, that the girl is in *any* state of undress or in any suggestive pose, nor that Mr. Fahlberg is nude or in any suggestive pose. It simply is a picture of Mr. Fahlberg in the same room with an Asian girl that Agent Mattison believes, without stated justification, to be a minor. On it's face this picture clearly is not child pornography, nor does it provide sufficient reasonable suspicion of child sex tourism.

Possibly recognizing the weakness of Agent Lombardi's testimony, the government creatively attempts, without citation or support, to retroactively bolster Lombardi's opinion through the subsequent forensic analysis of the laptops. According to this argument, although he doesn't recall them specifically, Agent Mattison *must* have reviewed numerous *specific* images, including the two it

---

[10]      It is important to note that any picture Agent Lombardi viewed on a cellular telephone screen would be a maximum of just a few inches in size making subtle determinations such as the age of a young woman even more difficult.

1  erroneously purports to be child pornography, during his initial search. *See*, Gov't
2  Opp. at 3.

3      For the purposes of determining whether Agent Lombardi had reasonable
4  suspicion which led to an extended border search, the defense submits that this
5  "evidence" should be disregarded altogether by this Court. Just as evidence from the
6  subsequent offsite forensic search itself can't form its own basis for the reasonable
7  suspicion in support thereof, nor can data evidencing when files were last accessed
8  *which was also only obtained during that subsequent search* be used in this manner.

9      Moreover, the Court can have little confidence that Agent Lombardi had
10  personal knowledge of images viewed during the time period alleged. The
11  government admits that the computer forensic analysis confirms that "SA Lombardi
12  *and* Officer Hur accessed" files. Gov't Opp. at 3. (Emphasis added). The defense
13  submits that the files could have been viewed by Officer Hur, or Group Supervisor
14  John Reynolds, or Special Agent Steven Kapellas, or other unnamed officials
15  assisting in the investigation, none of which submitted a declaration in this case, and
16  whose testimony therefore should not be credited in the Court's determination of
17  reasonable suspicion.

18      Finally, the defense concedes that if this Court finds that Agent Lombardi
19  viewed two images of alleged child pornography during the initial search, as the
20  government argues for the first time in its Opposition, that this observation obviously
21  would provide reasonable suspicion for the subsequent offsite search. The reality is,
22  however, that he did not. First, it defies credulity that if actual images of child
23  pornography were viewed on the laptop computers, that: 1) both ICE Counsel,
24  William Wander, and ICE ASAC/LAX Group Supervisor John Reynolds (with "two
25  years of experience supervising child pornography cases") would have advised Agent
26  Mattison that "there was insufficient contraband on FAHLBERG's detained property
27  for the seizure of the items" (Defendant's moving papers at Ex. B), 2) the
28  government would have freely *returned* these "contraband" images to Mr. Fahlberg

1  with his property (*Id.*), and 3) that the government would not have charged Mr.

2  Fahlberg with the possession of child pornography in the initial indictment.

3       If the Court is inclined to accept the premise that Agent Lombardi specifically

4  viewed the two images the government alleges, the defense requests the Court review

5  the two images in question,[11] in the context of the *other* images of the same woman

6  Agent Lombardi also allegedly viewed.  The defense is confident that the Court –

7  presumably as did ICE Counsel, William Wander, and ICE ASAC/LAX Group

8  Supervisor John Reynolds – will determine the woman in the images is clearly not a

9  minor, and therefore these images do not constitute child pornography nor provide

10  reasonable suspicion that Mr. Fahlberg was engaged in sex with minors.[12]

11       First, the two images which are allegedly contraband depict an Asian woman

12  with shaved, dark pubic hair, pronounced hips and fully developed breasts.  Second,

13  the four photographs the defense believes depicts the same woman, in the same

14  location, which purportedly also was viewed by Agent Lombardi at the time of the

15  search, *clearly* would have indicated to him that she was not a minor.  *See* Exhibit F,

16  attached hereto.  At most these pictures provide evidence that Mr. Fahlberg may have

17  engaged in sex with an *adult* woman.

18       In sum, the single photograph that Agent Lombardi can recall is insufficient to

19  provide reasonable suspicion to support a subsequent offsite extended border search

20  in this case.  Additionally, an evidentiary hearing will reveal that Agent Lombardi did

21  not view any images of child pornography. Given the totality of the circumstances in

22  this case, including the attenuated time and distance, and lack of diligence by the

23  government, there was no reasonable suspicion.

24  \\

25

26       [11]     Government counsel has indicated it will produce unredacted versions of

27  the two images for the Court's review at the hearing on June 28, 2010.

28       [12]     The defense also argues that the pictures clearly do not contain a
"lascivious" display of the genitals and therefore are not child pornography.

1   **C.   THE GOVERNMENT'S RETENTION OF COPIES OF MR.**

2   **FAHLBERG'S PRIVATE FILES FOR WHICH IT DETERMINED IT**

3   **HAD NO PROBABLE CAUSE WAS UNCONSTITUTIONAL**

4       Perhaps the most troubling aspect of the investigation in this case is the

5   government's indefinite retention of copies of Mr. Fahlberg's private files after it

6   determined that it had no probable cause and returned his property to him.  The

7   defense submits that after ICE determined it had insufficient probably cause to seize

8   Mr. Fahlberg's laptop computers, it was incumbent upon it to destroy the copies it

9   made.  The Fourth Amendment's concern about the government rummaging through

10  individuals' "original" private electronic files on property seized, applies equally to

11  exact copies of those private files months or years later without notice.  Mandating

12  that all electronic copies be destroyed is truly the only way to protect a reasonable

13  level of privacy.

14      In the instant case, the retained copies of Mr. Fahlberg's electronic files

15  triggered the government's foreign investigation initiated in Thailand and Cambodia

16  on September 6, 2010. The subsequent evidence discovered is fruit of the poisonous

17  tree and must be suppressed.

18      This principle that retained copies are just as intrusive as the original property

19  itself was embraced by the court in *United States v. Cotterman*:

20      The Government's disregard of the Fourth Amendment in
    connection with border searches of electronic media is

21      emphasized by the Government's continued possession of a
    copy of Mrs. Cotterman's hard drive. . .The Government

22      apparently believes that returning Mrs. Cotterman's laptop
    eliminates the intrusion on her privacy. Obviously, keeping

23      a copy of the hard drive with no viable basis does violate
    Mrs. Cotterman's privacy interests. . . At this point in time,

24      any incriminating evidence found now on the copy of Mrs.
    Cotterman's hard drive would be inadmissible because that

25      hard drive was not subject to seizure for containing
    contraband. *United States v. Cardona*, 769 F.2d at 629

26      (cashier's checks, not in bearer form, found in valid
    extended border search were not seized because they were

27      not contraband, but were photocopied because the checks
    were not subject to seizure the photocopies were

28      inadmissible)**.**

1 | *Id.* at *8.

2 | If the government were permitted to maintain an electronic copy of an

3 | individual's laptop, one can easily imagine the following hypothetical: An occasional

4 | traveler returns home by air from a popular vacation spot such as Mexico or Jamaica.

5 | CBP officers search a BlackBerry containing months worth of personal

6 | communications and business related emails, or an iPod with over 20,000 personal

7 | photographs as well as an organizer and address book. The officers then proceed to

8 | download and copy the electronically stored information before returning the device

9 | and allowing the passenger to continue on his or her trip home. The traveler has no

10 | notice that such a copy has even been made, let alone the government's intended

11 | purpose for possessing this personal information when they are under no reasonable

12 | suspicion of committing a crime.

13 | Sadly, there is anecdotal evidence that such searches, particularly as they relate

14 | to pernicious racial profiling, are starting to occur in the United States. Yasir Qadhi,

15 | a native Texan and a doctoral student at Yale University, received such intrusive

16 | invasion of his electronic devices at the border. *See*, Scott J. Upright Suspicionless

17 | Border Seizures of Electronic Files: The Over Extension of the Border Search

18 | Exception to The Fourth Amendment, William and Mary Law Review, October, 2009

19 | at *292. In 2006, Customs officials detained Mr. Qadhi, his wife, and his three

20 | children for five and a half hours while conducting a border search. *Id.* at *293.

21 | During the inspection, the officials took Mr. Qadhi's cell phone and copied all of the

22 | data it contained. Two years later, in the spring of 2008, the FBI brought Mr. Qadhi

23 | back in for questioning regarding the contacts contained within the phone. Mr. Qadhi

24 | was never found to be involved in anything illegal and has even served as a

25 | counter-terrorism consultant for the federal government. *Id.*

26 | The treatment of Mr. Qadhi and his family is not an isolated incident. In fact,

27 | the Association of Corporate Travel Executives conducted a survey in February 2008

28 | and reported that seven percent of the executives surveyed stated "they had been

20

1   subject to the seizure of a laptop or other electronic device" while reentering the

2   country. *Id.* Compound this invasion of privacy with no prohibition from indefinitely

3   disseminating electronic copies of the traveler's electronic media to other

4   government agencies in the future, and the radical destruction of the Fourth

5   Amendment by retaining copies of electronic media is transparent.

6        While the privacy concerns created by retaining copies of private information are

7   perhaps more pronounced in the electronic context, courts have been troubled with this

8   practice for some time.  For example, in *Heidy v. United States Customs Service*, 681

9   F.Supp. 1445 (C.D.Cal.,1988.) the court held that a Customs practice of keeping

10  photocopied evidence and records of non-violation of federal law was constitutionally

11  impermissible. The plaintiffs in *Heidy* were United States citizens re-entering the

12  country from Nicaragua.   During   inspection, Customs officials searched and

13  photocopied all papers carried by the individuals to ensure that the travelers were not

14  importing seditious material. With the FBI assistance, Customs made permanent records

15  consisting of the identity of each person from whom material was seized and a final

16  determination regarding the legality of the documents. Although the written  material

17  was found not to violate federal law, the copies and records were nonetheless retained

18  by both Customs and the FBI. Understandably, the individuals feared that government's

19  possession of these records would subject them to future inquiries upon reentry.

20       The court acknowledged Customs authority to review and copy written material

21  during a border search, but ordered the destruction of records of non-violation.

22  Specifically, Customs was to: (1) return any originals to the owner, (2) destroy all copies

23  and records reflecting individual identity, and (3) refuse dissemination to any federal

24  agency not willing to comply with Customs policies.   *See, also U.S. v. Moore* 423

25  F.Supp. 858 (D.C.W.Va. 1976.)(holding in the context of materials subject to a subpoena

26  before an expired grand jury "[w]hen individual has been released from criminal

27  jeopardy and indictment against him expires, he is entitled to return of his papers and

28  other materials as matter of course, *and that includes any photostats and other forms of*

21

1     *copy made from them*.")(Emphasis added).

2         There can be no doubt that the copying of electronic files without probable cause
3 should qualify as a meaningful interference with a possessory interest and, therefore, an
4 unreasonable seizure. This conclusion is reached through a simple application of current
5 property law. Black's Law Dictionary defines property as "[t]he right to possess, use,
6 and enjoy a determinate thing .... Also, termed bundle of rights." Black's Law Dictionary
7 1252 (8th ed. 2004). Included in this bundle of rights is the right of the owner to exclude
8 others, and the owner's right to destroy the property, both of which courts have found
9 to be essential to physical possession. [13]

10         In order to properly protect the rights of travelers, this Court should endeavor to
11 interpret the Fourth amendment to accommodate changing technology similar to the
12 Supreme Court cases of *Katz* and *Berger*. *Katz v. United States*, 389 U.S. 347, 353
13 (1967); *Berger v. New York*, 388 U.S. 41, 58-59 (1967). Both cases involved
14 government officials recording the voices of suspects and, in each case, the Court held
15 that the government had illegally seized the suspect's voice – equating the conversations
16 to property in which the suspects had a privacy interest. *See Katz*, 389 U.S. at 353;
17 *Berger*, 388 U.S. at 58-59. In *Berger*, the Court struck down a New York statute
18 governing wiretaps, because the statute should have particularly described "the
19 communications, conversations, or discussions to be seized." *Berger*, 388 U.S. at 58-59
20 ("We believe the statute here is equally offensive. First, as we have mentioned,
21 eavesdropping is authorized without requiring belief that any particular offense has been
22 or is being committed; nor that the 'property' sought, the conversations, be particularly
23 described."). In *Katz*, the Court held that "the Fourth Amendment governs not only the
24 seizure of tangible items, but extends as well to the recording of oral statements." *Katz*,

25

26        [13]     The Ninth Circuit Court of Appeals has seemingly recognized this
27 balance, by stating in *United States v. Ziegler*, 474 F.3d 1184, 1190 (9th Cir. 2007),
that the copying of a computer hard drive is a seizure. The Ninth Circuit, has thus
28 correctly recognized that copying a document or a computer file is different than
merely conducting a preliminary search.

389 U.S. at 353. These cases indicate that the Court intended the Fourth Amendment's Seizure Clause to apply to both intangible and tangible items.

The copying of electronic files merits the same treatment as the oral recordings at the heart of both *Katz* and *Berger* for two reasons. First, unlike tangible property, these items can be seized without the knowledge of the owner through electronic eavesdropping techniques or computer hacking. As Justice Brandeis wrote in 1928 in his dissenting opinion in the Olmstead case: "Ways may some day be developed by which the Government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home." *United States v. Olmstead*, 277 U.S. 438, 474 (1928) (Brandeis, J., dissenting). Second, emails and Internet chats increasingly are replacing conversations that once took place over the telephone. *See,* Shira A. Scheindlin & Johnathan M. Redgrave, Special Masters and E-Discovery: The Intersection of Two Recent Revisions to the Federal Rules of Civil Procedure, 30 Cardozo L. Rev. 347, 355 (2008)("For example, a typical employee at a large company will write or receive at least fifty emails per day. If that company has one hundred thousand employees, the company could be sending and receiving over 1.5 billion emails annually."). But unlike phone calls, each email or Internet chat leaves a "transcript" behind that can be copied from a computer. In order to provide these transcripts with the same protection afforded telephone conversations, this Court should apply the *Katz/Berger* standard to the border seizure of electronic files. As the world continues to move towards becoming a paperless society, our Fourth Amendment jurisprudence must expand to once again protect intangible property.

The Supreme Court of New Hampshire addressed the rights to exclude and destroy digital media in *New Hampshire v. Nelson,* 842 A.2d 83 (N.H. 2004). In this case, the defendant landlord took some intimate photographs from a tenant's residence, scanned them onto his computer, and then returned the original photographs to the tenant's apartment. *Id.* at 84. The defendant was charged with receipt of stolen property

1  but claimed that the government could not prove that he had the "purpose to deprive"

2  because he returned the photographs. The New Hampshire Supreme Court did not agree,

3  stating that "integral to ownership. . . is the right to exclude others from possessing,

4  using and enjoying a particular item of property." *Id*. at 86. The court continued,

5  "though the defendant returned the original photographs, he kept a computer

6  reproduction of the captured images, without permission, and it is these images he was

7  convicted of unlawfully retaining." *Id.* ("Though the medium changed from

8  photographic paper to a computer, the photographic images themselves remained

9  'property of another.'").

10  The same standard should apply to the government's actions regarding the

11  suspicionless, warrantless copying of computer files. Under *United States v.*

12  *Comprehensive Drug Testing, Inc.* 579 F.3d 989 (9th Cir. 2009), admittedly not in the

13  border context, the government is required to destroy all copies of the unconstitutionally

14  seized media. In the border context, once probable cause is not established, the similar

15  remedy should be enacted.

16  Once a traveler's electronic files are copied, that traveler loses the right to destroy

17  that property because the government now controls an exact replica. Accordingly, the

18  copying of electronic files constitutes a seizure, subject to Fourth Amendment

19  protection. Thus, copying electronic files is a seizure and is only reasonable when

20  government officials possess probable cause and obtain a warrant from a neutral

21  magistrate.

22  \\

23  \\

24  \\

25  \\

26  \\

27  \\

28  \\

24

## IV.

## CONCLUSION

This case highlights the need for the procedures followed in the majority of border search cases, such as *Arnold,* where agents obtain a search warrant before intruding on a person's reasonable expectation of privacy by depriving him of his property through a seizure and then conducting an intrusive search of that property.   Even if this Court concludes that such an intrusion may be undertaken without a warrant upon reasonable suspicion, a finding that reasonable suspicion existed in this case is not appropriate given that the Agent can only recall a single seemingly innocuous image.

But even if reasonable suspicion is accepted by the Court, the dissemination of the electronic copy of Mr. Fahlberg's computers cannot occur without probable cause. This case does not pose an unreasonable scenario that "the sky is falling." If the government can copy electronic media without presenting the necessary showing to an neutral judicial officer, then the most private and personal of documents – medical results, psychiatric records, drafts of legal strategy – will be fair game to not only the government agency engaged in the search, but other agencies in the indefinite future as well.   Such a likely result cannot be within the scope of the Fourth Amendment.

Respectfully submitted,


KAYE, McLANE & BEDNARSKI, LLP


DATED: June 21, 2010                          By_____/S/_____
                                                            RONALD O. KAYE
                                                            Attorneys for Curtis David Fahlberg

25