1   RONALD O. KAYE (No. 145051)
    KEVIN J. LaHUE (No. 237556)
2   KAYE, McLANE & BEDNARSKI, LLP
    234 E. Colorado Blvd.  Suite 230
3   Pasadena, California 91101
    Telephone: (626) 844-7660
4   Facsimile: (626) 844-7670
    rok@kmbllp.com
5
6   Attorneys for Defendant
    CURTIS DAVID FAHLBERG
7

8

9                   UNITED STATES DISTRICT COURT

10                CENTRAL DISTRICT OF CALIFORNIA

11                       WESTERN DIVISION

12   UNITED STATES OF AMERICA,        )   CASE NO. 09-00683-MMM
                                      )
13               Plaintiff,           )   SUPPLEMENTAL REPLY TO
                                      )   GOVERNMENT'S
14          v.                        )   SUPPLEMENTAL OPPOSITION TO
                                      )   DEFENDANT'S MOTION TO
15                                    )   SUPPRESS IDENTIFICATION
                                      )   TESTIMONY OF L.T.K.G.,
16   CURTIS DAVID FAHLBERG,           )   D.T.M.V., AND D.T.M.T.;
                                      )   DECLARATIONS.
17               Defendant.           )
                                      )   Hearing Date:  September 20, 2010
18   _____)   Hearing Time:  1:15 p.m.
                                          Court: Hon. Margaret M. Morrow
19
            Defendant Curtis David Fahlberg, by and through his counsel of record,
20
     Ronald Kaye, respectfully submits this Supplemental Reply to the Government's
21
     Supplemental Opposition to Defendant's Motion to Suppress Victim Identification
22
     Testimony.
23
     \\
24
     \\
25
     \\
26
     \\
27
     \\
28

1    This Reply is based upon the attached Memorandum of Points and Authorities,

2    the attached declarations, all files and records in this case, and any further evidence that

3    may be adduced at the hearing on this motion.

4

5                                          Respectfully submitted,

6

7                                          KAYE, McLANE & BEDNARSKI, LLP

8

9    DATED: August 15, 2010              By_____/S/_____
                                            RONALD O. KAYE
10                                          Attorneys for Curtis David Fahlberg

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2                                          **I.**

3                                   **INTRODUCTION**

4         In its effort to revive the interviews of the victim girls of this case, and contest

5    the opinions of Dr. Maloney and Professor Dialma, the government has retained Dr.

6    Wendy Freed, an advocate for abused children who has spent part of her professional

7    career focusing on Vietnamese child sex workers.[1]  As demonstrated in the attached

8    responsive declarations of Dr. Maloney and Professor Edialma, Dr. Freed's opinion

9    should not control this Court's analysis.

10        At this juncture, the case has changed significantly.  One of the victim girls,

11   D.T.M.E., will no longer be a charged victim in this case.  Further, outside of these

12   victim girls whose reliability the defense challenges, the *only* corroborating witness

13   to whether Mr. Fahlberg had sexual contact with minors at the Svay Pak brothels –

14   Mr. Fahlberg's driver, Channa Touch – has provided sworn testimony that Mr.

15   Fahlberg never advised him that he was having sexual relations with underage girls.

16   *See* Supplemental Briefing Regarding Evidence Gathered in Cambodia in Support of

17   Defendant's Motion to Suppress Victim Identification Testimony.  In fact, Mr. Touch

18   has provided exculpatory testimony that: 1) the majority of the prostitutes in Svay

19   Pak were adults; and 2) Mr. Fahlberg brought clothes, candy, school supplies and

20   school uniforms to all the children in the street – both girls and boys – when he

21   visited Svay Pak.  *Id.*

22        Moreover, three witnesses from three completely different social scenarios

23   during the relevant time period – 1) Mr. Fahlberg's interaction with youths in

24   Thailand; 2) Mr. Fahlberg's interaction with youths in the orphanage in Phnom Penh,

25   _____

26        [1]    The defense apologizes if this term offended Dr. Freed, but counsel has
     spoken to several professionals particularly familiar with this group – who reside in
27   the United States and Cambodia – who have not had the same response.  Based on
     this background, the defense continues to use this term, which in no way should
28   reflect any lesser sensitivity to this victimized group.

                                          1

1  Cambodia; and 3) Mr. Fahlberg's interaction with ex-patriots in the bar scene in

2  Phnom Penh – have testified under oath that Mr. Fahlberg does not have the

3  characteristic of being sexually interested in minors under 14 years old.  Finally, the

4  veracity of the e-mails that the government repeatedly brings before the Court to

5  reveal Mr. Fahlberg's true intent have been rebutted by Ms. Nantatorn Cha-ingram

6  ("Wenn"), who was the subject of a particularly problematic e-mail, and who testified

7  that references to any illicit sexual conduct in the e-mail are fictitious, and she

8  viewed them as a joke. *Id.*[2]

9       As demonstrated below, Dr. Freed's testimony does not contradict the

10  objective layers of evidence which challenge the integrity of the victim girls'

11  identification of Mr. Fahlberg, for which the Court has granted an evidentiary

12  hearing.  Unfortunately, Dr. Freed's  commitment to this victimized group reveals

13  substantial bias, and is problematic in a sensitive assessment of the admissibility of

14  evidence under a due process analysis.

15       Ultimately, the Court will decide the admissibility of the identification

16  testimony after an evidentiary hearing on September 20th.  The defense anticipates

17  that clear questioning of the victim girls, absent the influence of outside support, will

18  reveal the unconstitutional suggestibility and the unreliability of these identifications.

19                                      **II.**

20                                 **ARGUMENT**

21  A.   **DR. FREED'S DECLARATION DOES NOT UNDERMINE THE**

22       **DEFENSE'S POSITION**

23       Attached to this position are the sworn declarations of Dr. Maloney and

24

25       [2]     The emails produced by the government in this case were directed to one
    individual, Mr. Mark P. Sullivan. On July 2, 2007, Mr. Sullivan was interviewed by
26  ICE agents.  Mr. Sullivan stated that he has never observed Mr. Fahlberg ever have
    sexual relations, or bring up to his room, and girl who was under 18 years old; and
27  that "I thought Fahlberg was pretending to be a dirty old man." Sullivan ultimately
    stated, "I didn't have anything factual that FAHLBERG was doing anything wrong."
28

                                         2

1  Professor Dialma, which comment specifically on the critique of Dr. Freed.  Prior to

2   referencing specific sections of these declarations, it is important to note the

3  transparent bias of Dr. Freed.  This bias stems from the fact that Dr. Freed has spent

4  much of her career treating and advocating on behalf of abused children, particularly

5  those from Cambodia.   Dr. Freed has not developed expertise in assessing the

6  suggestibility of child victims, nor does her curriculum vitae reveal that she has any

7  forensic experience. While her commitment to the plight of this particular population

8  is commendable, such bias against Mr. Fahlberg has no place in a hearing reflecting

9  whether his due process rights will be violated by permitting the highly suggestive

10  and unreliable testimony of the victim girls.

11        For example, in her declaration, Dr. Freed specifically defends the motivation

12  of law enforcement interviews, specifically challenging the defense:

13            While the defense suggests some  nefarious purpose to this, I do
              not agree. If he had intentionally coached or rehearsed the
14            interview, why acknowledge it the moment the camera went on?
              Why not try to conceal it if this was something the agent was
15            seeking to hide?

16  Freed Dec. at ¶ 15(h).

17        Such support seems out of place for a psychological expert assessing the

18  credibility of the victim girls, and is more akin to that of government counsel.

19        A similar lack of objectivity is reflected in Dr. Freed's demonstrative concern

20  over the use of "child sex worker" by Professor Dialma. *Id.* at n. 1.  Unlike the

21  defense experts who have committed much of their careers to both protecting

22  children, and to recognizing the highly susceptible nature of such victims to

23  wrongfully identifying suspects of molestation, Dr. Freed shows no such impartiality.

24  Therefore, her opinion should be viewed according to what her expertise and

25  declaration reveal: she is an advocate and expert about the characteristics of  victims

26  of molestation, she is not an expert on assessing the suggestibility of Vietnamese

27  child sex workers to interviews and their lack of reliability.

28  //

3

**1. Professor Dialma's Declaration**

Attached hereto is Professor Dialma's declaration in response to Dr. Freed's critique. Dr. Freed essentially disagrees with Professor Dialma that the victim girls would comply with the expectations of the HAGAR representatives and law enforcement, but rather, opines that their allegiance is with their families and their pimps.

Professor Dialma does not disagree with the traditional allegiance of Vietnamese child sex workers, but clarifies:

> Based on my experience with AFESIP, the NGO had been providing food, shelter, education, counseling and other services for the victim girls. Although some victim girls do return to prostitution after being rescued by an NGO, many view the NGO as a great benefactor with a lot of money, who has provided them with resources they never previously obtained in their lives. Therefore, the girls have naturally become quite connected to the NGO and its representatives, and the girls would have significant loyalty and deference to these NGO representatives. From that background, the victim girls often try to please the NGO representatives in order to be in favor with them and not create conflict. This could easily result in the girls' agreement with the NGO representatives that a particular white, western man had abused them, even if they have no recollection of this fact.
>
> The fact that the law enforcement representative is working with the NGO representatives also makes the status of the law enforcement representative someone of moral authority. Therefore, it is clear to the interviewed girl that the NGO and law enforcement representative are working together. If the girls want to please the NGO representatives, which I believe is a natural consequence of having been rescued from child prostitution in Svay Pak, then they will equally want to please the white law enforcement representatives who are working with the NGO.

Dialma Declaration at ¶ 3.

In addition, Dr. Freed emphasizes the reluctance of the victim girls to disclose information to the NGO interviewers and to local law enforcement, in particular, to protect their family members and their pimp. In response, Professor Dialma agrees, but gives a more nuanced analysis:

> I agree with this position in situations where: 1) the girls are being interviewed by the NGO staff shortly after they have been rescued, 2) they are dealing with local Cambodian law enforcement, and 3) there is an investigation of the brothel where the girls were working.

4

1   However, my understanding of this case was that the girls had been
2   living with the NGO for a lengthy period of time, that it was obvious
    to the girls that Cambodian law enforcement representatives were
3   not involved in the interviews, and the focus was not on the brothels
    themselves.

4   As I described before, if the girls were living at the NGO for a
    substantial period of time, they would have significant loyalty and
5   deference to the expectations of the NGO staff, particularly if they
    were being interviewed in front of the NGO staff. Further, a child
6   prostitute can tend to protect parents and pimps by being reluctant
    during the early stages of interviewing (shortly after the police
7   arrived and people were arrested) and then become more compliant
    with the interviewers later.
8
    Also, I have been advised by attorney Ronald Kaye that the
9   interviews of the girls occurred in 2007. At that period, the brothels
    were likely closed and therefore there would be no link to the closure
10  of brothels.

11  In addition, local Cambodian police are notorious for being
    corrupt and violent, preying upon families in Svay Pak for not
12  cooperating with them. There is a qualitative difference between
    a white western law enforcement officer, accompanied by the
13  NGO staff member, trying to get information from the girls about
    a white, western man, as opposed to a local Cambodian police
14  officer trying to find information. With the Cambodian police
    officers, I would agree that the girls would not trust them and
15  would try and protect their family and / or their pimp. With a
    white western law enforcement officer accompanied by an NGO
16  representative, it is likely that the girl would try to cooperate and
    fulfill what they perceive are the expectations of these persons of
17  authority.

18  Dialma Dec. at ¶¶ 5-8.

19      Finally, Professor Dialma explains why the underlying premise of Dr. Freed

20  that the victim girls would not cooperate with law enforcement officials in order to

21  protect their family and to prevent retaliation from their pimps is limited in this

22  situation:

23      What I understand from attorney Ronald Kaye is the focus of the
        interviews with the girls was identifying Mr. Fahlberg.
24      Identifying a white, western man who is accused of having sex
        with the victim girls is not like identifying a pimp or a particular
25      brothel, or discussing any information about the family's
        complicity in prostituting the girls. My understanding from
26      attorney Ronald Kaye is that these girls were asked to pick out a
        photograph of Mr. Fahlberg, and explain what he did to them.
27      That information does not seem to impact the concerns that Dr.
        Freed discusses in her declaration. It is a clear example of the
28      type of activity where the girls would easily comply with the

5

authority of the interviewer and simply agree that Mr. Fahlberg
was the perpetrator.

Dialma Dec. at ¶ 9.

Thus, in this context, where the victim girls are living with the counselors from the NGO HAGAR for several years, where the brothels are closed, where the HAGAR representatives are collaborating with white, foreign law enforcement, and where the only information required of them is to point out an individual who allegedly violated them, Dr. Freed's cultural analysis of the factors supporting the reliability and lack of suggestibility of these victim girls is not compelling.

### 2.    Declaration of Dr. Maloney

Dr. Freed and Dr. Maloney appear to review the same materials, and reach completely different conclusions about the suggestibility of the interviews and the reliability of the victims girls' identifications.  As described above Dr. Freed's analysis reveals a substantial bias, whereas Dr. Maloney, who works on behalf of abused children in dependency court, as a forensic psychologist focusing on sex offenders, and is the Chief Psychologist of the Los Angeles County Jail, reveals no such agenda.

Ultimately, Dr. Maloney opines that there is substantial evidence supporting the likelihood that L.T.K.G. has been influenced by the law enforcement interviewers and the counselors at HAGAR.

According to Dr. Maloney, what Dr. Freed mistakenly focuses on is the lack of objective signs of intimidation during the interview of L.T.K.G.

> In her declaration, Dr. Freed focuses on what she characterizes to be the non-intimidating atmosphere of the interview.  She also emphasizes that L.T.K.G. does not appear intimidated, and the "therapist" (I have never been advised that the Khmer woman from the NGO HAGAR was a therapist) is not involved in the conversation. Freed Dec. ¶¶15 a-c.  I never opined that the interview itself appeared "intimidating."

> What Dr. Freed appears to misunderstand is that suggestibility does not necessarily equate to outward signs of intimidation, especially in a case like this where there are significant signs that L.T.K.G. had been practicing her answers.  If there were outward

6

> signs of intimidation, then L.T.K.G. would more likely freeze up and not be able to answer the questions in any fluid way. It seems highly unreasonable that any outward manifestations would be seen in this interview. By encouraging and supporting L.T.K.G. in her interview, the interviews inherently are supporting L.T.K.G.'s recitation of the answers that occurred in practice, with both the foreign law enforcement agents and with the HAGAR representatives. Outward signs of intimidation are exactly what law enforcement does not want shown in such interviews, and exactly why practice sessions are used. If the child follows the previously approved "script", then no intimidation is warranted.

Maloney Dec. at ¶¶ 3(b) & (c).

It is the passivity of the responses of L.T.K.G. – particularly when focusing on her first sexual experience which allegedly was forced, juxtaposed with the short latency period – that reveals a likelihood that L.T.K.G. is engaged in an exercise of memorization; reciting answers that have been practiced, accepted and possibly rewarded. It is quite probable that L.T.K.G. then believes that her answers will lead to the identification of a person who somehow should be held responsible for the tragic circumstances which made up her life prior to her rescue by the NGO. Maloney Dec. at ¶¶ 3(d), (e), (f) & (h). The following of the "script" is supported by these non-verbal characteristics, the fact that a practice session explicitly was referenced on video tape, but also possibly from her unlikely familiarity with the name "CD", regardless of the fact that she had sexual contact with "many" foreign men, and had been in the custody of the NGO for several years. *Id.* at 3(i).

Further, the lack of "fantastic or exaggerated details" does not impress Dr. Maloney as a significant factor bolstering L.T.K.G.'s credibility:

> Dr. Freed believes that the lack of "fantastic or exaggerated details" further strengthens her credibility. But if there were such blatantly unreliable details in the earlier interviews with the HAGAR representatives, it is reasonable that either directly or implicitly they would be omitted from the actual taped performance.

Maloney Dec. at ¶ 3(j).

Dr. Maloney's concluding paragraphs on L.T.K.G. reveal that he has substantial doubt in her reliability, regardless of Dr. Freed's efforts to poke holes in is

7

1  analysis:

> What I have reviewed, and what my extensive experience tells me, is that this interview was not reliable, and that L.T.K.G. shows multiple signs of being coached.  I do not speak Khmer, and I cannot discuss the accuracy of either the government's interpreter or the defendant's interpreter, but it is clear from many variables that I, as a professional who has worked in this field for several decades, do not trust the accuracy of L.T.K.G.'s responses during this interview.

> There is no doubt that L.T.K.G. had sexual relations with many men who were foreigners – an objectively long-term traumatic experience.  Further, L.T.K.G. admitted to having sexual relations with many men in a brothel style environment, which enhances the melding of the identities of different perpetrators. She also appears to have been receiving counseling with representatives of the NGO for several years, and has been prepared extensively for this interview. I do not know whether the defendant in this case is one of the men who engaged in this sexual conduct.  I do believe, however, based on my review of the video taped interview, and my extensive background in this field, that L.T.K.G. may have taken multiple incidents, accurately or inaccurately reported what occurred, and after being prepared by the HAGAR representatives and by law enforcement, adopted the defendant as the person who should take responsibility.  L.T.K.G. may in fact be unaware of this melding of events, and of her mistakenly inserting the defendant as the perpetrator, but from a psychological standpoint, it is unreasonable to ignore the strong possibility that this phenomenon is occurring.

Maloney Dec. at ¶¶ 3(k), (l) & (m).[3]

### 3.      Other Factors Undermining the Reliability of the Victim Girls

Outside of what has been discussed in the three defense pleadings leading up to the September 20, 2010 hearing, what follows are other items which call the reliability of the victim girls into question:

- *Use of French - both language and national identity*:

    Contrary to the government interpreter's analysis, "Barang" means "French", but "has also come to mean" foreigner. *See* http://www.wikipedia.org/wiki/Barang_(Khmer_word).  The fact that L.T.K.G. volunteers that the man "speaks French" strongly supports that

---

[3]      Dr. Maloney relies on his analysis in his initial declaration reflecting the suggestibility and lack of reliability of D.T.M.E. and D.T.M.T.

1    she incorrectly identifies Mr. Fahlberg as French. Government's Exhibit
2    A at 10.

3    • *Identification of Beung Kok*

4    L.T.K.G. specifically states that a photograph of her took place in Beung
5    Kok in Phnom Penh.[4]  Government Exhibit A at 2, and 14. As
6    demonstrated in Exhibit 1, attached hereto, the brothel district of Svay
7    Pak is not near the Beung Kok section of Phnom Penh.  Further, there is
8    no evidence that Mr. Fahlberg ever stayed in the Beung Kok section of
9    Phnom Penh.

10   • *The Failure to Produce any Evidence of Nude Photographs of L.T.K.G.*

11   L.T.K.G.  specifically states that Mr. Fahlberg took nude photographs of
12   her. Gov't Exhibit A at 17.  Although a search of every computer,
13   camera and telephone has been thoroughly reviewed by the government,
14   no such photograph has been uncovered.  Further, no forensic report has
15   revealed that such a photograph has been deleted.  Whoever did take
16   nude photographs of L.T.K.G., it was not Mr. Fahlberg.

17   • *Dispute Over the Sexual Acts of Mr. Fahlberg*

18   L.T.K.G. specifically states that Mr. Fahlberg had intercourse with her,
19   five or six times. Gov't Ex. A at 6.  However, she refused to engage in
20   oral sex with him. *Id.*  The first question is, if this perpetrator forced
21   L.T.K.G. to have intercourse, how likely is it that he would accept a
22   refusal for oral sex?  Moreover, D.T.M.T. states that Mr. Fahlberg
23   "never tried" to have sexual intercourse with her.  Gov't Ex. B at 16.
24   How likely is it that he would not follow the same sexual conduct with
25   two child prostitutes?  The inconsistent characterization of the specific

26

27   _____

     [4]    Contrary to the interpreter's representation, Beung Kok is not in Siem
28   Reap  – the city closest to Angkor Watt  – but is a section of Phnom Penh. *See* Exhibit
     1.

9

1    sexual acts of Mr. Fahlberg bolsters the fact that neither victim girl can

2    state with any accuracy that Mr. Fahlberg was the person who had

3    sexual contact with them.

4                                       **III.**

5                                  **CONCLUSION**

6        In paragraph 13 of her declaration, Dr. Freed states:

7            In a report for Physicians for Human Rights wrote in 1997
             discussing the commercial exploitation of women and children in
8            Cambodia, describe how the distortions, historical inaccuracies,
             and ambiguities that are part of a girl's accounts of her time as a
9            prostituted child have psychological meaning. There are *layers of
             truth* to the stories that the girls tell.

10       The defense is not proposing that everything the victim girls have said in their

11   interviews is fabricated. But when closely reviewing the video tapes reflecting the

12   interviews with the victim girls with multiple parties present after the likelihood of

13   multiple practice sessions, in conjunction with Dr. Maloney and Professor Dialma's

14   analysis, the identification of Mr. Fahlberg does not appear to be one of the layers of

15   the victim girls' descriptions which is truthful.

16       The suggestiveness and reliability problems with the photo identifications of

17   L.T.K.G., D.T.M.T. and D.T.M.E. are not a defense smoke screen, or a way of

18   confusing the issues. They go to the core of this case, and they reveal the likelihood

19   that the victim girls have wrongly identified Mr. Fahlberg.

20       Fundamental fairness calls for the Court to preclude the identification of Mr.

21   Fahlberg by the victim girls at trial.

22                                       Respectfully submitted,

23

24                                       KAYE, McLANE & BEDNARSKI, LLP

25

26
     DATED: August 15, 2010          By_____/S/_____
27                                       RONALD O. KAYE
                                         Attorneys for Curtis David Fahlberg
28

                                          10